# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Office of the Attorney General

★ ★ ★

**ATTORNEY GENERAL**
**BRIAN L. SCHWALB**

**Office of the Solicitor General**

November 3, 2023

<u>Via CM/ECF</u>

Mark J. Langer, Clerk of the Court
United States Court of Appeals
  for the District of Columbia Circuit
333 Constitution Avenue, NW
Washington, D.C. 20001

Re:     Submission under Federal Rule of Appellate Procedure Rule 28(j) in *District of Columbia v. Exxon Mobil Corp.*, No. 22-7163 (argument held May 8, 2023)

Dear Mr. Langer:

Appellee the District of Columbia submits this letter as supplemental authority under Rule 28(j). On October 31, in *City and County of Honolulu v. Sunoco LP*, No. SCAP-AA-429, the Supreme Court of the State of Hawai'i affirmed the denial of defendant oil and gas companies' motion to dismiss.

As relevant to the argument here, District Br. 17-19, 23-26, the court declined to adopt the Companies' "two-step" approach to preemption because "it engages in backwards reasoning." Slip op. 55. The court, in accord with precedent from several federal circuits and the U.S. Supreme Court, explained that "federal common law governing interstate pollution suits was displaced by the [Clean Air Act] and 'no longer exists.'" Slip op. at 55 (quoting *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1260 (10th Cir. 2022)). Once federal common law has been displaced, it "plays no part in [the] court's preemption analysis"; instead, the court's "task is to 'interpret and apply statutory law[.]'" Slip op. at 57 (quoting *Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 95 n.34 (1981)).

The court further held that "even if federal common law had not been displaced, Plaintiffs' claims would not be preempted by it" because "the source of Plaintiffs' alleged injury is [the Companies'] alleged failure to warn and deceptive promotion," "not pollution, nor emissions." Slip op. at 62; *see* District Br. 14-17.

---

Sincerely,

BRIAN L. SCHWALB
Attorney General

By:     /s/ Lucy E. Pittman
        LUCY E. PITTMAN
        Senior Assistant Attorney General

Cc: Counsel of Record (via CM/ECF)

Electronically Filed
Supreme Court
SCAP-22-0000429
31-OCT-2023
08:57 AM
Dkt. 74 OP

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

CITY AND COUNTY OF HONOLULU and HONOLULU BOARD OF WATER SUPPLY,
Plaintiffs-Appellees,

vs.

SUNOCO LP; ALOHA PETROLEUM, LTD.; ALOHA PETROLEUM LLC;
EXXON MOBIL CORPORATION; EXXONMOBIL OIL CORPORATION;
ROYAL DUTCH SHELL PLC; SHELL OIL COMPANY; SHELL OIL PRODUCTS
COMPANY LLC; CHEVRON CORPORATION; CHEVRON U.S.A. INC.;
BHP HAWAII INC.; BP PLC; BP AMERICA INC.; MARATHON PETROLEUM
CORPORATION; CONOCOPHILLIPS; CONOCOPHILLIPS COMPANY;
PHILLIPS 66; and PHILLIPS 66 COMPANY,
Defendants-Appellants,

and

BHP GROUP LIMITED and BHP GROUP PLC,
Defendants-Appellees.

SCAP-22-0000429

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-22-0000429; CASE NO. 1CCV-20-0000380)

October 31, 2023

RECKTENWALD, C.J., McKENNA, AND EDDINS, JJ.,
CIRCUIT JUDGE JOHNSON AND CIRCUIT JUDGE TONAKI,
ASSIGNED BY REASON OF VACANCIES,
AND EDDINS, J., CONCURRING

**\*\*\* FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER \*\*\***

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I.    INTRODUCTION

The City and County of Honolulu and the Honolulu Board of Water Supply (collectively, Plaintiffs) brought suit against a number of oil and gas producers[1] (collectively, Defendants) alleging five counts: public nuisance, private nuisance, strict liability failure to warn, negligent failure to warn, and trespass.  Defendants appeal the circuit court's denial of their motions to dismiss for both lack of jurisdiction and failure to state a claim.  We conclude that the circuit court properly denied both motions, and accordingly, this lawsuit can proceed.

Plaintiffs argue this is a traditional tort case alleging that Defendants engaged in a deceptive promotion campaign and misled the public about the dangers of using their oil and gas products.  Plaintiffs claim their theory of liability is simple: Defendants knew of the dangers of using their fossil fuel products, "knowingly concealed and misrepresented the climate impacts of their fossil fuel products," and engaged in "sophisticated disinformation campaigns to cast doubt on the science, causes, and effects of

---

[1]     Defendants are: Sunoco LP, Aloha Petroleum, Ltd., Aloha Petroleum LLC, Exxon Mobil Corporation, ExxonMobil Oil Corporation, Shell plc (f/k/a Royal Dutch Shell plc), Shell U.S.A. Inc. (f/k/a Shell Oil Company), Shell Oil Products Company LLC, Chevron Corporation, Chevron U.S.A. Inc., Woodside Energy Hawaii Inc. (f/k/a BHP Hawaii Inc.), BP plc, BP America Inc., Marathon Petroleum Corporation, ConocoPhillips, ConocoPhillips Company, Phillips 66, and Phillips 66 Company.  The circuit court dismissed BHP Group Limited and BHP Group plc – that dismissal was not appealed and is not before this court.

global warming," causing increased fossil fuel consumption and greenhouse gas emissions, which then caused property and infrastructure damage in Honolulu.  Simply put, Plaintiffs say the issue is whether Defendants misled the public about fossil fuels' dangers and environmental impact.

Defendants disagree.  They say this is another in a long line of lawsuits seeking to regulate interstate and international greenhouse gas emissions, all of which have been rejected.  Greenhouse gas emissions and global warming are caused by "billions of daily choices, over more than a century, by governments, companies, and individuals," and Plaintiffs "seek to recover from a handful of Defendants for the cumulative effect of worldwide emissions leading to global climate change and Plaintiffs' alleged injuries."  They argue: (1) the circuit court lacked specific jurisdiction over the Defendants; (2) Plaintiffs' claims are preempted by federal common law, which in turn, was displaced by the Clean Air Act (CAA); and (3) alternatively, Plaintiffs' claims are preempted by the CAA.

We agree with Plaintiffs.  This suit does not seek to regulate emissions and does not seek damages for interstate emissions.  Rather, Plaintiffs' complaint "clearly seeks to challenge the promotion and sale of fossil-fuel products without warning and abetted by a sophisticated disinformation campaign." Mayor & City Council of Baltimore v. BP P.L.C., 31 F.4th 178,

**\*\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\***

233 (4th Cir. 2022), <u>cert. denied</u>, 143 S. Ct. 1795 (2023) (characterizing a complaint brought against many of the same Defendants in this case alleging broadly the same counts, theory of liability, and injuries).  This case concerns torts committed in Hawai'i that caused alleged injuries in Hawai'i.

Thus, Defendants' arguments on appeal fail.  First, Defendants are subject to specific jurisdiction in Hawai'i because: (1) Plaintiffs' allegations that Defendants misled consumers about fossil fuels products' dangers "arise out of" and "relate to" Defendants' contacts with Hawai'i, i.e., Defendants' sale and marketing of those fossil fuel products in Hawai'i, <u>Ford Motor Co. v. Montana Eighth Judicial District Court</u>, 141 S. Ct. 1017, 1025 (2021); (2) it is reasonable for Hawai'i courts to exercise specific jurisdiction over Defendants, and doing so does not conflict with interstate federalism principles because Hawai'i has a "significant interest[] . . . [in] 'providing [its] residents with a convenient forum for redressing injuries inflicted by out-of-state actors,'" <u>see</u> <u>id.</u> at 1030 (quoting <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 473 (1985)); and (3) the Supreme Court has never imposed a "clear notice" requirement, <u>see</u> <u>id.</u> at 1025.

Second, the CAA displaced federal common law governing interstate pollution damages suits; after displacement, federal common law does not preempt state law.  See <u>Am. Elec. Power Co.</u>

4

v. Connecticut, 564 U.S. 410, 423-24 (2011) ("AEP"); Bd. of
Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.,
25 F.4th 1238, 1260 (10th Cir. 2022), cert. denied, 143 S. Ct.
1795 (2023) ("[T]he federal common law of nuisance that formerly
governed transboundary pollution suits no longer exists due to
Congress's displacement of that law through the CAA.").  We must
only consider whether the CAA preempts state law.  AEP, 564 U.S.
at 429 ("[T]he availability vel non of a state lawsuit depends
inter alia on the preemptive effect of the [CAA].").

     Third, the CAA does not preempt Plaintiffs' claims.
The CAA does not occupy the entire field of emissions
regulation.  See Merrick v. Diageo Ams. Supply, Inc., 805 F.3d
685, 695 (6th Cir. 2015) (determining that there is "no evidence
that Congress intended that all emissions regulation occur
through the [CAA's] framework").  There is no "actual conflict"
between Plaintiffs' state tort law claims and the CAA's
overriding federal purpose or objective.  See In re Methyl
Tertiary Butyl Ether (MTBE) Prod. Liab. Litig. (MTBE), 725 F.3d
65, 101 (2d Cir. 2013) (concluding that CAA did not preempt
state tort law claims relating to a gasoline additive where it
was possible to comply with both state and federal law).

     Therefore, we affirm the circuit court's orders
denying Defendants' motion to dismiss for lack of jurisdiction
and motion to dismiss for failure to state a claim.

**\*\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\***

## II.  BACKGROUND

### A.  Circuit Court Proceedings

#### 1.  Original complaint, removal, and remand

In March 2020, Plaintiffs filed their original complaint in the Circuit Court for the First Circuit alleging that for decades, Defendants knew their fossil fuel products caused greenhouse gas emissions and global warming, but they failed to warn consumers of the threat, and actively worked to discredit scientific evidence that supported the existence of global warming.  In April 2020, Defendants removed the case to federal court.  Defendants argued that removal jurisdiction was appropriate because federal common law governed, and the CAA and other federal statutes preempted Plaintiffs' claims.[2]

On Plaintiffs' motion, the federal district court remanded the case to state circuit court.  The federal court explained that the Ninth Circuit, in City of Oakland v. BP PLC, 969 F.3d 895, 906-08 (9th Cir. 2020), recently rejected

---

[2]    Defendants asserted eight grounds for federal jurisdiction: (1) the Outer Continental Shelf Lands Act (OCSLA) because "[a] significant portion of oil and gas exploration and production" occurs on the shelf; (2) the federal officer removal statute, see 28 U.S.C. § 1442(a)(1), because oil and gas production "took place under the direction of a federal officer to support critical national security, military, and other core federal government operations;" (3) federal enclave jurisdiction because some oil production occurred on federal enclaves like the Outer Continental Shelf; (4) federal common law, which defendants argue governs Plaintiffs' claims; (5) federal question jurisdiction because Plaintiffs' claims "necessarily raise[] federal questions under the [CAA], EPA and other federal regulations and international treaties on climate change to which the United States is a party;" (6) federal preemption by the CAA and other related statutes; (7) bankruptcy jurisdiction; and (8) admiralty jurisdiction.

Defendants' federal-common-law, federal-preemption, and federal-question-jurisdiction arguments. City & Cnty. of Honolulu v. Sunoco LP, No. 20-CV-00163-DKW-RT, 2021 WL 531237, at *2 n.8 (D. Haw. Feb. 12, 2021). The court explained that the "principal problem with Defendants' arguments is that they misconstrue Plaintiffs' claims." Id. at *1. "More specifically, contrary to Defendants' contentions, Plaintiffs have chosen to pursue claims that target Defendants' alleged concealment of the dangers of fossil fuels, rather than the acts of extracting, processing, and delivering those fuels." Id. Further, Plaintiffs' nuisance claims arise "not through [Defendants'] 'fossil fuel production activities,' . . . but through their alleged failure to warn about the hazards of using their fossil fuel products and disseminating misleading information about the same." Id. at *3.

On appeal, the Ninth Circuit affirmed the district court's order remanding the case to state circuit court. City & Cnty. of Honolulu v. Sunoco LP, 39 F.4th 1101, 1113 (9th Cir. 2022). Defendants filed an application for writ of certiorari to the U.S. Supreme Court, which was denied. Sunoco LP v. City & Cnty. of Honolulu, 143 S. Ct. 1795 (2023) (denying application for certiorari).

**\*\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\***

### 2.  First Amended Complaint

In its First Amended Complaint (Complaint), Plaintiffs added the Board of Water Supply (BWS) as a plaintiff and amended certain allegations to incorporate damages specific to BWS. Plaintiffs also added an allegation that the wrongful conduct giving rise to the second cause of action (private nuisance) was committed with actual malice, permitting punitive damages.

First, Plaintiffs allege that human activity is causing the atmosphere and oceans to warm, sea levels to rise, snow cover to diminish, oceans to acidify, and hydrologic systems to change.  Greenhouse gas emissions, which are largely a byproduct of combustion of fossil fuels, are the chief cause of this warming.  The accumulation of greenhouse gases in the atmosphere has adverse impacts on the earth, including: warming of the average surface temperature, resulting in increasingly frequent heatwaves; sea level rise; flooding of land and infrastructure; changes to the global climate, including longer periods of drought; ocean acidification; increased frequency of extreme weather; changes to ecosystems; and impacts on human health associated with extreme weather, decreased air quality, and vector-borne illnesses.

Next, Plaintiffs allege that Defendants knew about the dangers associated with their products because they, or their predecessors in interest, were members of the American Petroleum

*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

Institute (API).  Beginning in the 1950s, scientists warned the
API that fossil fuels were causing atmospheric carbon dioxide
levels to increase.  In 1965, President Lyndon B. Johnson's
Scientific Advisory Committee warned of global warming and the
catastrophic impacts that could result.  The API President
related these findings to industry leaders at the association's
annual meeting that year.  Plaintiffs allege that by 1965,
industry leaders were aware of the global warming phenomenon
caused by their products.  Defendants continued to gather
information on the climate change impacts of their products
throughout the 1960s, 1970s, and 1980s.

During the 1980s, many of the defendants in the
present case formed their own research units focused on climate
modeling.  API provided a forum where Defendants shared research
efforts and corroborated each other's findings.  Plaintiffs
allege that by 1988, Defendants "had amassed a compelling body
of knowledge about the role of anthropogenic greenhouse gases,
and specifically those emitted from the normal use of
Defendants' fossil fuel products, in causing global warming and
its cascading impacts[.]"

Plaintiffs allege that around 1990, public discussion
shifted from gathering information on climate change to
international efforts to curb emissions.  At this point,
Defendants – rather than collaborating with the international

9

*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

community to help curb emissions - "embarked on a decades-long campaign designed to maximize continued dependence on their products and undermine national and international efforts to rein in greenhouse gas emissions."  Defendants began a public relations campaign to cast doubt on the science connecting global climate change to their products.  Defendants promoted their products through misleading advertisements and funding "climate change denialist organizations."

According to Plaintiffs, Defendants' efforts to cast doubt on climate science continued throughout the 1990s and 2000s.  Defendants "bankroll[ed]" scientists with "fringe opinions" in order to create a false sense of disagreement in the scientific community.  Defendants' own scientists, experts, and managers had previously acknowledged climate change's effects.  At the same time, Defendants worked to change public opinion over climate change's existence and avoid regulation. Defendants funded dozens of think tanks, front groups, and dark money foundations pushing climate change denial, with ExxonMobil alone spending almost $31 million.

Plaintiffs allege that, while Defendants publicly cast doubt on climate change, they simultaneously invested in operational changes to prepare for its adverse consequences. For example, Defendants allegedly raised offshore oil platforms to protect against rising sea levels, reinforced them against

10

storms, and developed new technologies for extracting oil in places previously blocked by polar sea ice.

Defendants now claim they are investing in renewable energy, but Plaintiffs claim these statements are a pretense. Defendants' advertisements and promotional materials do not disclose the risks of their products, and they continue to ramp up fossil fuel production, including new fossil fuel development.

Plaintiffs allege that they have sustained damages caused by Defendants' failure to warn and deceptive promotion of dangerous products. Defendants' conduct "is a substantial factor in causing global warming," which has had adverse effects on Plaintiffs. These effects include sea level rise (causing flooding, erosion, and beach loss); more extreme weather events; ocean warming (causing destruction of coral reefs); loss of endemic species; and diminished availability of fresh water. Because of Defendants' conduct, Plaintiffs suffered damage to their facilities and property, incurred increased planning and preparation costs to adapt communities to global warming's effects, collected less tax revenue due to impacts on tourism, and suffered the cost of public health impacts such as an increase in heat-related illnesses. Plaintiffs have already suffered damage to beach parks, roads, and drain way infrastructure from flooding and sea level rise.

Plaintiffs bring five counts under state law: public nuisance, private nuisance, strict-liability failure to warn, negligent failure to warn, and trespass.  All counts rely on the same theory of liability: Defendants knew about the dangers of using their fossil fuel products, failed to warn consumers about those known dangers, and engaged in a sophisticated disinformation campaign to increase fossil fuel consumption, all of which exacerbated the impacts of climate change in Honolulu.

### 3.   **Defendants' joint motions to dismiss**

Defendants filed two motions to dismiss, the first for lack of jurisdiction and the second for failure to state a claim.  In their first motion to dismiss, Defendants argued the circuit court did not have specific jurisdiction because

> "(1) the Complaint avers, as it must, that Plaintiffs' alleged injuries arise out of and relate to <u>worldwide</u> conduct by countless actors, not Defendants' alleged contacts with Hawai'i; (2) Defendants did not have 'clear notice' that as a result of their activities in Hawai'i they could be sued here for activity occurring around the world; and (3) exercising jurisdiction would be constitutionally unreasonable."

In their second motion to dismiss, Defendants argued: (1) Plaintiffs' claims are interstate pollution claims, which must be brought under federal common law, not state common law, and that the CAA preempts interstate pollution federal common law claims; or alternatively, (2) Plaintiffs' state common law claims are preempted by the CAA.  Plaintiffs opposed.

12

*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

At the motion hearing, Plaintiffs summarized their theory of liability, which is central to the jurisdictional and preemption issues on appeal.  Plaintiffs explained that defendants "concealed and misrepresented the climate impacts of their products, using sophisticated disinformation campaigns to discredit the science of global warming."  Defendants also allegedly misled "consumers and the rest of the world about the dangers of using their products as intended in a profligate manner."  Thus, "these deceptive commercial activities . . . inflated the overall consumption of fossil fuels, which increased greenhouse gas emissions, which exacerbated climate change, which created the hazardous environmental conditions" that have allegedly injured Plaintiffs.

**4.    The circuit denied Defendants' motions to dismiss**

The circuit court subsequently denied both motions.[3]

The circuit court denied Defendants' motion to dismiss for lack of jurisdiction, concluding that it had specific jurisdiction because Plaintiffs' claims arose out of and related to Defendants' sales and marketing contacts in Hawai'i.  See, e.g., Ford Motor, 141 S. Ct. at 1025.  The circuit court also determined it would be reasonable to exercise specific

---

[3]    The Honorable Jeffrey P. Crabtree presided.

13

jurisdiction over Defendants.  See Hawaii Forest & Trial Ltd. v. Davey, 556 F. Supp. 2d 1162, 1168-72 (D. Haw. 2008).

The circuit court also denied Defendants' joint motion to dismiss for failure to state a claim.  The court explained that the standard for the review of a motion to dismiss "is generally limited to the allegations in the complaint, which must be deemed true for purposes of the motion," Kahala Royal Corp. v. Goodsill Anderson Quinn & Stifel, 113 Hawai'i 251, 266, 151 P.3d 732, 747 (2007), but courts are "not required to accept conclusory allegations," Civ. Beat L. Ctr. for the Pub. Int., Inc. v. City & Cnty. of Honolulu, 144 Hawai'i 466, 474, 445 P.3d 47, 55 (2019).  And "the issue is not solely whether the allegations as currently pled are adequate."  Rather, "[a] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim that would entitle him or her to relief under any set of facts or any alternative theory."  (Citations omitted).

The circuit court first concluded that City of New York v. Chevron Corp., 993 F.3d 81 (2d Cir. 2021), cited by Defendants, "has limited application to this case, because the claims in the instant case are both different from and were not squarely addressed in [that] opinion."  The circuit court then determined that federal common law did not govern Plaintiffs'

*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

state law claims.  The circuit court also determined that

Plaintiffs' claims were not preempted by the CAA.

The circuit court also rejected Defendants' argument

that a large damages award in this case could act as a de facto

emissions regulation because an unfavorable judgment would "not

prevent Defendants from producing and selling as much fossil

fuels as they are able, as long as Defendants make the

disclosures allegedly required, and do not engage in

misinformation."  The circuit court concluded:

> A broad doctrine that damages awards in tort cases
> impermissibly regulate conduct and are thereby preempted
> would intrude on the historic powers of state courts.  Such
> a broad "damages = regulation = preemption" doctrine could
> preempt many cases common in state court, including much
> class action litigation, products liability litigation,
> claims against pharmaceutical companies, and consumer
> protection litigation.

Last, the circuit court concluded that it was

appropriate for state common law to govern Plaintiffs' claims:

> Defendants argue (and the City of New York opinion
> expresses) that climate change cases are based on "artful
> pleading."  Respectfully, we often see "artful pleading" in
> the trial courts, where new conduct and new harms often
> arise:
>
>> The argument that recognizing the tort will
>> result in a vast amount of litigation has accompanied
>> virtually every innovation in the law.  Assuming that
>> it is true, that fact is unpersuasive unless the
>> litigation largely will be spurious and harassing.
>> Undoubtedly, when a court recognizes a new cause of
>> action, there will be many cases based on it.  Many
>> will be soundly based and the plaintiffs in those
>> cases will have their rights vindicated.  In other
>> cases, plaintiffs will abuse the law for some
>> unworthy end, but the possibility of abuse cannot
>> obscure the need to provide an appropriate remedy.
>
> Fergerstrom v. Hawaiian Ocean View Estates, 50 Haw. 374,
> 377 (1968) (opinion by Levinson, J.)[.]  Here, the causes

15

**\*\*\* FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER \*\*\***

> of action may seem new, but in fact are common.  They just
> seem new due to the unprecedented allegations involving
> causes and effects of fossil fuels and climate change.
> Common law historically tries to adapt to such new
> circumstances.

The circuit court then granted Defendants leave to file an interlocutory appeal.

**B.   Appellate Proceedings**

Defendants timely filed their joint notice of interlocutory appeal from the circuit court's Order Denying Defendants' Joint Motion to Dismiss for Failure to State a Claim and its Order Denying Defendants' Joint Motion to Dismiss for Lack of Personal Jurisdiction.  This court subsequently granted Plaintiffs' application for transfer from the Intermediate Court of Appeals.

On appeal, Defendants frame this case as one where Plaintiffs "seek[] to hold Defendants liable under Hawaiʻi tort law for harms allegedly attributable to global climate change."  This case should be dismissed because "these emissions flow from billions of daily choices, over more than a century, by governments, companies, and individuals about what types of fuels to use, and how to use them."  Plaintiffs "seek to recover from a handful of Defendants for the cumulative effect of worldwide emissions leading to global climate change and Plaintiffs' alleged injuries."

Plaintiffs dispute Defendants' characterization of the Complaint. Plaintiffs argue that the Complaint does "not ask for damages for <u>all</u> effects of climate change; rather, [it] seek[s] damages only for the effects of climate change allegedly <u>caused</u> by Defendants' breach of Hawai'i law regarding failure to disclose, failures to warn, and deceptive promotion." Plaintiffs contend their Complaint is "straightforward": "Defendants knowingly concealed and misrepresented the climate impacts of their fossil fuel products" and that "deception inflated global consumption of fossil fuels, which increased greenhouse gas emissions, exacerbated climate change, and created hazardous conditions in Hawai'i." Despite Defendants' contention that this suit seeks to regulate fossil fuel production, "so long as Defendants start warning of their products' climate impacts and stop spreading climate disinformation, they can sell as much fossil fuel as they wish without fear of incurring further liability."

Defendants raise three points of error: (1) the circuit court lacked specific jurisdiction over the Defendants; (2) Plaintiffs' claims are preempted by federal common law, which in turn, was displaced by the CAA; and (3) alternatively, Plaintiffs' claims are preempted by the CAA.

First, Defendants argue that specific jurisdiction does not attach because: (1) Plaintiffs cannot show that their

17

**\*\*\* FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER \*\*\***

claims "arise out of or relate to," Ford Motor, 141 S. Ct. at
1025, Defendants' contacts with Hawaiʻi because Plaintiffs'
alleged injuries did not "occur in-state as a result of the use
of the product in-state;" (2) Defendants' in-state conduct "did
not reasonably place them on clear notice" they would be subject
to specific jurisdiction in Hawaiʻi as required by the federal
Due Process Clause; and (3) the exercise of "personal
jurisdiction here would conflict with federalism principles"
limiting state jurisdiction in areas of national interest.

Plaintiffs dispute Defendants' arguments, contending:
(1) the U.S. Supreme Court explained in Ford Motor that it had
"never framed the specific jurisdiction inquiry as always
requiring proof of causation — i.e., proof that the plaintiff's
claim came about because of the defendant's in-state conduct,"
id. at 1026; (2) Defendants had fair warning they could be haled
into Hawaiʻi courts, and Ford Motor did not create a "clear
notice" requirement, id. at 1027; and (3) Plaintiffs' suit does
not interfere with national energy policy because Defendants can
continue to produce as much oil as they want as long as they
stop their tortious marketing conduct.

Second, Defendants argue that Plaintiffs' state law
claims are governed by federal common law "because they seek
redress for harms allegedly caused by interstate and
international emissions."  Relying on City of New York,

18

\*\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\*

Defendants say that federal common law preempts Plaintiffs' state common law tort claims, and in turn, the CAA preempts the federal common law.  See City of New York, 993 F.3d at 93-96. Defendants contend that "[o]nce this court correctly concludes that Plaintiffs' claims are necessarily governed by federal law, it follows that Plaintiffs also have no remedy under federal law."

Plaintiffs counter that the CAA displaced federal common law governing interstate pollution, and that law "no longer exists."  Boulder, 25 F.4th at 1260; see also AEP, 564 U.S. at 423.  Plaintiffs claim that "once federal common law disappears, the question of state law preemption is answered solely by reference to federal statutes, not the ghost of some judge-made federal law."  See AEP, 564 U.S. at 429 ("[T]he availability . . . of a state lawsuit depends . . . on the preemptive effect of the [CAA].").  According to Plaintiffs, the proper preemption analysis requires examining only whether the CAA preempts their state law claims.  The court need not consider first whether displaced federal common law preempts Plaintiffs' state claims, and second whether displaced federal common law is preempted by the CAA.

Third and finally, Defendants alternatively argue that the CAA preempts Plaintiffs' claims.  Defendants say Plaintiffs seek damages for injuries allegedly caused by out-of-state

sources' emissions.  Relying on N. Carolina ex rel. Cooper v.
Tenn. Valley Auth., 615 F.3d 291, 303, 306 (4th Cir. 2010),
Defendants contend that the "CAA preempts state-law claims
concerning out-of-state emissions."  Plaintiffs counter that the
"CAA does not concern itself in any way with the acts that
trigger liability under [its] Complaint, namely: the use of
deception to promote the consumption of fossil fuel products."
They say the CAA regulates "pollution-generating emissions from
both stationary sources, such as factories and powerplants, and
moving sources, such as cars, trucks, and aircraft," Util. Air
Regul. Grp. v. EPA, 573 U.S. 302, 308 (2014), not the
traditional state tort claims for failure to warn and deceptive
promotion.

### III. STANDARD OF REVIEW

**A.    Motion to Dismiss**

> A trial court's ruling on a motion to dismiss is
> reviewed de novo.  The court must accept plaintiff's
> allegations as true and view them in the light most
> favorable to the plaintiff; dismissal is proper only if it
> appears beyond doubt that the plaintiff can prove no set of
> facts in support of his or her claim that would entitle him
> or her to relief.

Delapinia v. Nationstar Mortg. LLC, 150 Hawaiʻi 91, 97-98, 497
P.3d 106, 112-13 (2021) (quoting Goran Pleho, LLC v. Lacy, 144
Hawaiʻi 224, 236, 439 P.3d 176, 188 (2019)).

*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

B.    Jurisdiction

        "A trial court's determination to exercise personal jurisdiction is a question of law reviewable de novo when the underlying facts are undisputed."  Shaw v. N. Am. Title Co., 76 Hawai'i 323, 326, 876 P.2d 1291, 1294 (1994) (citing Bourassa v. Desrochers, 938 F.2d 1056, 1057 (9th Cir. 1991)).  Plaintiffs "need make only a prima facie showing that: (1) [defendant's] activities in Hawai'i fall into a category specified by Hawai'i's long-arm statute, [Hawai'i Revised Statutes (HRS)] § 634-35; and (2) the application of HRS § 634-35 comports with due process."  Id. at 327, 876 P.3d at 1295 (citing Cowan v. First Ins. Co. of Hawai'i, 61 Haw. 644, 649, 608 P.2d 394, 399 (1980)).  When the circuit court relies on pleadings and affidavits, without conducting an "'full-blown evidentiary hearing,'" the plaintiff's "'allegations are presumed true and all factual disputes are decided in [plaintiff's] favor.'"  Id. (citations omitted).

C.    Preemption

        Questions of federal preemption "are questions of law reviewable de novo under the right/wrong standard."  Rodrigues v. United Pub. Workers, AFSCME Loc. 646, AFL-CIO, 135 Hawai'i 316, 320, 349 P.3d 1171, 1175 (2015).

**\*\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\***

## IV.  DISCUSSION

We affirm the circuit court's orders denying Defendant's motions to dismiss.  Similar to <u>Baltimore</u>, Plaintiffs' Complaint "clearly seeks to challenge the promotion and sale of fossil-fuel products without warning and abetted by a sophisticated disinformation campaign."  31 F.4th at 233. While Plaintiffs' Complaint does reference global emissions repeatedly, "these references only serve to tell a broader story about how the unrestrained production and use of Defendants' fossil-fuel products contribute to greenhouse gas pollution." <u>Id.</u>  Plaintiffs do "not merely allege that Defendants contributed to climate change and its attendant harms by producing and selling fossil-fuel products; it is the concealment and misrepresentation of the products' known dangers - and the simultaneous promotion of their unrestrained use - that allegedly drove consumption, and thus greenhouse gas pollution, and thus climate change."  <u>Id.</u> at 233-34.

As the circuit court explained:

> The court recognizes that nuisance, trespass, and failure to warn vary somewhat in terms of their specific elements.  All of these claims, however, share the same basic structure of requiring that a defendant engage in tortious conduct that causes injury to a plaintiff. Moreover, as the court understands it, Plaintiffs are relying on the same basic theory of liability to prove each of their claims, namely: that Defendants' failures to disclose and deceptive promotion increased fossil fuel consumption, which - in turn - exacerbated the local impacts of climate change in Hawai'i.

22

**\*\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\***

Because this is a traditional tort case alleging Defendants misled consumers and should have warned them about the dangers of using their products, Defendants' arguments fail. Defendants' contacts with Hawai'i (selling oil and gas here) arise from and relate to Plaintiffs' claims (deceptive promotion and failure to warn about the dangers of using the oil and gas sold here). Defendants are alleged to have engaged in tortious acts in Hawai'i and have extensive contacts in Hawai'i, and it is therefore reasonable for Defendants to be haled into court here. Further, neither displaced federal common law nor the CAA preempts Plaintiffs' state-law tort claims.

## A.   Defendants Are Subject to Specific Jurisdiction in Hawai'i

Specific jurisdiction attaches where (1) Defendants' activity falls under the State's long-arm statute, and (2) the exercise of jurisdiction comports with due process. See Shaw, 76 Hawai'i at 327, 876 P.2d at 1295. As we recently explained, "the two-step inquiry may in fact be redundant" because Hawai'i's long-arm statute "was adopted to expand the jurisdiction of the State's courts to the extent permitted by the due process clause of the Fourteenth Amendment." Yamashita v. LG Chem, Ltd., 152 Hawai'i 19, 21-22, 518 P.3d 1169, 1171-72 (2022), opinion after certified question answered, 62 F.4th 496 (9th Cir. 2023) (quoting Cowan, 61 Haw. at 649, 608 P.2d at 399). But while "this collapsed inquiry yields the same practical result as the

two-step test" and is "not improper," "there is value in
remembering that personal jurisdiction rests on both negative
federal limits and positive state assertions of jurisdiction."
Id. at 22, 518 P.3d at 1172.  Accordingly, we engage in the two-
step test outlined in Yamashita.

        First, Defendants' activity in Hawai'i falls under the
long-arm statute.  Plaintiffs' Complaint alleges that Defendants
conducted fossil fuel business in Hawai'i, committed torts in
Hawai'i, and caused injury in Hawai'i.  See HRS § 634-35(a)
(1)-(2)(2016)[4] (persons subject to Hawai'i's personal
jurisdiction when transact business or commit tort within
state).  Further, Defendants did not dispute below and do not
dispute on appeal that their in-state activity falls under the
long-arm statute.

        Second, exercising specific jurisdiction over
Defendants comports with due process.  Specific jurisdiction

_____

        [4]    HRS § 634-35, Hawai'i's long-arm statute, provides:

        **Acts submitting to jurisdiction.**  (a) Any person, whether or not
        a citizen or resident of this State, who in person or through an
        agent does any of the acts hereinafter enumerated, thereby
        submits such person, and, if an individual, the person's personal
        representative, to the jurisdiction of the courts of this State
        as to any cause of action arising from the doing of any of the
        acts:
            (1) The transaction of any business within this State;
            (2) The commission of a tortious act within this State;
            (3) The ownership, use, or possession of any real estate
        situated in this State;
            (4) Contracting to insure any person, property, or risk
        located within this State at the time of contracting.

comports with due process where: (1) defendants "purposefully
avail[ed] [themselves] of the privilege of conducting activities
in the forum, thereby invoking the benefits and protections of
its laws"; (2) plaintiffs' claim "arises out of or relates to
the defendant[s'] forum-related activities"; and (3) exercising
specific jurisdiction "comport[s] with fair play and substantial
justice, i.e. it must be reasonable." Int. of Doe, 83 Hawaiʻi
367, 374, 926 P.2d 1290, 1297 (1996). This three-part test is
"commonly referred to as the minimum contacts test." Greys Ave.
Partners, LLC v. Theyers, 431 F. Supp. 3d 1121, 1128 (D. Haw.
2020). "The minimum contacts test 'ensures that a defendant
will not be haled into a jurisdiction solely as a result of
random, fortuitous, or attenuated contacts[.]'" Freestream
Aircraft (Bermuda) Ltd. v. Aero L. Grp., 905 F.3d 597, 603 (9th
Cir. 2018) (quoting Burger King, 471 U.S. at 475).

        Defendants do not contest the first prong of the
minimum contacts test - that they "purposefully avail[ed]"
themselves of the forum. See id. Therefore, at issue is
whether Plaintiffs' claims "arise out of or relate to"
Defendants' Hawaiʻi contacts and whether the exercise of specific
jurisdiction is reasonable. Ford Motor, 141 S. Ct. at 1025.
Defendants further argue that, under Ford Motor, they did not
have "clear notice" they could be subject to specific

jurisdiction in Hawai'i.  Id. at 1030 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

As set forth below, Defendants are subject to specific jurisdiction in Hawai'i because: (1) Plaintiffs' allegations that Defendants misled consumers about the dangers of using their products "arise out of" and "relate to" Defendants' contacts with Hawai'i, here Defendants' sale and promotion of oil and gas in Hawai'i, id. at 1025 (quoting Bristol-Myers Squibb Co. v. Superior Ct. of Cal., 137 S. Ct. 1773, 1786 (2017)); (2) it is reasonable for Hawai'i courts to exercise specific jurisdiction over Defendants and doing so does not conflict with interstate federalism principles because Hawai'i has a "significant interest[] [in] 'providing [its] residents with a convenient forum for redressing injuries inflicted by out-of-state actors,'" see id. at 1030 (quoting Burger King, 471 U.S. at 473); and (3) the U.S. Supreme Court has never imposed a "clear notice" requirement, despite having the opportunity to do so, see id. at 1025.

Courts typically analyze jurisdictional contacts on a claim-by-claim basis.  See, e.g., Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 274-75 (5th Cir. 2006).  But courts "need not assess contacts on a claim-by-claim basis if all claims arise from the same forum contacts."  See, e.g., Moncrief Oil Int'l Inc. v. OAO Gazprom, 414 S.W.3d 142, 150-51

(Tex. 2013).  Plaintiffs bring five claims: public nuisance, private nuisance, strict liability failure to warn, negligent failure to warn, and trespass.  Plaintiffs' claims all arise from the same alleged forum contacts for all Defendants – here, Defendants' products were transported, traded, distributed, promoted, marketed, refined, manufactured, sold, and/or consumed in Hawai'i.  Plaintiffs' claims also all arise from the same alleged acts – here, Defendants' deceptive promotion of and failure to warn about the dangers of using oil and gas.  Accordingly, we examine all claims against all Defendants together.  See id.

### 1.    Plaintiffs' claims "arise out of or relate to" Defendants' in-state conduct

Quoting Ford Motor, Defendants argue that when personal jurisdiction is based on "'advertising, selling, and servicing,'" the alleged injuries must be "caused by the use and malfunction of the defendant's products within the forum State" for specific jurisdiction to attach.  141 S. Ct. at 1022.  In short, Defendants say "the injury must occur in-state as a result of the use of the product in-state" for specific jurisdiction to attach.  In this case, Defendants contend that Hawai'i is a small state, with only 0.02% of the world's population, that accounts for only 0.06% of the world's carbon dioxide emissions per year.  Quoting Native Vill. of Kivalina v.

27

*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

ExxonMobil Corp., Defendants argue that "'the undifferentiated
nature of greenhouse gas emissions from all global sources and
their world-wide accumulation over long periods of time' mean
that 'there is no realistic possibility of tracing any
particular alleged effect of global warming to any particular
emissions by any specific person, entity, [or] group at any
particular point in time.'"[5]  663 F. Supp. 2d 863, 876 (N.D. Cal.
2009) ("Kivalina I"), aff'd, 696 F.3d 849 (9th Cir. 2012).
Given the "undifferentiated nature of greenhouse gas emissions,"
Defendants argue the circuit court erred in asserting specific
jurisdiction.

---

[5]    In Kivalina I, the Village of Kivalina brought a federal common
law nuisance claim for damages against 24 oil, energy, and utility companies.
663 F. Supp. 2d at 868.  Defendants' Kivalina I quotations are taken from the
court's Article III standing analysis, not from an analysis of whether the
court had specific jurisdiction under the minimum contacts test.  See id. at
881.  The court concluded that because Kivalina sought damages for greenhouse
gas emissions, which come from "global sources and their worldwide
accumulation", the "multitude of alternative culprits" meant Kivalina could
not establish its injury was fairly traceable to Defendants.  Id. at 880-81
(quotation marks omitted).  Accordingly, the court dismissed the case for
lack of standing.  Id. at 882.  Kivalina I involved different claims than
those before us in this case, and was disposed of on standing, not minimum
contacts grounds – it is inapposite with respect to Defendants'
jurisdictional arguments.  See id. at 868, 882.

       But Native Vill. of Kivalina v. ExxonMobil Corp., 696 F.3d 849
(9th Cir. 2012) ("Kivalina II") is relevant to Defendants' federal common law
arguments.  There, the Ninth Circuit affirmed the trial court's dismissal for
lack of jurisdiction in Kivalina I, but not because Kivalina lacked standing.
Id. at 856-58.  Instead, the Ninth Circuit determined that "AEP extinguished
Kivalina's federal common law public nuisance damage action, along with the
federal common law public nuisance abatement actions."  696 F.3d at 858.
Accordingly, Kivalina could not bring its federal common law nuisance claim,
and dismissal was proper.  Id.

We agree with Plaintiffs that "Defendants' arguments for reversal flow[] from a single, fatally flawed premise: they say, in various formulations, that they can only be subject to personal jurisdiction if the climate change injuries Plaintiffs allege were <u>caused by</u> Defendants' fossil fuels being burned <u>in Hawaiʻi</u>."[6]  Indeed, the U.S. Supreme Court rejected an argument similar to Defendants' causation argument in <u>Ford Motor</u>, holding that the "causation-only approach finds no support in this Court's requirement of a 'connection' between a plaintiff's suit and a defendant's activities."  141 S. Ct. at 1026.

In <u>Ford Motor</u>, the U.S. Supreme Court consolidated two cases with the same underlying facts: in both, there was a car accident <u>in the forum state</u> involving an allegedly malfunctioning Ford vehicle designed, manufactured, and sold <u>outside of the forum state</u>.  <u>Id.</u> at 1023.  Ford moved to dismiss both cases, arguing that "the state court . . . had jurisdiction only if the company's conduct in the State had given rise to the plaintiff's claims."  <u>Id.</u>  Ford argued that a "causal link" was required: it was only subject to specific jurisdiction in the forum state "if the company had designed, manufactured, or –

---

[6]      Defendants' causation arguments are better saved for the merits stage of this litigation where Plaintiffs must prove causation with respect to all of its tort claims.  Of course, we express no opinion as to the validity of those arguments.

29

most likely – sold in the State the particular vehicle involved in the accident."  Id.

    The Supreme Court held that for specific jurisdiction to attach, a defendant "must take 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State.'"  Id. at 1024 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).  "The contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.'"  Id. at 1025 (quoting Keeton v. Hustler Mag., Inc., 465 U.S. 770, 774 (1984)).  The contacts "must show that the defendant deliberately 'reached out beyond' its home — by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there."  Id. (quoting Walden v. Fiore, 571 U.S. 277, 285 (2014)).

    Accordingly, for specific jurisdiction to attach, a plaintiff's claims "'must arise out of or relate to defendant's contacts' with the forum."  Id. (quoting Bristol-Myers, 137 S. Ct. at 1786).  "The first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing."  Id. at 1026.  Ford Motor thus requires only "a 'connection' between a plaintiff's suit and a defendant's activities" for specific jurisdiction to attach.  Id. at 1026 (quoting Bristol-Myers, 137 S. Ct. at 1776).  "Or put just a bit

*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

differently, there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation."  Id. at 1025 (quoting Bristol-Myers, 137 S. Ct. at 1779) (quotation marks omitted).

Similar to Defendants' arguments here, the Ford Motor defendants contended that the link between their forum contacts and plaintiffs' claims "must be causal in nature: Jurisdiction attaches 'only if the defendant's forum conduct gave rise to the plaintiff's claims.'"  Id. at 1026.  But the Supreme Court made clear that it has "never framed the specific jurisdiction inquiry as always requiring proof of causation — i.e., proof that the plaintiff's claim came about because of the defendant's in-state conduct."  Id.

The Court relied on World-Wide Volkswagen, 444 U.S. at 295, which "held that an Oklahoma court could not assert jurisdiction over a New York car dealer just because a car it sold later caught fire in Oklahoma."  Ford Motor, 141 S. Ct. at 1027.  The World-Wide Volkswagen court "contrasted the dealer's position to that of two other defendants — Audi, the car's manufacturer, and Volkswagen, the car's nationwide importer (neither of which contested jurisdiction)."  Id.  "[I]f Audi and Volkswagen's business deliberately extended into Oklahoma (among other States), then Oklahoma's courts could hold the companies

31

accountable for a car's catching fire there — even though the
vehicle had been designed and made overseas and sold in New
York."  Id.  And while "technically 'dicta,'" the
Audi/Volkswagen scenario from World-Wide Volkswagen has become
the "paradigm case of specific jurisdiction" and has been
"reaffirmed" in other cases.  Id. at 1027-28.  This paradigm
case appeared again in Daimler, where the court again "did not
limit jurisdiction to where the car was designed, manufactured,
or first sold."  Id. at 1028.

        Turning back to the facts in Ford Motor, the Court
explained that "[b]y every means imaginable - among them,
billboards, TV and radio spots, print ads, and direct mail -
Ford urges [people in the forum states] to buy its vehicles."
Id.  Ford dealers regularly maintained and repaired Ford cars,
and Ford distributed replacement parts throughout both states.
Id.  Ford "systematically served a market in [the forum states]
for the very vehicles that the plaintiffs allege malfunctioned
and injured them in those States."  Id.  Accordingly, "there is
a strong 'relationship among the defendant, the forum, and the
litigation' – the 'essential foundation' of specific
jurisdiction."  Id.  (quoting Helicopteros Nacionales de
Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984)).

        The same is true here.  Defendants do not contest that
they purposefully availed themselves of the rights and

*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

privileges of conducting extensive business in Hawai'i.  Indeed, the Complaint alleges that each Defendant conducted substantial business in Hawai'i.  Each defendant is alleged to have transported, traded, distributed, promoted, marketed, refined, manufactured, sold, and/or consumed oil and gas in Hawai'i.  Plaintiffs also allege that Defendants failed to warn consumers in Hawai'i about the dangers of using the oil and gas Defendants sold in the state and that Defendants engaged in a deceptive marketing campaign to conceal, deny, and discredit efforts to make those dangers known to the public.  Plaintiffs further allege that Defendants' tortious failure to warn and deceptive promotion caused extensive injuries in Hawai'i, including:

> injury or destruction of City - or [Honolulu Board of Water Supply] - owned or operated facilities and property deemed critical for operations, utility services, and risk management, as well as other assets that are essential to community health, safety, and well-being; increased planning and preparation costs for community adaptation and resiliency to global warming's effects; decreased tax revenue due to impacts on the local tourism - and ocean-based economy; increased costs associated with public health impacts; and others.

Just as in Ford Motor, "there is a strong 'relationship among the defendant, the forum, and the litigation' – the 'essential foundation' of specific jurisdiction."  See id. (quoting Helicopteros, 466 U.S. at 414).  Defendants sold and marketed oil and gas in Hawai'i, availed themselves of Hawai'i markets and laws, and the at-issue litigation alleges tortious acts and damages in Hawai'i that

33

"arise out of" or "relate to" Defendants Hawai'i contacts, i.e.,
oil and gas business conducted in the state.  See id. at 1026.
Indeed, the connection between Defendants, Hawai'i, and this
litigation is more closely intertwined than that of Ford Motor.
See id. at 1028.  Unlike in Ford Motor, here, the alleged
injury-causing products (oil and gas) were marketed and sold in
the forum state.  See id.  Therefore, Defendants are subject to
specific jurisdiction because there is a clear and unambiguous
"affiliation between the forum and the underlying controversy."
See id. (quoting Bristol-Myers, 137 S. Ct. at 1779) (quotation
marks omitted).

        Defendants rely on Martins v. Bridgestone Am. Tire
Ops., LLC, 266 A.3d 753, 759, 761 (R.I. 2022).  Martins is
inapposite.  In Martins, a Rhode Island resident drove a truck
from Massachusetts to Connecticut, and struck a tree in
Connecticut when an allegedly defective tire made in and
installed in Tennessee failed.  Id. at 756.  The Rhode Island
resident was severely injured and was taken to and later died in
Rhode Island.  Id.  The only connection between Rhode Island
(the forum state) and the litigation was that the decedent was a
Rhode Island resident who passed away in Rhode Island.  Id. at
761.  The Rhode Island Supreme Court did not endorse the
causation test put forth by Defendants here – the court instead

determined that the plaintiffs' claims did not arise out of or
relate to the tire companies' Rhode Island contacts.  Id.

     The Supreme Court has "endorse[d] an 'effects' test of
jurisdiction in situations involving tortious acts."  Shaw, 76
Hawai'i at 330, 876 P.2d at 1298 (quoting Calder v. Jones, 465
U.S. 783, 789 (1984)).  "Under this theory, asserting
jurisdiction against nonresident defendants who commit torts
directed at a forum state with the intention of causing in-state
'effects' satisfies due process."  Id.  The effects test inquiry
"focuses on conduct that takes place outside the forum state and
that has effects inside the forum state."  Freestream Aircraft,
905 F.3d at 604.  Generally, "[t]he commission of an intentional
tort in a state is a purposeful act that will satisfy the first
two requirements [of the minimum contacts test]."  Id. at 603
(quoting Paccar Int'l, Inc. v. Com. Bank of Kuwait, S.A.K., 757
F.2d 1058, 1064 (9th Cir. 1985)).  Therefore, where a
nonresident defendant is alleged to have committed a tort
directed at the forum state, the effects test is an alternate
due process theory capable of establishing that: (1) the
defendant purposefully availed themselves of the forum; and (2)
the plaintiff's claim arises out of or relates to the
defendant's forum contacts.  Id. at 1062.

     Plaintiffs argues that "the effects test . . . is
satisfied here" because "the Complaint alleges that the targets

35

of Defendants' deceptive marketing and failure to warn included audiences and consumers in Hawai'i, and those misrepresentations and omissions, directed at least in part to Hawai'i, contributed to Plaintiff's injuries."  Defendants counter that Plaintiffs failed to identify in their Complaint "a single deceptive message that Defendants allegedly made in or directed at Hawai'i," which "defeats personal jurisdiction under the effects test."

The circuit court did not engage in an "effects" test analysis, and the parties' briefs almost exclusively address the traditional "minimum contacts" test.  Because Defendants are subject to specific jurisdiction under the minimum contacts test, see infra Section IV(A)(1), it is not necessary to engage in an effects test analysis as to the first two prongs of the due process inquiry.  See Louis Vuitton Malletier, S.A. v. Mosseri, 736 F.3d 1339, 1357 (11th Cir. 2013) (determining that because the plaintiff had met the "purposeful availment" prong of the "minimum contacts" test, the court "need not analyze the 'effects test' here").

Relatedly, Defendants argue that, under Shaw, Plaintiffs' claims "bear at most an 'incidental' . . . relationship to Defendants' in-state activities and thus lack the requisite close connection found in Ford Motor that permitted exercise of specific jurisdiction."  In Shaw, the

36

*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

court held that for the purposes of the long-arm statute's "transacting business" subsection, <u>see</u> HRS § 634-35(a)(1), the alleged Hawaiʻi business conduct (the signing of escrow documents) was "merely incidental" to business at the crux of the case (the escrow transaction, which happened in California). <u>Shaw</u>, 76 Hawaiʻi at 328, 876 P.2d at 1296.  Thus, the plaintiff failed to sufficiently allege, for the purposes of the long-arm statute, that the defendant "transact[ed] business" in Hawaiʻi. <u>Id.</u>

The Court in <u>Shaw</u> held that the plaintiff sufficiently alleged under another subsection of the long-arm statute that the defendant committed a "tortious act" in Hawaiʻi, <u>see</u> HRS § 634-35(a)(2), and that due process was satisfied under the "effects" test.  <u>Shaw</u>, 76 Hawaiʻi at 329-330, 332, 876 P.2d at 1297-98, 1300.  Notably, <u>Shaw</u>'s "merely incidental" holding did not affect the court's due process analysis – the defendant was still subject to specific jurisdiction.  <u>See Shaw</u>, 76 Hawaiʻi at 328, 876 P.2d at 1296.  Here, Defendants' in-state conduct is anything but "merely incidental" to Plaintiffs' claims.  <u>See id.</u>

## 2.   **Exercising specific jurisdiction is reasonable and does not "conflict with federalism principles"**

The exercise of specific jurisdiction must "comport with fair play and substantial justice, i.e. it must be reasonable."  <u>Doe</u>, 83 Hawaiʻi at 374, 926 P.2d at 1297.  In <u>Doe</u>,

this court adopted the Ninth Circuit's seven-factor test for

determining whether the exercise of jurisdiction is reasonable,

which is as follows:

> (1) the extent of the defendants' purposeful
> interjection into the forum state's affairs; (2) the burden
> on the defendant of defending in the forum; (3) the extent
> of any conflict with the sovereignty of the defendants'
> state; (4) the forum state's interest in adjudicating the
> dispute; (5) concerns of judicial efficiency; (6) the
> significance of the forum to the plaintiff's interest in
> relief; and (7) the existence of alternative fora.

Id. (citing Caruth v. Int'l Psychoanalytical Ass'n, 59 F.3d 126,

127 (9th Cir. 1995)).

        "None of the factors is solely dispositive; all seven

are weighed in the factual circumstances in which they arise."

Id. (citation omitted).  And, as here, "where a defendant who

purposefully has directed [their] activities at forum residents

seeks to defeat jurisdiction, [they] must present a compelling

case that the presence of some other considerations would render

jurisdiction unreasonable."  Burger King, 471 U.S. at 477

(emphasis added).  Therefore, "we begin with a presumption of

reasonableness."  Caruth, 59 F.3d at 128.

        Defendants do not engage with the Doe factors, but

appear to argue that factors three and four weigh against

determining that the exercise of jurisdiction over Defendants is

"reasonable."  Doe, 83 Hawai'i at 374, 926 P.2d at 1297.

Defendants say that "exercising personal jurisdiction here would

be '[un]reasonable, in the context of our federal system of

government.'"  Quoting Ford Motor, 141 S. Ct. at 1024)(brackets
in original).  According to Defendants, permitting specific
jurisdiction in this context would subject companies to climate
change suits in every court in the country.  And if Plaintiffs'
theory were adopted abroad, "American companies could be sued on
climate change-related claims in courts around the world."
According to Defendants, "[d]ue process does not countenance
that result."  We review each of the Doe factors in turn, and
conclude that they weigh in favor of exercising specific
jurisdiction over Defendants because doing so is "reasonable."
Id.  Defendants have not "present[ed] a compelling case" that
the exercise of specific jurisdiction here would be
unreasonable.  See Burger King, 471 U.S. at 477.

     The first factor examines "the extent of the
defendants' purposeful interjection into the forum state's
affairs."  Doe, 83 Hawai'i at 374, 926 P.2d at 1297.  Defendants
are alleged to have engaged in repeated, purposeful business in
Hawai'i.  Their products were transported, traded, distributed,
promoted, marketed, refined, manufactured, sold, and/or consumed
in Hawai'i.

     The second factor examines "the burden on the
defendant of defending in the forum."  Doe, 83 Hawai'i at 374,
926 P.2d at 1297.  Defendants are multi-national oil and gas
corporations with billions in annual revenues.  The burden on

*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

Defendants in defending a suit in a state where Defendants
conduct extensive oil and gas business is slight.

        The third factor examines "the extent of any conflict
with the sovereignty of the defendants' [home] state."  Id.
Defendants' primary argument is that Plaintiffs' "claims []
implicate the interests of numerous other States and nations,
many of which do not share the 'substantive social policies'
Plaintiffs seek to advance - such as curbing energy production
and the use of fossil fuels or allocating the downstream costs
of consumer use to the energy companies to bear directly."  But
this lawsuit does not seek to regulate emissions or curb energy
production – it seeks to hold Defendants accountable for
allegedly (1) failing to warn about the dangers of their fossil
fuel products and (2) deceptively promoting those products.
Holding Defendants accountable for their Hawai'i torts implicates
the sovereignty of no state other than Hawai'i.  And, even if
this case did involve "substantive social policies" not advanced
by other states, "the 'fundamental substantive social policies'
of another State may be accommodated through application of the
forum's choice-of-law rules."  Burger King, 471 U.S. at 477.

        Relying on Bristol-Myers Squibb Co. v. Superior Ct. of
Cal., 137 S. Ct. at 1780, Defendants further contend that
"asserting personal jurisdiction over these out-of-state
Defendants for global climate change would impermissibly

*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

interfere with the power of Defendants' home States (or nations) over their own corporate citizens and could punish commercial conduct that occurred beyond the forum State's borders." However, Defendants' reliance on Bristol-Myers is misplaced.

The U.S. Supreme Court in Bristol-Myers addressed whether a claim arises out of or relates to a defendant's contacts – the second prong of the minimum contacts test. Id. at 1781. The Court did not hold that specific jurisdiction was lacking because doing so would be unreasonable. See id. Instead, the Court determined that specific jurisdiction was improper because there was no "connection between the forum and the specific claims at issue." See id.

The fourth factor examines "the forum state's interest in adjudicating the dispute." Doe, 83 Hawai'i at 374, 926 P.2d at 1297. Defendants argue that "Hawai'i's interests in this suit . . . are no greater than other States,'" and later state that Hawai'i's interest is "slight." However, we agree with Plaintiffs that Hawai'i "has a strong interest in remedying local harms related to corporate misconduct."

The fifth factor examines the "concerns of judicial efficiency." Id. Because this factor is not relevant here, and Defendants make no arguments to the contrary, we do not address it.

The sixth factor examines "the significance of the forum to the plaintiff's interest in relief." Id.  Again, Plaintiffs seeks monetary damages for injuries allegedly suffered in Hawai'i as a result of Defendants' alleged tortious conduct in Hawai'i.

The seventh factor examines the "existence of alternate fora." Id.  Defendants have not shown that there is an alternate forum that is better situated than Hawai'i to decide this dispute.

In sum, the Doe factors weigh heavily in favor of determining it is reasonable to exercise specific jurisdiction over Defendants. See id.  Further, given that Defendants purposefully availed themselves of Hawai'i markets, Defendants have failed to overcome the presumption that the exercise of specific jurisdiction is reasonable. See Burger King, 471 U.S. at 477, Caruth, 59 F.3d at 128.

**3.  The Due Process Clause does not require that Defendants have "clear notice" they could be subject to specific jurisdiction in Hawai'i**

The exercise of specific jurisdiction is governed by the three-part minimum contacts test: jurisdiction is proper where: (1) the defendant purposefully avails itself of the forum; (2) the defendant's contacts "arise out of or relate to" the plaintiff's claim; and (3) the exercise of specific jurisdiction is reasonable. Doe, 83 Hawai'i at 374, 926 P.2d at

1297.  Where the minimum contacts test is met, the exercise of specific jurisdiction comports with due process.  Id.

Defendants argue that in addition to the minimum contacts test, the Fourteenth Amendment's "Due Process Clause requires a defendant's activities in the forum to place it on 'clear notice' that it is susceptible to a lawsuit in that State for the claims asserted by a plaintiff," Ford Motor, 141 S. Ct. at 1025, 1030.  (Emphasis added.)  This is wrong.  The minimum contacts test "provides defendants with 'fair warning'" or, as the Supreme Court explained, "knowledge that 'a particular activity may subject [it] to the jurisdiction of a foreign sovereign."  Id. at 1025 (emphasis added) (quoting Burger King, 471 U.S. at 472) (brackets in original).  "[F]air warning" is not an additional requirement for the exercise of specific jurisdiction.  Rather, "fair warning" is what due process "provides."  If the minimum contacts test is met, a defendant has fair warning; and if it has fair warning, then due process is satisfied.

The U.S. Supreme Court has not held that "clear notice" is a separate requirement (on top of the minimum contacts test) necessary for the exercise of specific jurisdiction.  In Ford Motor, the Court used the phrase "clear notice" three times, once in a parenthetical and twice when summarizing the holdings in World-Wide Volkswagen.  Id. at 1025,

1027, 1030.  At no point did the Court in <u>Ford Motor</u> hold that
"clear notice" was required for the exercise of specific
jurisdiction.  <u>Id.</u>  Rather, the Supreme Court used the phrase
"clear notice" in <u>Ford Motor</u> and other cases like <u>World-Wide
Volkswagen</u> to describe situations where a defendant's contacts
were so pervasive that the defendant had <u>more than</u> "fair
warning" they could be subject to specific jurisdiction in a
forum.  <u>Id.</u> at 1025, 1030; <u>see also</u> <u>World-Wide Volkswagen</u>, 444
U.S. at 297.

        In sum, if a defendant has purposefully availed
themselves of a forum, the claim arises from or relates to those
contacts with the forum, and the exercise of jurisdiction is
reasonable, the defendant has "fair warning" they could be
subject to specific jurisdiction in that forum.  <u>See</u> <u>id.</u> at
1025.  The minimum contacts test (and the "fair warning" it
provides) allows a defendant to "'structure [its] primary
conduct' to lessen or avoid exposure to a given State's courts."
<u>Id.</u> (quoting <u>World-Wide Volkswagen</u>, 444 U.S. at 297 (brackets in
original)).  Here, the exercise of specific jurisdiction
comports with due process because: (1) Defendants purposefully
availed themselves of the benefits and protections of Hawai'i
laws; (2) Plaintiffs' claims "arise out of or relate to"
Defendants' Hawai'i contacts; and (3) the exercise of specific

jurisdiction is reasonable. Defendants had – at a minimum –
"fair warning" they could be subject to suit in Hawai'i. See id.

**B.    Federal Common Law Does Not Preempt Plaintiffs' Claims**

Defendants next argue that "[f]ederal law exclusively
governs claims seeking relief for injuries allegedly caused by
interstate and international emissions." They say that the
"basic scheme of the [federal] Constitution . . . demands that
federal common law," AEP, 564 U.S. at 421 (quotation marks
omitted), govern any dispute involving "air and water in their
ambient or interstate aspects," Illinois v. City of Milwaukee,
406 U.S. 91, 103 (1972) ("Milwaukee I"). Defendants' argument
ignores well-settled law that "the federal common law of
nuisance that formerly governed transboundary pollution suits no
longer exists due to Congress's displacement of that law through
the CAA." Boulder, 25 F.4th at 1260; see also AEP, 564 U.S. at
421.

And despite its displacement, Defendants also argue
that federal common law plays a role in our preemption analysis.
They say that we should first look to whether displaced federal
common law preempts Plaintiffs' claims, and then to whether the
CAA displaced federal common law. We disagree. "When a federal
statute displaces federal common law, the federal common law
ceases to exist." Baltimore, 31 F.4th at 205. And as the
Supreme Court explained in AEP, once federal common law is

45

displaced, "the availability vel non of a state lawsuit

depends inter alia on the preemptive effect of the federal Act,"

not displaced federal common law.  564 U.S. at 429.

Accordingly, our preemption analysis requires analyzing the

preemptive effect of only the CAA – and, it has none in this

context.  See supra Section IV(C).

Defendants' federal common law preemption arguments

also fail because Plaintiffs' claims do not seek to regulate

emissions.  The federal common law cited by Defendants formerly

governed transboundary pollution abatement and damages suits,

not the tortious marketing and failure to warn claims brought by

Plaintiffs.  We agree with the circuit court:

> Plaintiffs' framing of their claims in this case is more
> accurate.  The tort causes of action are well recognized.
> They are tethered to existing well-known elements including
> duty, breach of duty, causation, and limits on actual
> damages caused by the alleged wrongs.  As this court
> understands it, Plaintiffs do not ask for damages for all
> effects of climate change; rather, they seek damages only
> for the effects of climate change allegedly caused by
> Defendants' breach of Hawai'i law regarding failures to
> disclose, failures to warn, and deceptive promotion
> (without deciding the issue, presumably by applying
> Hawai'i's substantial factor test, see, e.g., Estate of Frey
> v. Mastroianni, 146 Hawai'i 540, 550 (2020)).  Plaintiffs do
> not ask this court to limit, cap, or enjoin the production
> and sale of fossil fuels.  Defendants' liability in this
> case, if any, results from alleged tortious conduct, and
> not from lawful conduct in producing and selling fossil
> fuels.

Simply put, Plaintiffs' claims do not seek to regulate

emissions.  Instead, Plaintiffs' Complaint "clearly seeks to

challenge the promotion and sale of fossil-fuel products without

warning and abetted by a sophisticated disinformation campaign."

Baltimore, 31 F.4th at 233. Plaintiffs' references to emissions in its Complaint "only serve to tell a broader story about how the unrestrained production and use of Defendants' fossil-fuel products contribute to greenhouse gas pollution." Id.

**1. The federal common law governing interstate pollution abatement and damages suits was displaced by the CAA**

Because the CAA displaced federal common law, we cannot accept Defendants' argument that the federal common law governs here. First, "AEP extinguished [] federal common law public nuisance damage action[s], along with the federal common law public nuisance abatement actions." Native Vill. of Kivalina v. ExxonMobil Corp., 696 F.3d 849, 857 (9th Cir. 2012) ("Kivalina II"). Federal appellate courts have recently reaffirmed that the federal common law once governing interstate pollution damages and abatement suits was displaced.[7] In Rhode Island v. Shell Oil Prod. Co., 35 F.4th 44 (1st Cir. 2022), cert. denied sub nom. Shell Oil Prod. Co. v. Rhode Island, 143 S. Ct. 1796 (2023), the First Circuit held that "[t]he Clean Water Act and the [CAA] . . . have statutorily displaced any federal common law that previously existed," and as such, the

[7] These courts did so in the context of removal jurisdiction. All held that federal common law did not govern the plaintiffs' claims, and as such, federal courts did not have jurisdiction over the at-issue state law claims. But, regardless of context, all three cases directly addressed whether federal common law governs state common law claims based on failure to warn and deceptive promotion theories. And all three courts determined that federal common law had been displaced.

court could not "rule that any federal common law controls Rhode
Island's claims."  Id. at 55 (quotation marks omitted).

        In Baltimore, the Fourth Circuit held that federal
common law did not control the city of "Baltimore's state-law
claims because federal common law in this area cease[d] to exist
due to statutory displacement, Baltimore [did] not invoke[] the
federal statute displacing federal common law, and . . . the CAA
does not completely preempt Baltimore's claims."  31 F.4th at
204.  And in Boulder, the Tenth Circuit held that "the federal
common law of nuisance that formerly governed transboundary
pollution suits no longer exists due to Congress's displacement
of that law through the CAA."  25 F.4th at 1260.  Indeed,
Defendants even concede that "[t]he Supreme Court, the Ninth
Circuit, and the Second Circuit have all held that a tort-law
claim for greenhouse gas emissions arising under federal common
law fails as a matter of law under [Federal Rules of Civil
Procedure Rule] 12(b)(6) because Congress displaced such claims
when it established a comprehensive regulatory scheme for
emissions via the CAA."  (Emphasis added.)

        Nonetheless, Defendants cite to three cases (Milwaukee
I, Oakland I, and City of New York) that they argue support the
proposition that federal common law governs Plaintiffs' claims.
These cases have either been overturned (Milwaukee I and Oakland
I) or rely on flawed reasoning (City of New York).

48

In Milwaukee I, the state of Illinois brought an original action against the state of Wisconsin in the Supreme Court for Wisconsin's "pollution . . . of Lake Michigan, a body of interstate water."[8]  Milwaukee I, 406 U.S. at 93.  Illinois alleged Wisconsin discharged "200 million gallons of raw or inadequately treated sewage and other waste materials" daily into Lake Michigan.  Id.  The Supreme Court explained that "where there is an overriding federal interest in the need for a uniform rule of decision or where the controversy touches basic interests of federalism, we have fashioned federal common law." Id. at 105 n.6.  The Court concluded that "[c]ertainly these same demands for applying federal law are present in the pollution of a body of water such as Lake Michigan," and that federal law governs disputes involving "air and water in their ambient or interstate aspects."  Id. at 103, 105 n.6.

Accordingly, the Court held that the "question of apportionment of interstate waters is a question of 'federal common law' upon which state statutes or decisions are not conclusive."  Id. at 105.  Notably, the Court acknowledged that the federal common law it created might one day be superseded by statute, explaining: "new federal laws and new federal

---

[8]    The Court ultimately determined that "original jurisdiction [was] not mandatory," declined to exercise original jurisdiction, and remitted the case to the "appropriate district court whose powers are adequate to resolve the issues."  Milwaukee I, 406 U.S. at 98, 108.

*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

regulations may in time preempt the field of federal common law
of nuisance." Id. at 107.

    After the Court remitted Milwaukee I to the district
court to determine the outcome of the case under federal common
law, Congress "enacted the Federal Water Pollution Control
Amendments of 1972 [(1972 FWPCA)]." City of Milwaukee v.
Illinois, 451 U.S. 304, 307 (1981) ("Milwaukee II").  On appeal
in Milwaukee II, the Court held that in enacting the 1972 FWPCA,
which governed sewage discharges into interstate bodies of
water, Congress displaced the federal common law created in
Milwaukee I.  The Court concluded:

        Congress has not left the formulation of appropriate
    federal standards to the courts through application of
    often vague and indeterminate nuisance concepts and maxims
    of equity jurisprudence, but rather has occupied the field
    through the establishment of a comprehensive regulatory
    program supervised by an expert administrative agency.

    [ . . . ]

        The establishment of such a self-consciously
    comprehensive program by Congress, which certainly did not
    exist when [Milwaukee I] was decided, strongly suggests
    that there is no room for courts to attempt to improve on
    that program with federal common law.

Milwaukee II, 451 U.S. at 317, 319.

    Accordingly, the Court determined that "no federal
common-law remedy was available," thus overruling Milwaukee I.
Id. at 332.  That holding was reaffirmed in AEP when the Supreme

*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

Court determined that the federal common law claims permitted by Milwaukee I were displaced by the CAA.[9]  AEP, 546 U.S. at 424.

Defendants also rely on City of Oakland v. BP PLC, 325 F. Supp. 3d 1017, 1021–22 (N.D. Cal. 2018) ("Oakland I"), vacated and remanded sub nom. City of Oakland v. BP PLC, 960 F.3d 570 (9th Cir. 2020), opinion amended and superseded on denial of reh'g, 969 F.3d 895 (9th Cir. 2020).  In Oakland I, the cities of Oakland and San Francisco brought suit against five large oil and gas companies[10] in state court alleging one count of nuisance on the same theory that Plaintiffs raises

_____

[9]     Defendants also cite to Illinois v. City of Milwaukee, 731 F.2d 403, 411 (7th Cir. 1984) ("Milwaukee III") for the proposition that the displacement of "one form of federal law (common law) by another (federal statute) does not somehow breathe life into nonexistent state law."  On remand from Milwaukee II, Illinois argued that "Illinois common law controlled this case until Milwaukee I judicially promulgated federal common law, and that since the 1972 FWPCA dissipated federal common law, Illinois law must again control."  Id. at 406.  The Seventh Circuit disagreed, and held that, "[g]iven the logic of Milwaukee I and Milwaukee II, we think federal law must govern in this situation except to the extent that the 1972 FWPCA (the governing federal law created by Congress) authorizes resort to state law."  Id. at 411.  Respectfully, the Seventh Circuit's approach in Milwaukee III ignores the presumption that state laws and claims are not preempted absent "a clear and manifest purpose of Congress" to do so.  See Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947) ("[W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.").

        Not surprisingly, the Supreme Court implicitly overruled the Seventh Circuit's Milwaukee III decision in AEP when the Court held that, after federal common is displaced, "the availability vel non of a state lawsuit depends inter alia on the preemptive effect of the federal Act."  564 U.S. at 429.  Thus, contrary to Milwaukee III and Defendants' argument, state law that was previously preempted by federal common law does have new life when the federal common law is displaced.  See id.

[10]    The five defendants in Oakland I (Chevron Corporation, Exxon Mobil Corporation, BP p.l.c., Royal Dutch Shell plc, and ConocoPhillips) are also defendants in this case.

here. Id. at 1021-22. The case was removed to federal court, and Oakland and San Francisco then amended their complaint to add a "separate claim for public nuisance under federal common law." Id. The district court determined that AEP and Kivalina II held that the CAA displaced federal common law claims for emissions abatement and damages. Id. at 1024. Accordingly, the district court dismissed Oakland and San Francisco's federal common law claim and the state law nuisance claim because "nuisance claims must stand or fall under federal common law." Id. at 1028.

On appeal, the Ninth Circuit reversed the federal district court, determining that Oakland and San Francisco only added the federal common law claim "to conform" to an earlier district court ruling. City of Oakland v. BP PLC, 969 F.3d 895, 909 (9th Cir. 2020) ("Oakland II"). The Ninth Circuit also determined that the state law nuisance claim should not have been dismissed because "it is not clear that the claim requires an interpretation or application of federal law at all, because the Supreme Court has not yet determined [(since AEP displaced the old federal common law)] that there is a [new] federal common law of public nuisance relating to interstate pollution." Id. at 906. Indeed, in Kivalina II, the Ninth Circuit held just that – concluding that federal common law suits (not state common law suits) "aimed at imposing liability on energy

*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

producers for 'acting in concert to create, contribute to, and maintain global warming' and 'conspiring to mislead the public about the science of global warming,' [were] displaced by the [CCA]." Id. (quoting Kivalina II, 696 F.3d at 854) (emphasis added). Therefore, the trial court was incorrect when it determined that displaced federal common law required the dismissal of Oakland and San Francisco's state common law claim because it was preempted. Id. Since displaced federal common law did not provide a federal jurisdictional hook, the Ninth Circuit remanded the case to the federal district court to determine whether there was an alternate basis for federal jurisdiction with respect to only the state common law claim. Id. at 911.

Further, the Second Circuit in City of New York also held that the "[CAA] displace[d] federal common law claims concerned with domestic greenhouse gas emissions." 993 F.3d at 95. Thus, Defendants' best case – City of New York – goes against them in part by holding that the very federal common law they rely on is no longer good law. Indeed, City of New York is consistent with AEP, Rhode Island, Baltimore, Boulder, Kivalina II, and Oakland II in holding that the federal common law once governing interstate pollution suits was displaced by the CAA. Accordingly, Defendants' argument that federal common law preempts Plaintiffs' claims fails, because Defendants do not

53

point to any case recognizing a federal common law action for interstate pollution suits that has not been displaced by the CAA.

### 2. Federal common law does not retain preemptive effect after it is displaced

Defendants acknowledge that the federal common law that once governed interstate pollution damages and abatement suits was displaced by the CAA. Nonetheless, Defendants argue that despite displacement, federal common law still lives. Defendants say that federal common law still lives but only with enough power to preempt state common law claims "involving interstate air pollution." According to Defendants, federal common law is both dead and alive – it is dead in that the CAA has displaced it, but alive in that it still operates with enough force to preempt Plaintiffs' state law claims.

Under Defendants' preemption theory, this court should first look to whether the federal common law governing interstate pollution damages and abatement claims preempts Plaintiffs' state common law claims. After determining that federal common law does in fact preempt Plaintiffs' state common law claims, Defendants say this court should then look to whether the CAA displaced federal common law claims (and Defendants say it did). Indeed, were this court to adopt Defendants' two-step approach, Plaintiffs would have no viable

*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

cause of action under state or federal law.  Federal common law
would preempt state common law, and in turn, the CAA would
displace federal common law.  No common law cause of action
would be available.  Further, no federal statutory cause of
action would be available because the CAA does not contain one
available to Plaintiffs, see 42 U.S.C. § 7401 et seq., and any
state statutory cause of action would be preempted by federal
common law, which, in turn, would be displaced by the CAA.

We decline to follow Defendants' two-step approach
because it engages in backwards reasoning.  This court would
first need to determine whether the federal common law governing
interstate pollution suits is still good law before determining
whether it can preempt state law claims.  And, as we have
explained above, the federal common law governing interstate
pollution suits was displaced by the CAA and "no longer exists."
Boulder, 25 F.4th at 1260; see also Milwaukee II, 451 U.S. at
314 ("[W]hen Congress addresses a question previously governed
by a decision rested on federal common law the need for such an
unusual exercise of lawmaking by federal courts disappears.").

Defendants' approach cannot be reconciled with AEP.
In AEP, two groups of plaintiffs, including eight States,
brought suit against the Tennessee Valley Authority and four
private companies who were allegedly responsible for 10% of
global emissions.  564 U.S. at 418.  The plaintiffs brought

federal common law and state law nuisance claims, and "sought injunctive relief requiring each defendant to cap its carbon dioxide emissions and then reduce them by a specified percentage each year for at least a decade."  564 U.S. at 419 (quotation marks omitted).  The Supreme Court held that the CAA displaced only federal common law governing interstate emissions.  Id. at 428-29.  Having determined that federal common law was displaced, the Court concluded that "the availability vel non of a state lawsuit depends inter alia on the preemptive effect of the [CAA]."  Id. at 429.  And since the parties had not briefed whether the CAA preempted "the availability of a claim under state nuisance law," the Court left "the matter open for consideration on remand."  Id.

In AEP, with regard to the plaintiffs' state common law nuisance claims, the relevant inquiry was not: (1) whether federal common law preempted the remaining state law claims, and if so, (2) whether the CAA displaced the federal common law. Id.  Instead, AEP made clear that whether the state law nuisance claims were preempted depended only on an analysis of the CAA because "'when Congress addresses a question previously governed by a decision rested on federal common law, . . . the need for such an unusual exercise of law-making by federal courts disappears.'"  AEP, 564 U.S. at 423 (quoting Milwaukee II, 451

U.S. at 314).[11]  The Supreme Court did not analyze the federal common law's preemptive effect because it was displaced by the CAA.  See id.  And if federal common law retained preemptive effect after displacement, the Court would have instructed the trial court on remand to examine whether displaced federal common law preempted the state law claims.  See id.

Simply put, displaced federal common law plays no part in this court's preemption analysis.  Once federal common law is displaced, the federal courts' task is to "interpret and apply statutory law[.]"  Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO, 451 U.S. 77, 95 n.34 (1981) (emphasis added).  Therefore, "[a]s instructed in AEP and supported by [Kivalina II], we look to the federal act that displaced the federal common law to determine whether the state claims are preempted."  Boulder, 25 F.4th at 1261.  The correct preemption analysis requires an examination only of the CAA's preemptive effect because "AEP extinguished [] federal common law public nuisance damage action[s], along with the federal common law public

---

[11] There is a "significant distinction between the statutory displacement of federal common law and the ordinary preemption of a state law."  Baltimore, 31 F.4th at 205.  Federal common law is disfavored because "it is primarily the office of Congress, not the federal courts, to prescribe national policy in areas of special federal interest."  AEP, 564 U.S. at 423-24.  Thus, "[l]egislative displacement of federal common law does not require the 'same sort of evidence of a clear and manifest [congressional] purpose' demanded for preemption of state law."  Id. at 423.  Instead, "[t]he test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute 'speak[s] directly to [the] question' at issue."  Id. at 424.  When federal common law is displaced, it "no longer exists."  Boulder, 25 F.4th at 1260.

nuisance abatement actions." Kivalina II, 696 F.3d at 857; see
also id. at 866 (Pro, J., concurring) ("Once federal common law
is displaced, state nuisance law becomes an available option to
the extent it is not preempted by federal law.").

Defendants primarily rely on City of New York to argue
that their two-step preemption analysis is the correct one.  In
that case, New York City filed a state-law tort suit in federal
court "against five oil companies to recover damages caused by
those companies' admittedly legal commercial conduct in
producing and selling fossil fuels around the world."  993 F.3d
at 86.  At issue was whether New York City's claims were
preempted by either federal common law or the CAA.  Id. at 89.
The Second Circuit first looked to whether federal common law
governing interstate pollution damages and abatement suits
preempted New York City's state law claims, holding that it did.
Id. at 95 (determining that New York City's "claims must be
brought under federal common law").  Next, the court examined
whether the federal common law was displaced by the CAA, holding
again that it was.  Id. at 98 (determining that "federal common
law claims concerning domestic greenhouse gas emissions are
displaced by statute.").  Thus, the Second Circuit held that
displaced federal common law preempted New York City's state law
claims.  Id. at 95-98.

We agree with the Fourth Circuit's analysis in

Baltimore, which explained why City of New York is not

persuasive in that respect:

> [A]fter recognizing federalism and the need for a
> uniform rule of decision as federal interests, City of New
> York confusingly concludes that federal common law is "most
> needed in this area" because New York's state-law claims
> touch upon the federal government's relations with foreign
> nations. [993 F.3d] at 91–92. But it never details what
> those foreign relations are and how they conflict with New
> York's state-law claims. See id. at 92. The same is true
> when City of New York declares that state law would
> "upset[] the careful balance" between global warming's
> prevention and energy production, economic growth, foreign
> policy, and national security. Id. at 93. Besides
> referencing statutes acknowledging policy goals, the
> decision does not mention any obligatory statutes or
> regulations explaining the specifics of energy production,
> economic growth, foreign policy, or national security, and
> how New York law conflicts therewith. See id. It also
> does not detail how those statutory goals conflict with New
> York law. See id. [Critically,] City of New York
> essentially evades the careful analysis that the Supreme
> Court requires during a significant-conflict analysis.

Id. (emphasis added) (footnote omitted).

## 3. Even were federal common law to control, it would not govern Plaintiffs' claims

Even if federal common law governing interstate

pollution claims had not been displaced, Plaintiffs' claims

would not be preempted by it. The claims permitted by federal

common law in this area were brought against polluting entities

and sought to enjoin further pollution.[12]  See, e.g., Milwaukee

---

[12]    Defendants cite to no cases recognizing federal common law claims
for interstate pollution damages. But this is neither here nor there.
Damages claims are no longer available under federal common law. In Kivalina
II, Kivalina sought "damages for harm caused by past emissions." 696 F.3d at
857. The Ninth Circuit determined that "displacement of a federal common law
right of action means displacement of remedies." Id. Therefore, "AEP
extinguished Kivalina's federal common law public nuisance damage action,

I, 406 U.S. at 93 (requesting court enjoin "pollution by the defendants of Lake Michigan").  Indeed, in AEP, the plaintiffs sued the Tennessee Valley Authority and other powerplant owners and sought injunctive relief to prevent future emissions.  564 U.S. at 418.  As the Supreme Court explained in AEP, this "specialized federal common law" governed "suits brought by one State to abate pollution emanating from another State."  Id. at 421.  Thus, the source of the injury in federal common law claims is pollution traveling from one state to another.  That is not what Plaintiffs allege here.

Rather, as the Ninth Circuit explained in earlier proceedings in this case, Plaintiffs "allege that oil and gas companies knew about climate change, understood the harms energy exploration and extraction inflicted on the environment, and concealed those harms from the public."  Sunoco LP, 39 F.4th at 1106 (emphasis added).  As Plaintiffs allege, "Defendants' liability is causally tethered to their failure to warn and deceptive promotion," and "nothing in this lawsuit incentivizes — much less compels — Defendants to curb their fossil fuel production or greenhouse gas emissions."  Simply put, the source of Plaintiffs' alleged injury is Defendants' allegedly tortious

---

along with the federal common law public nuisance abatement actions."  Id.
We agree.  Therefore, even though it appears that no court has recognized a
federal common law claim for interstate pollution damages, such claims were
displaced by the CAA.  See id.

marketing conduct, not pollution traveling from one state to another.

Numerous courts have rejected similar attempts by oil and gas companies to reframe complaints alleging those companies knew about the dangers of their products and failed to warn the public or misled the public about those dangers.  The Ninth Circuit did so in this case.  See id. at 1113.  And in other cases alleging similar deceptive promotion and failure to warn torts, the Fourth Circuit, Tenth Circuit, and the Districts of Connecticut, Massachusetts, and Minnesota have also rejected attempts to characterize those claims as being about emissions and pollution.  See Boulder, 25 F.4th at 1264 (Boulder's claims "are premised on the Energy Companies' activities of 'knowingly producing, promoting, refining, marketing and selling a substantial amount of fossil fuels used at levels sufficient to alter the climate, and misrepresenting the dangers.'"); Baltimore, 31 F.4th at 217 ("None of Baltimore's claims concern emission standards, federal regulations about those standards, or pollution permits.  Their Complaint is about Defendants' fossil-fuel products and extravagant misinformation campaign that contributed to its injuries."); Connecticut v. Exxon Mobil Corp., No. 3:20-CV-1555 (JCH), 2021 WL 2389739, at *13 (D. Conn. June 2, 2021) ("ExxonMobil's argument on this issue fails because the claims Connecticut has chosen to bring in this case

61

seek redress for deceptive and unfair practices relating to
ExxonMobil's interactions with consumers in Connecticut - not
for harms that might result from the manufacture or use of
fossil fuels[.]"); Minnesota v. Am. Petroleum Inst., No. CV 20-
1636 (JRT/HB), 2021 WL 1215656, at *13 (D. Minn. Mar. 31, 2021)
("[T]he State's action here is far more modest than the
caricature Defendants present."); Massachusetts v. Exxon Mobil
Corp., 462 F. Supp. 3d 31, 44 (D. Mass. 2020) ("Contrary to
ExxonMobil's caricature of the complaint, the Commonwealth's
allegations do not require any forays into foreign relations or
national energy policy. It alleges only corporate fraud.").

        The source of Plaintiffs' alleged injury is
Defendants' alleged failure to warn and deceptive promotion.
See Sunoco LP, 39 F.4th at 1113 ("[t]his case is about whether
oil and gas companies misled the public about dangers from
fossil fuels.").  Even were this court to determine that federal
common law retains preemptive effect after displacement, the
federal common law cited to by Defendants would not preempt
Plaintiffs' claims in this case.  The source of Plaintiffs'
injury is not pollution, nor emissions.  Instead, the source of
Plaintiffs' alleged injury is Defendants' alleged failure to
warn and deceptive promotion.  Therefore, even if federal common
law had not been displaced, Plaintiffs' claims would not be
preempted by it.

**4.    We decline to expand federal common law, and, in any event, Defendants waived such an argument**

In their opening brief, Defendants say they "do not seek to <u>expand</u> federal common law to a new sphere" and instead "rely on extensive Supreme Court precedent establishing that federal law <u>already</u> governs in this area."  Defendants have waived any argument to expand federal common law to cover Plaintiffs' claims here.  Second, Defendants fail to point to any case recognizing new federal common law decided after <u>AEP</u> and <u>Kivalina II</u> displaced the old federal common law that once governed suits for interstate pollution damages or abatement. We reiterate that the sources of Plaintiffs' alleged injury are Defendants' alleged tortious marketing and failure to warn. Defendants also fail to point to any case recognizing federal common law governing tortious marketing suits.

Even if Defendants had argued federal common law should be expanded to cover tortious marketing, that argument would fail because the "cases in which federal courts may engage in common lawmaking are few and far between."  <u>Rodriguez v. FDIC</u>, 140 S. Ct. 713, 716 (2020).  We see no "uniquely federal interests" in regulating marketing conduct, an area traditionally governed by state law.  <u>See id.</u> at 717.

We also decline to create new federal common law governing suits that "<u>involv[e]</u> . . . interstate air pollution."

63

**\*\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\***

(Emphasis in original.)  Congress has enacted a comprehensive legislative scheme to address interstate air pollution, and "once Congress addresses a subject, even a subject previously governed by federal common law, <u>the justification for lawmaking by the federal courts is greatly diminished</u>."  <u>Nw. Airlines</u>, 451 U.S. at 95 n.34 (emphasis added).  "[I]t is primarily the office of Congress, not the federal courts, to prescribe national policy in areas of special federal interest."  <u>AEP</u>, 564 U.S. at 423-24.  And "[c]ases justifying judicial creation of preemptive federal rules are extremely limited: [w]hether latent federal power should be exercised to displace state law is primarily a decision for Congress, not the federal courts."  <u>In re Nat'l Sec. Agency Telecomms. Recs. Order Litig.</u>, 483 F. Supp. 2d 934, 940 (N.D. Cal. 2007) (quoting <u>Atherton</u>, 519 U.S. at 218) (quotation marks omitted).  "Our commitment to the separation of powers is too fundamental to continue to rely on federal common law by judicially decreeing what accords with common sense and the public weal when Congress has addressed the problem."  <u>Milwaukee II</u>, 451 U.S. at 315 (internal quotation marks omitted).

**C.    The CAA Does Not Preempt Plaintiffs' Claims**

        Having determined that displaced federal common law plays no part in this court's preemption analysis, we now turn to whether the CAA preempts Plaintiffs' state claims.  <u>See</u>

Boulder, 25 F.4th at 1261 ("As instructed in AEP and supported by [Kivalina II], we look to the federal act that displaced the federal common law to determine whether the state claims are preempted."). Defendants say that federal law must govern all suits that "involve[] interstate and international emissions." (Emphasis added). They say that a large damage award in effect could regulate air pollution,[13] and that air pollution is an area governed exclusively by "federal law." But the question before the court is not whether a potential damages award in this case could regulate air pollution. If that were true, then any case with a potentially large damage award must be dismissed because it might regulate a field – the mere possibility of regulation, standing alone, is not enough to dismiss Plaintiffs' claims. A suit does not "regulate" a matter simply because it might have "an impact" on that matter. Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 50 (1987). Rather, the operative question is whether Plaintiffs' state law claims are preempted by federal law. To prevail, Defendants need to show not only that Plaintiffs' claims could lead to a large damages award that effectively acts

---

[13] Defendants cite to Kurns v. R.R. Friction Prod. Corp., 565 U.S. 625, 637 (2012), a products liability cases involving a railroad worker exposed to asbestos, to argue that damages awards can effectively act as regulation. This is accurate, but incomplete. The Court did not ask only whether such a large damages award could operate as a regulation. The Court further engaged in a preemption analysis, and asked whether such an award was preempted by federal law. Id. Based on prior precedent, the Court concluded that Congress had occupied the entire field of locomotive equipment regulation and that the worker's claims were therefore preempted. Id.

as a regulation, but critically, that such a large damages award is preempted by federal law.  Defendants do not do so.

The doctrine of preemption is rooted in the federal Constitution's Supremacy Clause, which provides that federal law "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Courts begin with the presumption that state laws and claims are not preempted.  Wyeth v. Levine, 555 U.S. 555, 565 (2009).  This is because the "historic police powers of the States [are] not to be superseded . . . unless that was the clear and manifest purpose of Congress."  Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947) (citing Napier v. Atlantic Coast Line R. Co., 272 U.S. 605, 611 (1926) and Allen-Bradley Local v. Wisconsin Employment Relations Board, 315 U.S. 740, 749 (1942)).[14] Therefore, when determining whether a statute is preempted through any preemption doctrine, courts primarily evaluate whether Congress intended to preempt state law.  Id.

---

[14]    The Supreme Court has applied this presumption against preemption of historic police powers broadly.  Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 528-29 (1992) (requiring a showing of congressional intent to supersede state common law duties not to make false statements or conceal facts and holding that Congress expressed no such intent in the Federal Cigarette Labeling and Advertising Act); CTS Corp v. Waldburger, 573 U.S. 1, 19 (2014) (quoting Wos v. E.M.A., 568 U.S. 627, 639-40 (2013)) ("[i]n our federal system, there is no question that States possess the 'traditional authority to provide tort remedies to their citizens' as they see fit").

**\*\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\***

There are two types of preemption: complete and substantive (or ordinary) preemption.  City of Hoboken v. Chevron Corp., 45 F.4th 699, 707 (3d Cir. 2022).  Complete preemption applies only in the context of federal removal jurisdiction, which is not at issue here.[15]  Id.  Defendants argue that the CAA substantively preempts Plaintiffs' state tort law claims.

In general, there are three types of substantive preemption:

> (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, "where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law"; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives.

New York SMSA Ltd. P'ship v. Town of Clarkstown, 612 F.3d 97, 104 (2d Cir. 2010) (emphases added) (citing English v. General Elec. Co., 496 U.S. 72, 78-79 (1990)).

Defendants do not specify which substantive preemption theory they rely on.  We address each preemption theory in turn.

First, express preemption does not apply.  Federal law expressly preempts state law where the federal statute contains an express preemption clause barring state law claims in

---

[15]    The Supreme Court has only recognized three federal statutes that completely preempt state laws: "ERISA, the National Bank Act, and the Labor-Management Relations Act." City of Hoboken, 45 F.4th at 707 (citing Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 6-8, 10-11 (2003)).

*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

enumerated areas.  Oneok, Inc. v. Learjet, Inc., 575 U.S. 373,

376 (2015) (holding that Congress may "pre-empt . . . a state

law through . . . express language in a statute").  Simply put,

the CAA contains no "express language" preempting state common

law tort claims.  See id.  Rather, the CAA explicitly preserves

"any right which any person (or class of persons) may have under

any statute or common law to seek enforcement of any emission

standard or limitation or to seek any other relief[.]"  42

U.S.C. § 7604(e) (2018).

        Second, field preemption does not apply because the

CAA does not completely occupy the field of emissions.  Field

preemption applies where (1) the "scheme of federal regulation

[is] so pervasive as to make reasonable the inference that

Congress left no room for the States to supplement" the

regulation, or (2) the "federal interest is so dominant" in a

field "that the federal system will be assumed to preclude

enforcement of state laws on the same subject."  Rice, 331 U.S.

at 230.  Field preemption "reflects a congressional decision to

foreclose any state regulation in the area, even if it is

parallel to federal standards," so "even complementary state

regulation is impermissible" when Congress has occupied an

entire field.  Arizona v. United States, 567 U.S. 387, 401

(2012).

68

The CAA simply does not occupy the entire field of emissions regulation, as noted above.  Merrick, 805 F.3d at 694 (holding that CAA does not bar state common law claims against in-state emitters because "environmental regulation is a field that the states have traditionally occupied").  "There is no evidence that Congress intended that all emissions regulation occur through the [CAA's] framework, such that any state law approach to emissions regulation would stand as an obstacle to Congress's objectives."  Id. at 695.  Indeed, under the CAA, each state retains regulatory power through their State Implementation Plan (SIP), which provides for state-level implementation, maintenance, and enforcement of CAA emissions standards with federal oversight.  42 U.S.C. § 7410(a)(1) (2018).  While the federal government has primary authority over emissions legislation, states are responsible for implementation through their SIP.  See id.  And the CAA's "Retention of State authority" section expressly protects a state's right to adopt or enforce any standard or limitation respecting emissions unless the state policy in question would be less stringent than the CAA.  42 U.S.C. § 7416 (2018).[16]  Congress encouraged states

_____

[16]    42 U.S.C. § 7416 (2018) provides:

> Except as otherwise provided in sections 1857c-10(c),
> (e), and (f) (as in effect before August 7, 1977), 7543,
> 7545(c)(4), and 7573 of this title (preempting certain
> State regulation of moving sources) nothing in this chapter

to participate through SIPs and provided for state regulation of any emissions standard or limitation as stringent as or more stringent than the CAA.  See 42 U.S.C. § 7410(a)(1) (2018).

Accordingly, the CAA does not occupy the field of emissions regulation such that state law is preempted – it does not "reflect[] a congressional decision to foreclose any state regulation in the area."  Arizona, 567 U.S. at 401.  And, even if it did, the City's claims do not seek to regulate emissions, and so a claim of field preemption in the field of emissions regulation is inapposite.

Third, conflict preemption does not apply.  Conflict preemption takes two forms.  The first form is obstacle preemption, where state law claims "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Arizona, 567 U.S. at 399 (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).  The second form is impossibility preemption, which is a "demanding defense", Wyeth, 555 U.S. at 573, that succeeds where state law claims are shown

_____

shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution; except that if an emission standard or limitation is in effect under an applicable implementation plan or under section 7411 or section 7412 of this title, such State or political subdivision may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation under such plan or section.

70

to directly conflict with federal law or penalize behavior that federal law requires.  AT&T Co. v. Cent. Off. Tel., Inc., 524 U.S. 214, 227 (1998) (holding that federal statute preempts state law when state law claims directly conflict with federal law); Geier v. Am. Honda Motor Co., 529 U.S. 864, 873 (2000) (holding that federal statute preempts state law where state law penalizes what federal law requires).  Neither obstacle preemption nor impossibility preemption applies here.

> 1.  **Obstacle preemption does not apply**

The CAA does not preempt Plaintiffs' claims through obstacle preemption because their claims arise from Defendants' alleged failure to warn and deceptive marketing conduct, not emissions-producing activities regulated by the CAA.  Obstacle preemption applies only where there is an "actual conflict" between state law and a statute's overriding federal purpose and objective.  Mary Jo C. v. N.Y. State & Loc. Ret. Sys., 707 F.3d 144, 162 (2d Cir. 2013).  "[T]he conflict between state law and federal policy must be a sharp one."  Marsh v. Rosenbloom, 499 F.3d 165, 178 (2d Cir. 2006) (quotation marks omitted).  The operative federal purpose or policy is defined by "examining the federal statute as a whole and identifying its purpose and intended effects," and "[w]hat is a sufficient obstacle is a matter of judgment."  Arizona, 567 U.S. at 400 (quoting Crosby, 530 U.S. at 363).

71

The U.S. Supreme Court has applied this standard sparingly, finding obstacle preemption in only two scenarios: (1) where a federal legislation involved a uniquely federal area of regulation and state law directly conflicted with the federal program's operation, and (2) where Congress has clearly chosen to preclude state regulation because the federal legislation struck a delicate balance of interests at risk of disturbance by state regulation.[17] In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig., 959 F.3d 1201, 1212 (9th Cir. 2020). But this is a "high threshold." Chamber of Com. of U.S. v. Whiting, 563 U.S. 582, 607 (2011).

Here, the CAA's identified purposes are to protect the country's air resources, public health, and welfare; prevent and control air pollution; and support state, local, and regional air pollution prevention and control efforts. See 42 U.S.C. § 7401(b) (2018); Bunker Hill Co. Lead & Zinc Smelter v. EPA, 658 F.2d 1280, 1284 (9th Cir. 1981) ("[The CAA] was intended

_____

[17]    The first category historically includes areas such as foreign affairs powers and regulating maritime vessels. Crosby, 530 U.S. at 373-74 (holding that the federal foreign affairs power is a uniquely federal area of regulation); United States v. Locke, 529 U.S. 89, 97 (2000) (holding that maritime vessel regulation is a uniquely federal area). The second category historically includes criminal immigration penalties, vehicle safety device implementation, and interstate pollution under the Clean Water Act. Arizona, 567 U.S. at 405 (holding that the federal government struck a balance in immigration penalties that would be disturbed by an additional state law criminal penalty); Geier, 529 U.S. at 879-81 (holding that the federal government struck a balance in gradual airbag phase-in that would be undermined by a state law immediate implementation requirement); Int'l Paper Co. v. Ouellette, 479 U.S. 481, 494, 497 (1987) (holding that affected-state claims against out-of-state polluters stand as an obstacle to the balance struck by the Clean Water Act).

comprehensively to regulate, through guidelines and controls, the complexities of restraining and curtailing modern day air pollution."). The CAA achieves these purposes primarily by "regulat[ing] pollution-generating emissions from both stationary sources, such as factories and powerplants, and moving sources, such as cars, trucks, and aircraft." Util. Air Regul. Grp. v. EPA, 573 U.S. 302, 308 (2014).

Plaintiffs' state tort law claims do not seek to regulate emissions, and there is thus no "actual conflict" between Hawaiʻi tort law and the CAA. See Mary Jo, 707 F.3d at 162. These claims potentially regulate marketing conduct while the CAA regulates pollution. We agree with Plaintiffs that the "CAA does not concern itself in any way with the acts that trigger liability under Plaintiffs' Complaint, namely: the use of deception to promote the consumption of fossil fuel products." The CAA expresses no policy preference and does not even mention marketing regulations.

Defendants argue that the CAA preempts Plaintiffs' claims because Congress preempted affected-state common law claims regarding emissions through the CAA, and Plaintiffs' claims seek to regulate out-of-state emissions. Affected-state claims are state law actions where the injury occurred in a different state from the state where the emission was released; courts have held that the CAA preempts these claims. See Int'l

73

Paper Co. v. Ouellette, 479 U.S. 481, 500 (1987). Source-state claims are state law actions where the injury was suffered in the same state as the emitting conduct; courts have held that the CAA does not preempt these claims. See id.

Relying on Ouellette, Defendants say "[e]very federal court of appeals to consider this issue has recognized that the CAA does not permit States to use their state tort law to address harms caused by emissions occurring in other States." Defendants are correct, but their analysis is incomplete. In Ouellette, the Supreme Court examined whether the Clean Water Act (CWA) preempted "a common-law nuisance suit filed in a Vermont court under Vermont law, when the source of the alleged injury [was] located in New York." Id. at 483. The Supreme Court held that affected-state common law claims arising from polluting activity located outside the affected-state are preempted by the CWA because "[t]he application of affected-state laws would be incompatible with the [CWA's] delegation of authority and its comprehensive regulation of water pollution." Id. at 500. Applying affected-state common law could potentially subject a defendant-polluter to "an indeterminate number of potential regulations" depending on how far the emission traveled.[18] Id. at 499; see also Merrick, 805 F.3d at

_____

[18]    Defendants also cite to N. Carolina, ex rel. Cooper v. Tennessee Valley Auth., 615 F.3d 291, 297 (4th Cir. 2010), arguing that Ouellette's

693 (explaining that "claims based on the common law of the
source state . . . are not preempted by the [CAA,]" but "claims
based on the common law of a non-source state . . . are
preempted by the [CAA]").

But the rationale motivating the <u>Ouellette</u> court in
preempting affected-state common law claims does not apply to
Plaintiffs' state tort claims.  This is because Plaintiffs'
claims require "additional tortious conduct" to succeed.  <u>MTBE</u>,
725 F.3d at 104.  Here, that additional tortious conduct is
Defendants' alleged deceptive marketing and failure to warn
about the dangers of using their products – the source of
Plaintiffs' alleged injury is not emissions but the additional
alleged torts.

In this case, as in <u>MTBE</u>, Defendants' alleged tortious
conduct is <u>not production of emissions</u> and therefore, obstacle
preemption does not apply.  In <u>MTBE</u>, the defendant gasoline
producer used MTBE, a fuel additive that reduced emissions, to

---

rationale in determining the CWA preempted affected-state common law claims
should be applied to the CAA.  In <u>Cooper</u>, the Fourth Circuit determined that
North Carolina's nuisance action seeking an injunction against fixed
powerplants from emitting sulfur dioxides and nitrous oxides was preempted by
the CAA because the "EPA has promulgated [National Ambient Air Quality
Standards] for a number of emissions, including standards for all the
emissions involved in this case." <u>Id.</u> at 299.  Critically, the CAA, and the
agency it empowers (the EPA), had already expressly regulated the very
emissions (sulfur dioxides and nitrous oxides) alleged to have caused the
nuisance. <u>Id.</u> at 299-303.  But the <u>Cooper</u> court refused to "hold flatly that
Congress has entirely preempted the field of emissions regulation." <u>Id.</u> at
302.  And it acknowledged that the "<u>Ouellette</u> Court itself explicitly
refrained from categorically preempting every nuisance action brought under
source state law." <u>Id.</u> at 303.

bring its gasoline into compliance with the CAA's minimum oxygen content requirement. Id. at 129. The CAA identified a number of substances, including MTBE, that could have been added to gasoline to help bring it into compliance with the oxygen content requirement. Id. at 81. New York City and its agencies brought ten causes of action, including strict liability failure to warn, negligence, public nuisance, private nuisance, and trespass, arguing that the defendant oil producer's use of MTBE caused detrimental contamination of groundwater. Id. at 80-83. The defendant argued that the plaintiff's tort claims "conflict[ed] with and are therefore preempted by . . . the [CAA] Amendments of 1990[.]" Id. at 95.

The Second Circuit held that New York City's claims were not preempted under either obstacle or impossibility preemption. Id. at 97-103. The court held that where a party participates in a non-polluting emissions-related activity (i.e., choosing gasoline additives), the fact that it complied with relevant CAA provisions did not absolve the party of any state common law or statutory duties to warn of public hazards or comply with an additional standard of care. Id. at 65. In short, the Second Circuit determined that state tort law claims are not preempted by the CAA where the alleged tortious behavior does not produce emissions. Id. at 104-05.

76

Plaintiffs' claims simply do not risk subjecting Defendants to "an indeterminate number of potential regulations" because the claims do not subject Defendants to any additional emissions regulation at all.  See Ouellette, 479 U.S. at 499. Plaintiffs are correct that where the emissions originate is irrelevant because emissions are at most a link in the causal chain connecting Plaintiffs' alleged injuries and Defendants' unrelated liability-incurring behavior.  **[AB at 33, ICA Dkt. 65:43]**  Simply put, this means obstacle preemption does not apply.

**2.  Impossibility preemption does not apply**

At its most demanding, the impossibility doctrine historically required it to be a "physical impossibility" to comply with both state and federal requirements for federal law to preempt state law.  Florida Lime & Avocado Growers v. Paul, 373 U.S. 132, 143 (1963).[19]  The modern impossibility doctrine is broader and now includes instances where state law penalizes what federal law requires, Geier, 529 U.S. at 873, or where state law claims directly conflict with federal law, AT&T Co.,

---

[19]    Under the Florida Lime & Avocado Growers standard, some scenarios would yield different results than preemption doctrine's intended effect: "[f]or example, if federal law gives an individual the right to engage in certain behavior that state law prohibits, the laws would give contradictory commands notwithstanding the fact that an individual could comply with both by electing to refrain from the covered behavior." Wyeth, 555 U.S. at 590 (2009) (Thomas, J., concurring).  In that scenario, it is not a physical impossibility to comply with both requirements, but modern doctrine would find a sufficient conflict between federal and state law to preempt state law through impossibility preemption.

524 U.S. at 227.  But impossibility preemption is still a

"demanding defense."  Wyeth, 555 U.S. at 573.  Defendants do not

raise impossibility preemption, and it does not apply

regardless.

MTBE is instructive again.  There, the Second Circuit

declined to preempt state tort claims through impossibility

preemption where: (1) it was possible to comply with the CAA and

avoid tort liability; (2) state and federal law did not directly

conflict; and (3) the CAA did not require the alleged conduct.

MBTE, 725 F.3d at 97.  The oil producer defendant could have

complied with both state and federal law if it had used other

additives (like ethanol) that did not pose the same health risk

as MTBE but would bring the fuel into CAA oxygen content

compliance without incurring prohibitively high costs.  Id. at

99-101.  Though the CAA identified MTBE as one additive that

would sufficiently boost oxygen content, at no point did it

require the specific use of MTBE in gasoline – it was one of

many options.  Id. at 98.

The same is true here.  The CAA does not bar

Defendants from warning consumers about the dangers of using

their fossil fuel products.  See id.  Defendants could simply

avoid federal and state liability by adhering to the CAA and

separately issuing warnings and refraining from deceptive

conduct as required by Hawai'i law; it is not a "physical

*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

impossibility" to do both concurrently.  See Florida Lime &
Avocado Growers, 373 U.S. at 143; State ex rel. Shikada v.
Bristol-Myers Squibb Co., 152 Hawaiʻi 418, 438, 526 P.3d 395, 415
(2023) (rejecting a pharmaceutical company's argument that
"there was no way [it] could have updated [a drug's] label to
provide the warning that [state law] require[d] and at the same
time comply with federal law" regarding drug labeling).

### V.    CONCLUSION

For the foregoing reasons, we hold that Defendants are
subject to specific jurisdiction in Hawaiʻi and that neither
federal common law nor the Clean Air Act preempt Plaintiffs'
claims.  We reiterate that federal common law retains no
preemptive effect after it is displaced.  Were we to adopt
Defendants' argument that displaced federal common law preempts
Plaintiffs' state law claims, Plaintiffs could not recover under
Hawaiʻi tort law, even where the state specifically permits
lawsuits to hold companies responsible for allegedly deceptive
marketing claims about any product, including oil and gas
products.  We decline to unduly limit Hawaiʻi's ability to use
its police powers to protect its citizens from alleged deceptive
marketing.

Accordingly, the circuit court's Order Denying
Defendants' Motion to Dismiss for Failure to State a Claim,
filed March 29, 2022, and Order Denying Defendants' Joint Motion

*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

to Dismiss for Lack of Personal Jurisdiction, filed March 31,

2022, are affirmed.

Theodore J. Boutrous, Jr.,*        /s/ Mark E. Recktenwald
Joshua D. Dick,*
Melvyn M. Miyagi,                  /s/ Sabrina S. McKenna
Ross T. Shinyama,
Summer H. Kaiawe,                  /s/ Todd W. Eddins
Andrea E. Neuman,* and
Erica W. Harris,*                  /s/ Ronald G. Johnson
for appellants Chevron
Corporation and Chevron            /s/ John M. Tonaki
U.S.A., Inc.

C. Michael Heihre,
Michi Momose,
J. Scott Janoe,*
Megan Berge,* and
Sterling Marchand,*
for appellants Sunoco LP, Aloha
Petroleum, Ltd., and Aloha
Petroleum LLC

Paul Alston,
John-Anderson L. Meyer,
Claire Wong Black,
Glenn T. Melchinger,
Theodore V. Wells, Jr.,*
Daniel J. Toal,* and
Yahonnes Cleary,*
for appellants Exxon Mobil
Corporation and ExxonMobil Oil
Corporation

Joachim P. Cox,
Randall C. Whattoff,
David C. Frederick,*
James M. Webster III,* and
Daniel S. Severson,*
for appellants Shell plc (f/k/a
Royal Dutch Shell plc), Shell
U.S.A. Inc. (f/k/a Shell Oil
Company), and Shell Oil
Products Company LLC

Margery S. Bronster,
Lanson K. Kupau,
Kelly A. Higa Brown,
Victor L. Hou,* and
Boaz S. Morag,*
for appellants Woodside
Energy Hawaii Inc. (f/k/a
BHP Hawaii Inc.) and
appellee BHP Group Limited

Lisa A. Bail,
David J. Hoftiezer,
Jonathan W. Hughes,*
Matthew T. Heartney,* and
John D. Lombardo,*
for appellants BP plc and
BP America Inc.

Ted N. Pettit,
Shannon S. Broome,*
Shawn Patrick Regan,* and
Anne Marie Mortimer,*
For appellants Marathon
Petroleum Corporation

Crystal K. Rose,
Adrian L. Lavarias,
Sharon Paris,
Jameson R. Jones,*
Daniel R. Brody,*
Steven M. Bauer,*
Margaret A. Tough,* and
Katherine A. Rouse,*
for appellants ConocoPhillips,
ConocoPhillips Company

Crystal K. Rose,
Adrian L. Lavarias,
Sharon Paris,
Steven M. Bauer,*
Margaret A. Tough,* and
Katherine A. Rouse,*
for appellants Phillips 66 and
Phillips 66 Company

**\*\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\***

Victor M. Sher,*
Dana M.O. Viola,
Robert M. Kohn,
Nicolette Winter,
Jeff A. Lau,
Matthew K. Edling,*
Corrie J. Yackulic,* and
Stephanie D. Biehl,*
for appellees City and County
of Honolulu and Honolulu Board
of Water Supply

*pro hac vice*

Anne E. Lopez
Ewan C. Rayner
for amicus curiae
Department of Attorney General

Tara A. Buckley
for amicus curiae
Hawaiʻi State Association of
Counties

Chase H. Livingston
for amicus curiae
Legal Scholars

Mark M. Murakami
for amicus curiae
Chamber of Commerce of the
United States of America

**Electronically Filed
Supreme Court
SCAP-22-0000429
31-OCT-2023
08:58 AM
Dkt. 76 OPC**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

CITY AND COUNTY OF HONOLULU and HONOLULU BOARD OF WATER SUPPLY,
Plaintiffs-Appellees,

vs.

SUNOCO LP; ALOHA PETROLEUM, LTD.; ALOHA PETROLEUM, LLC; EXXON
MOBIL OIL CORPORATION; ROYAL DUTCH SHELL PLC; SHELL OIL COMPANY;
SHELL OIL PRODUCTS COMPANY, LLC; CHEVRON CORP.; CHEVRON USA,
INC.; BHP HAWAII, INC.; BP PLC; BP AMERICA, INC.; MARATHON
PETROLEUM CORP.; CONOCOPHILLIPS; CONOCOPHILLIPS COMPANY;
PHILLIPS 66; and PHILLIPS 66 COMPANY,
Defendants-Appellants,

and

BHP GROUP LIMITED and BHP GROUP PLC,
Defendants-Appellees.

_____

SCAP-22-0000429

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-22-0000429; 1CCV-20-0000380)

OCTOBER 31, 2023

CONCURRING OPINION BY EDDINS, J.

I agree with the Chief Justice's well-reasoned opinion.

**\*\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\***

Because the principles that govern personal jurisdiction arose after 1868, I write separately.

Enduring law is imperiled.  Emerging law is stunted.  A justice's personal values and ideas about the very old days suddenly control the lives of present and future generations. Recently, the Supreme Court erased a constitutional right.  It recalled autonomy and empowered states to force birth "for one reason and one reason only: because the composition of this Court has changed."  Dobbs v. Jackson Women's Health Org., 142 S. Ct. 2228, 2319-20 (2022) (Kagan, J., dissenting).  The day before, the Court cherry-picked history to veto public safety legislation, disturb the tranquility of public places, and increase homicide.  New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111 (2022).  The same week, it promoted a conjured idea hostile to judicial restraint - "major questions." When executive branch policy-making grazes disliked policy preferences, major questions "magically appear as get-out-of-text-free cards."  West Virginia v. EPA, 142 S. Ct. 2587, 2641 (2022) (Kagan, J., dissenting).

For now, International Shoe still fits.  Defendants must have minimum contacts with the forum state such that exercising jurisdiction over them does not offend traditional notions of fair play and substantial justice.  But the due process clause mentions neither fairness and justice, nor minimum contacts.

And those standards clash with how courts determined personal jurisdiction long ago.  See Pennoyer v. Neff, 95 U.S. 714, 733 (1877) (courts lack jurisdiction over defendants who are not physically present in the state or who have not consented to jurisdiction).

So when justices solicit cases to test their way against durable personal jurisdiction principles, a state occupying one of the world's most geographically isolated land masses pays attention.  Ford Motor's concurrence announced "International Shoe's increasingly doubtful dichotomy."  Ford Motor Co. v. Montana Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1039 (2021) (Gorsuch, J., concurring).  It floated reviving the old tag rule to hale corporations into court, asking "future litigants and lower courts" to help determine how the Constitution's original meaning or history jostles personal jurisdiction law.  Id.

Back in the day, parties played tag inside a state's boundaries.  Once tagged, a party could be sued for anything, even things that happened outside the state.  Mallory v. Norfolk S. Ry. Co., 600 U.S. 122, 128 (2023).  But if a party couldn't be tagged, they couldn't be personally sued.

Time-travelling to 1868 would unravel Hawai'i's long arm statute.  Hawai'i Revised Statutes (HRS) § 634-35 (2016) reaches as far as the federal constitution allows.  Yamashita v. LG Chem, Ltd., 152 Hawai'i 19, 21, 518 P.3d 1169, 1171 (2022).  A

3

*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

state registration statute preserves jurisdiction over national corporations.  Mallory, 600 U.S. at 134.  But what about other businesses, shell companies, and individuals that do not enter or remain in Hawaiʻi?  See Shaffer v. Heitner, 433 U.S. 186, 200 (1977) ("The Pennoyer rules generally favored nonresident defendants by making them harder to sue").

Now, settled law easily unsettles.  Some justices feel precedent is advisory.  See Gamble v. United States, 139 S. Ct. 1960, 1984 (2019) (Thomas, J., concurring); Amy Coney Barrett, Precedent and Jurisprudential Disagreement, 91 Tex. L. Rev. 1711, 1728 (2013); Dobbs, 142 S. Ct. at 2265.  Who knows what law may vanish?  Or what text gets exiled next?  See, e.g., Trinity Lutheran Church of Columbia, Inc. v. Comer, 582 U.S. 449, 466 (2017) (ghosting the Establishment Clause).

Before the Court's hubristic originalists arrived, everyone got it wrong.  Well, mostly everyone.  See Dred Scott v. Sandford, 60 U.S. 393, 405 (1857) (enslaving human beings and denying citizenship based on race because the Supreme Court must interpret the Constitution "according to its true intent and meaning when it was adopted").  All others, hall-of-fame jurists to 1Ls, held egregiously wrong-headed views.  Only public meaning at inception counts.  Traditional methods to interpret the Constitution are unacceptable.  See, e.g., Brown v. Bd. of Educ. of Topeka, Shawnee Cnty., Kan., 347 U.S. 483, 492-93

4

(1954) ("In approaching this problem, we cannot turn the clock back to 1868 when the Amendment was adopted, or even to 1896 when Plessy v. Ferguson was written.  We must consider public education in the light of its full development and its present place in American life throughout the Nation").

A chosen interpretive theory cages the Constitution.  Why originalism?  To keep value judgments out of judging.  To constrain judges.

Not that judges are always restrained.  See, e.g., Shelby Cnty., Ala. v. Holder, 570 U.S. 529 (2013) (dismembering a cornerstone of American civil rights because a few judges made up a textually-unsupported rule that Alabama's equal sovereignty prevents the federal government from enforcing federal law – a law those judges felt worked too well).

Inconvenient originalism nurtures views that the Court operates as a political body.  For instance, Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010), sidestepped text, history, and tradition to invalidate a major law on a question vital to democracy - limitless corporate money influencing elections.  Corporations though have never been "members of 'We the People' by whom and for whom our Constitution was established."  Id. at 466 (opinion of Stevens, J.).  In 1791, corporations were rare, highly regulated creations of the states and not mentioned in the Constitution.  Id. at 426–27.

5

**\*\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\***

Corporations had *privileges*, not rights.  <u>Id.</u> at 427.  They did not enjoy the same free speech protections as people.  <u>Id.</u> at 428-29, 466 ("corporations have no consciences, no beliefs, no feelings, no thoughts, no desires").  And they certainly were not spending silver coins to sway elections.

Whose history are we talking about anyway?  The powerful.  The few white men who made laws and shaped lives during the mostly racist and misogynistic very old days.  Originalism revives their value judgments.  To constrain the value judgments of contemporary judges!

What about today's need-to-be-constrained judges?  They need to be historians.  Figuring out the way things were to govern the way things are.  Excavating 18th and 19th century experiences to control 21st century life.  How?  Relying on partisan amicus briefs, borrowing history books and dictionaries, searching online, using artificial intelligence?  As one judge put it: "[T]he standard articulated in <u>Bruen</u> expects us to play historian in the name of constitutional adjudication."  <u>United States v. Bullock</u>, ___ F. Supp. 3d ___, 2023 WL 4232309, at \*4-\*5 (S.D. Miss. 2023) (Reeves, J.) ("[A]n overwhelming majority of historians reject the Supreme Court's most fundamental Second Amendment holding – its 2008 conclusion that the Amendment protects an individual right to bear arms,

rather than a collective, Militia-based right") (both quotes
cleaned up).

I fear the Court self-inflicts harm, loses public
confidence, and exposes itself to real criticisms about its
legitimacy.

Inconvenient originalism may just save International Shoe.
Playing tag exposes nationwide corporations to easy forum-
shopping by plaintiffs.  "[C]orporations might lose special
protections."  Ford Motor, 141 S. Ct. at 1039 n.5 (Gorsuch, J.,
concurring).  They might get sued for any claim, in any state,
even though they have no connection to that state.  Mallory, 600
U.S. at 128.  And states may enact the broadest possible
jurisdiction consent statutes to compete with each other.  See
id. at 130.

Sharper minds than mine deep dive and debate the tugs
between originalism and other interpretative modalities.  I'm
just a state judge who respects and admires the federal
constitution's open-textured, freedom-and-liberty-inspired
language.

Sure, a constitutional provision's public meaning at
ratification may matter centuries or decades later.  See United
Pub. Workers, AFSCME, Local 646, AFL-CIO v. Yogi, 101 Hawai'i 46,
53, 62 P.3d 189, 196 (2002) ("[i]n construing a constitutional
provision, the court can also look to [the] understanding of

7

voters who ratified the constitutional provision"). But to the
Hawai'i Supreme Court, it's not decisive, or the *only* way to
interpret a constitution.

In Hawai'i, the Aloha Spirit inspires constitutional
interpretation. When this court exercises "power on behalf of
the people and in fulfillment of [our] responsibilities,
obligations, and service to the people" we "may contemplate and
reside with the life force and give consideration to the 'Aloha
Spirit.'" HRS § 5-7.5(b) (2009).

Hawai'i's people define the Aloha Spirit as:

> "Aloha Spirit" is the coordination of mind and heart within
> each person. It brings each person to the self. Each
> person must think and emote good feelings to others. In
> the contemplation and presence of the life force, "Aloha",
> the following unuhi laulā loa may be used:
>
> "Akahai", meaning kindness to be expressed with tenderness;
>
> "Lōkahi", meaning unity, to be expressed with harmony;
>
> "'Olu'olu", meaning agreeable, to be expressed with
> pleasantness;
>
> "Ha'aha'a", meaning humility, to be expressed with modesty;
>
> "Ahonui", meaning patience, to be expressed with
> perseverance.
>
> These are traits of character that express the charm,
> warmth and sincerity of Hawai'i's people. It was the
> working philosophy of native Hawaiians and was presented as
> a gift to the people of Hawai'i. "Aloha" is more than a word
> of greeting or farewell or a salutation. "Aloha" means
> mutual regard and affection and extends warmth in caring
> with no obligation in return. "Aloha" is the essence of
> relationships in which each person is important to every
> other person for collective existence. "Aloha" means to
> hear what is not said, to see what cannot be seen and to
> know the unknowable.

HRS § 5-7.5(a).

**\*\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\***

*Ku'ia ka hele a ka na'au ha'aha'a* (hesitant walks the humble hearted).  Mary Kawena Pukui, 'Ōlelo No'eau: Hawaiian Proverbs & Poetical Sayings 201 (1983).  A humble person walks carefully so they will not hurt others.  Id.

The United States Supreme Court could use a little Aloha.

/s/ Todd W. Eddins

9