SCHEDULED FOR ORAL ARGUMENT ON MAY 8, 2023

No. 22-7163

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

DISTRICT OF COLUMBIA,
PLAINTIFF-APPELLEE,

v.

EXXON MOBIL CORPORATION, *et al.*,
DEFENDANTS-APPELLANTS.

ON APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**BRIEF FOR APPELLEE**

HASSAN A. ZAVAREEI
ANNA C. HAAC
**TYCKO & ZAVAREEI, LLP**
2000 Pennsylvania Avenue, NW,
Suite 1010
Washington, D.C. 20006
(202) 973-0900
hzavareei@tzlegal.com
ahaac@tzlegal.com

VICTOR M. SHER
**SHER EDLING LLP**
100 Montgomery Street, Suite 1410
San Francisco, CA 94104
(628) 231-2510
vic@sheredling.com

BRIAN L. SCHWALB
Attorney General for the District of
Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

THAIS-LYN TRAYER
Deputy Solicitor General

LUCY E. PITTMAN
Senior Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 727-3881
lucy.pittman@dc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici*.—Exxon Mobil Corporation, ExxonMobil Oil Corporation, Shell plc (f/k/a Royal Dutch Shell plc), Shell USA, Inc. (f/k/a Shell Oil Company), BP p.l.c., BP America Inc., Chevron Corporation, and Chevron U.S.A. Inc. were the defendants below and are the appellants here.  The District of Columbia was the plaintiff below and is the appellee here.   Amici include: the Chamber of Commerce of The United States of America and Indiana and 13 Other States, both in support of Defendants-Appellants.

B. *Ruling under review*.—Appellants appeal the November 12, 2022 order and opinion (ECF Nos. 117, 118) entered by U.S. District Judge Timothy J. Kelly remanding this action to the Superior Court of the District of Columbia.

C. *Related cases*.—None.

## TABLE OF CONTENTS

STATEMENT OF THE ISSUE ................................................................1

STATEMENT OF THE CASE ................................................................2

    1.    The District Sues The Companies In State Court For Violating The District of Columbia Consumer Protection Procedures Act .........2

    2.    The Companies Remove The Case And The District Court Remands, Finding No Basis For Federal Jurisdiction ..........................5

STANDARD OF REVIEW ...................................................................8

SUMMARY OF ARGUMENT .............................................................8

ARGUMENT .....................................................................................13

    I.    There Is No Federal Question Jurisdiction .........................................13

        A.    The Companies cannot establish federal jurisdiction by showing complete preemption ...................................................14

            1.    The complaint pleads state-law claims that do not implicate any area of federal common law .....................15

            2.    The federal common law identified by the Companies has been displaced ........................................17

            3.    Federal common law cannot be the basis for removal because only Congress may completely preempt state law .........................................................23

        B.    The Companies cannot establish federal jurisdiction under the *Grable* doctrine .........................................................29

            1.    The state consumer-protection claims do not necessarily raise a federal issue .....................................30

            2.    Even if there is a federal issue raised in the claims, it is not substantial ...........................................................33

3.    Resolving these quintessential state-law consumer-protection claims in federal court would disrupt the federal-state balance ....................................................... 35

II.    The Federal Officer Removal Statute Does Not Apply ..................... 36

A.    The commercial leases, contracts, and regulatory compliance the Companies cite do not establish that the Companies were acting under the federal government ............. 38

B.    There is no connection between the Companies' commercial agreements with the federal government and the District's claims of deceptive marketing ........................... 44

III.    There Is No Jurisdiction Under The Outer Continental Shelf Lands Act .......................................................................... 49

CONCLUSION ...................................................................... 54

# TABLE OF AUTHORITIES*

## *Cases*

*\*Am. Elec. Power Co. v. Connecticut*,
  564 U.S. 410 (2011)........................................................ 17, 18, 19, 21, 23, 26, 28

*Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202 (5th Cir. 1988) ........ 52

*Arizona v. Manypenny*, 451 U.S. 232 (1981)............................................................ 37

*Atherton v. Fed. Deposit Ins. Corp.*, 519 U.S. 213 (1997) ............................... 16, 25

*Baker v. Atl. Richfield Co.*, 962 F.3d 937 (7th Cir. 2020) ...................................... 49

*Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1 (2003)............................... 13, 14, 27

*\*Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*,
  25 F.4th 1238 (10th Cir. 2022) ................. 1, 17, 22, 24-26, 33, 35, 40, 41, 50-53

*Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*,
  405 F. Supp. 3d 947 (D. Colo. 2019).................................................................... 1

*Bender v. Jordan*, 623 F.3d 1128 (D.C. Cir. 2010) ................................................. 34

*Buljic v. Tyson Foods, Inc.*, 22 F.4th 730 (8th Cir. 2021) ...................................... 44

*Box v. PetroTel, Inc.*, 33 F.4th 195 (5th Cir. 2022) ........................................... 38-39

*BP p.l.c. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532 (2021).............. 22

*Capitol Hill Grp. v. Pillsbury, Winthrop, Shaw, Pittman, LLC*,
  569 F.3d 485 (D.C. Cir. 2009)............................................................................... 8

*Caterpillar Inc. v. Williams*, 482 U.S. 386 (1987)........................................... 13, 24

*City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101 (9th Cir. 2022) ............ 1, 52

---

\*      Authorities upon which we chiefly rely are marked with asterisks.

*City & Cnty. of Honolulu v. Sunoco LP*,
   2021 WL 531237 (D. Haw. Feb. 12, 2021) ......................................................... 1

*City of Annapolis v. BP P.L.C.*, 2022 WL 4548226 (D. Md. Sept. 29, 2022).......... 2

*City of Hoboken v. Exxon Mobil Corp.*, 558 F. Supp. 3d 191 (D.N.J. 2021) ........... 1

*City of Milwaukee v. Illinois & Michigan*,
   451 U.S. 304 (1981)........................................................ 19, 21, 24, 28

*City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021) ..................... 20, 21

*City of Oakland v. BP PLC*, 969 F.3d 895 (9th Cir. 2020)....................................... 2

*Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*,
   996 F.3d 243 (4th Cir. 2021) ............................................................................. 47

*Cnty. of San Mateo v. Chevron Corp.*,
   32 F.4th 733 (9th Cir. 2022) ...................................... 2, 24, 40, 41, 42, 43, 51, 52

*Cnty. of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934 (N.D. Cal. 2018) ........ 2

*Connecticut v. Exxon Mobil Corp.*,
   2021 WL 2389739 (D. Conn. June 2, 2021) ....................................................... 2

*Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588 (D.C. Cir. 2015).................... 49

*D.C. Ass'n of Chartered Pub. Sch. v. District of Columbia*,
   930 F.3d 487 (D.C. Cir. 2019)............................................................... 30, 31, 32

*Danca v. Priv. Health Care Sys., Inc.*, 185 F.3d 1 (1st Cir. 1999)......................... 8

*Delaware v. BP Am. Inc.*, 578 F. Supp. 3d 618 (D. Del. 2022)............................... 1

*Edenfield v. Fane*, 507 U.S. 761 (1993) ............................................................... 16

*Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677 (2006)......... 25, 34, 35

*EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563 (5th Cir. 1994)...... 50-52

*Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938) ....................................................... 15

*Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963) ...................... 16

\*\*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1 (1983)...................................................... 13, 14, 25, 30, 35, 36

\**Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005)................................................... 6, 29, 30, 31, 34

\**Gunn v. Minton*, 568 U.S. 251 (2013) ............................... 6, 13, 14, 29, 31, 34, 35

*Hagans v. Lavine*, 415 U.S. 528 (1974).............................................. 18

*Hodge v. Talkin*, 799 F.3d 1145 (D.C. Cir. 2015) ................................... 30

*Illinois v. City of Milwaukee*, 406 U.S. 91 (1972) ...................................... 19, 27, 28

*In re Deepwater Horizon*, 745 F.3d 157 (5th Cir. 2014)........................................ 50

*In re Otter Tail Power Co.*, 116 F.3d 1207 (8th Cir. 1997) .................................. 29

*Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987)................................................... 26

*Isaacson v. Dow Chem. Co.*, 517 F.3d 129 (2d Cir. 2008).................................... 49

*Jefferson Cty. v. Acker*, 527 U.S. 423 (1999) ......................................... 45

\**K&D LLC v. Trump Old Post Off. LLC*, 951 F.3d 503 (D.C. Cir. 2020)................................................. 13, 37, 44, 45, 46

*Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223 (5th Cir. 1985) ......................................................... 52

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) ........................................... 16

*Loughlin v. United States*, 393 F.3d 155 (D.C. Cir. 2004) ...................................... 8

*Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149 (1908).................... 31, 32

*Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31 (D. Mass. 2020)........... 2

\**Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178 (4th Cir. 2022).................1, 15, 17, 18, 20, 22, 25, 28, 31, 34, 40, 43, 46, 50, 52

*Mayor & City Council of Baltimore v. BP P.L.C.*,
    388 F. Supp. 3d 538 (D. Md. 2019) ................................................................... 1

*Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987)................................................. 24

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
    453 U.S. 1 (1981) .............................................................................................. 19

*Minnesota v. Am. Petroleum Inst.*, No. 21-1752,
    2023 WL 2607545 (8th Cir. Mar. 23, 2023) ..................................... 2, 24, 29, 47

*Minnesota v. Am. Petroleum Inst.*,
    2021 WL 1215656 (D. Minn. Mar. 31, 2021) ..................................................... 2

*Native Village of Kivalina v. ExxonMobil Corp.*,
    696 F.3d 849 (9th Cir. 2012) ....................................................................... 21, 22

*Nat'l Farmers Union Ins. Companies v. Crow Tribe of Indians*,
    471 U.S. 845 (1985).......................................................................................... 27

*N. Carolina by & through N. Carolina Dep't of Admin. v. Alcoa Power
    Generating, Inc.*, 853 F.3d 140 (4th Cir. 2017).............................................. 28

*Oneida Indian Nation of N.Y. State v. Oneida Cnty.*, 414 U.S. 661 (1974) ........... 27

*Rhode Island v. Chevron Corp.*, 393 F. Supp. 3d 142 (D.R.I. 2019) ...................... 1

*Rhode Island v. Shell Oil Prod. Co.*,
    35 F.4th 44 (1st Cir. 2022).................................................... 1, 22, 24, 31, 47, 52

*Rhode Island v. Shell Oil Prods. Co.*, 979 F.3d 50 (1st Cir. 2020) ........................ 46

*Rivet v. Regions Bank of La.*, 522 U.S. 470 (1998). ............................................... 24

*Rodriguez v. Fed. Deposit Ins. Corp.*, 140 S. Ct. 713 (2020)................................. 15

*Ruppel v. CBS Corp.*, 701 F.3d 1176 (7th Cir. 2012)............................................. 48

*Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922 (5th Cir. 1997) .................... 28

*Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981) ................. 15, 16

*United States v. Standard Oil Co. of Cal.,
    545 F.2d 624 (9th Cir. 1976) ............................................................... 41, 42, 43

W. Virginia State Univ. Bd. of Governors v. Dow Chem. Co.,
    23 F.4th 288 (4th Cir. 2022) ........................................................................ 38

Wallis v. Pan Am. Petroleum Corp., 384 U.S. 63 (1966) ...................................... 25

*Watson v. Philip Morris Cos., 551 U.S. 142 (2007)......... 37, 38, 39, 40, 41, 42, 43

*Statutes and Regulations*

D.C. Code § 28-3901 ................................................................................................ 4

D.C. Code § 28-3904 .............................................................................................. 31

D.C. Code § 28-3909 .......................................................................................... 5, 53

12 U.S.C. § 5551 ................................................................................................... 36

15 U.S.C. § 57b ..................................................................................................... 36

15 U.S.C. § 2072 ................................................................................................... 36

21 U.S.C. § 379r .................................................................................................... 36

28 U.S.C. § 1331 ................................................................................................... 13

28 U.S.C. § 1441 ................................................................................................... 13

28 U.S.C. § 1442 ................................................................................... 36, 37, 38, 45

28 U.S.C. § 1451 ..................................................................................................... 4

42 U.S.C. § 6239 ................................................................................................... 43

42 U.S.C. § 7604 ................................................................................................... 26

43 U.S.C. § 1349 ................................................................................................7, 50

**GLOSSARY**

JA            Joint Appendix

OCS           Outer Continental Shelf

OCSLA         Outer Continental Shelf Lands Act

## STATEMENT OF THE ISSUE

The District of Columbia brought suit in the Superior Court of the District of Columbia against several oil and gas companies under the District's Consumer Protection Procedures Act. These state-law claims allege that for decades, the Companies have engaged in false and deceptive marketing in the District that has misled District consumers about the primary role of the Companies' products in causing climate change. Although the claims do not arise under federal law, and liability rests on the Companies' misrepresentations and deceptive omissions—not on the production or extraction of fossil fuels—the Companies removed the action to federal district court. The district court rejected the Companies' theories of federal jurisdiction and remanded, consistent with at least eleven other district courts that have remanded similar state-law deception lawsuits against fossil fuel companies, which the First, Third, Fourth, Eighth, Ninth, and Tenth Circuits all affirmed on appeal.[1] The question presented is:

---

[1]    *See Mayor & City Council of Baltimore v. BP P.L.C.*, 388 F. Supp. 3d 538 (D. Md. 2019), *aff'd*, 31 F.4th 178 (4th Cir. 2022); *Delaware v. BP Am. Inc.*, 578 F. Supp. 3d 618 (D. Del. 2022), *aff'd sub nom. City of Hoboken v. Chevron Corp.*, 45 F.4th 699 (3d Cir. 2022); *City of Hoboken v. Exxon Mobil Corp.*, 558 F. Supp. 3d 191 (D.N.J. 2021), *aff'd sub nom. City of Hoboken v. Chevron Corp.*, 45 F.4th 699 (3d Cir. 2022); *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 405 F. Supp. 3d 947 (D. Colo. 2019), *aff'd*, 25 F.4th 1238 (10th Cir. 2022); *Rhode Island v. Chevron Corp.*, 393 F. Supp. 3d 142 (D.R.I. 2019), *aff'd sub nom. Rhode Island v. Shell Oil Prods. Co.*, 35 F.4th 44 (1st Cir. 2022); *City & Cnty. of Honolulu v. Sunoco LP*, No. 20-CV-00163-DKW-RT, 2021 WL 531237

Whether the district court properly remanded the District's complaint to state court because the District pleaded only state-law claims and the Companies cannot show any grounds for federal jurisdiction.

## STATEMENT OF THE CASE

**1.    The District Sues The Companies In State Court For Violating The District of Columbia Consumer Protection Procedures Act.**

In June 2020, the District filed its complaint, alleging that the Companies have known for decades that their fossil fuel products cause carbon dioxide and other greenhouse gas emissions that have a negative effect on the global climate, but withheld this information from consumers to increase sales and protect their business interests.  Joint Appendix ("JA") 99-104.  The Companies' scientists and industry reports detailed the catastrophic effects that their products would have on sea levels, ocean currents, precipitation patterns, regional temperature, and weather, all of which would result in the devastating loss of ecosystems,

---

(D. Haw. Feb. 12, 2021), *aff'd*, 39 F.4th 1101 (9th Cir. 2022); *Cnty. of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934 (N.D. Cal. 2018), *aff'd*, 32 F.4th 733 (9th Cir. 2022); *City of Oakland v. BP PLC*, 969 F.3d 895 (9th Cir. 2020), *cert. denied sub nom. Chevron Corp. v. City of Oakland*, 141 S. Ct. 2776 (2021); *Minnesota v. Am. Petroleum Inst.*, No. CV 20-1636 (JRT/HB), 2021 WL 1215656 (D. Minn. Mar. 31, 2021), *aff'd*, No. 21-1752, 2023 WL 2607545 (8th Cir. Mar. 23, 2023); *Connecticut v. Exxon Mobil Corp.*, No. 3:20-CV-1555 (JCH), 2021 WL 2389739 (D. Conn. June 2, 2021), *appeal filed*, No. 21-1446 (2d Cir. June 8, 2021); *Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31 (D. Mass. 2020); *City of Annapolis v. BP P.L.C.*, No. CV SAG-21-00772, 2022 WL 4548226 (D. Md. Sept. 29, 2022), *appeal filed*, No. 22-2082 (4th Cir. Oct. 14, 2022).

communities, and people. JA 102-04. Notably, the Companies capitalized on that knowledge of climate change to protect their businesses by investing in infrastructure to account for sea level changes, storm severity, and the reduction and disappearance of polar ice sheets. JA 104-05. Nevertheless, they withheld this knowledge from the public. *See, e.g.*, JA 106. Moreover, the Companies independently and jointly with industry groups engaged in a campaign of denial and disinformation about climate change and their products' role. JA 106-21. The Companies' deliberate deception misled District consumers about climate science—falsely claiming that global warming was not a serious threat or that the science is unsettled. *See, e.g.*, JA 107-09, 111, 120.

Consistent with the Companies' *internal* research, the use of their products has caused significant climate change, with dangerous consequences. JA 121-23; *see* JA 81-82. Globally, the concentration of carbon dioxide has almost doubled over fifty years, JA 81, 121, temperatures have increased, JA 121, as have more extreme weather patterns, JA 121, and sea levels are rising with snow and ice cover diminishing, JA 121-22. Locally, the District has experienced record-breaking temperatures, sea level rise greater than the global average, and extreme precipitation events with associated flooding. JA 122-23.

More recently, the complaint alleges that the Companies have shifted their misinformation strategies to mislead District consumers about their level of

investment in cleaner energy sources.  JA 123-38.  They have rebranded their fossil fuels as green products.  JA 138-44.  And these false advertisements and claims, targeted at District consumers through online sources and print publications, mislead and influence consumers' purchasing decisions.  JA 144-46.  For example, the Companies "market[] . . . the[ir] fossil fuel products to DC consumers as 'safe,' 'clean,' 'emissions-reducing,' and impliedly beneficial to the climate—when production and use of such products is the leading cause of climate change— . . . reminiscent of the tobacco industry's effort to promote 'low-tar' and 'light' cigarettes as an alternative to quitting smoking."  JA 139.  And the Companies have engaged in "long-term advertising and communications campaign[s] designed to obscure the scientific reality of global warming in the minds of consumers in the District," JA 113, falsely claiming in the *Washington Post* that a "U.S. National Assessment report on climate change" was "based 'on unreliable models.'"  JA 119.

Based on these long-standing and continuing deceptive acts by the Companies, the District filed a four-count complaint in the Superior Court alleging violations of the District's Consumer Protection Procedures Act, D.C. Code § 28-3901 *et seq*.; *see* 28 U.S.C. § 1451(1) ("The term 'State court' includes the Superior Court of the District of Columbia.").  The complaint seeks to enjoin the Companies from violating the Act, as well as statutory penalties and fees,

restitution, and damages for the harm caused by the Companies' deceptive actions in the District.  JA 156 (citing D.C. Code § 28-3909).

**2.    The Companies Remove The Case And The District Court Remands, Finding No Basis For Federal Jurisdiction.**

In July 2020, the Companies removed the state-law claims to district court, urging seven theories of federal subject matter jurisdiction.   JA 13-74.   On November 12, 2022, the district court rejected each of those theories and remanded the complaint to the Superior Court.  JA 454-74.

As relevant here, the district court first rejected the Companies' reliance on federal common law.  JA 457-63.  The district court rejected the argument that the District's suit is governed by federal common law on transboundary pollution because Supreme Court precedent has held that any such federal common law has been displaced by federal statute.  JA 460 n.3.  The district court further declined to create federal common law, finding no "significant conflict" between the District's consumer-protection claims and the federal interests identified by the Companies.   JA 458-60.   The district court also explained that the Companies cannot overcome the well-pleaded complaint rule through reliance on the doctrine of complete preemption.   JA 461-62.   This is because only statutes, not federal common law, can completely preempt state-law causes of action, and even for statutes the Supreme Court has rarely recognized instances of complete preemption.  JA 462.

The district court further rejected the Companies' theory of *Grable* jurisdiction.  JA 463-65 (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005)).  Under *Grable*, the district court explained that there is a "slim category" of state-law claims that may allow for federal jurisdiction when "a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  JA 463 (quoting *Gunn v. Minton*, 568 U.S. 251, 258 (2013)).  The district court found that the Companies failed to identify a disputed federal issue necessary to resolve the consumer-protection claims.  JA 463-64.  The district court rejected the Companies' argument that the claims "implicate[] a slew of federal interests, including the federal government's regulatory framework on climate issues, national policies balancing energy production with environmental protection, and foreign affairs."  JA 464.  Instead, recognizing that the complaint is one of consumer protection, the district court found that whether the Companies "misled consumers about the effects of fossil fuels . . . can be adjudicated without a court resolving any questions of federal law."  JA 464.

The district court also rejected the Companies' reliance on the federal officer removal statute.  JA 469-71.  The statute permits removal of state complaints when defendants show they were (1) "acting under the direction of the

federal government," (2) "that there is a nexus or causal connection between the asserted federal authority and the conduct at issue," and (3) "that they can allege a colorable federal defense to the District's claims." JA 469-70 (internal quotation marks omitted). The Companies claim that they have acted under the federal government's direction in the development of fossil fuel products. JA 470. But the district court reasoned that the development of fossil fuels is not the conduct at issue; the conduct alleged is concealment and misrepresentation. JA 471. Resting on the second prong, the court found that the Companies failed to show a nexus between the asserted official authority related to the production of fossil fuels and that conduct. JA 470-71.

Finally, the district court rejected the Companies' contention that the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349, provides jurisdiction. JA 467-69. The district court explained that the "alleged false advertising and misleading information campaigns are not 'operation[s]'" under OCSLA, "even if those acts somehow relate to [the Companies'] offshore drilling." JA 468. The district court also rejected the Companies' argument that their fossil fuel operations on the Outer Continental Shelf are the "but-for" cause of consumer-protection claims predicated on false advertising. JA 468-69.

On November 28, 2022, the Companies timely appealed.

## STANDARD OF REVIEW

The Court reviews "the district court's legal conclusions regarding subject matter jurisdiction, including [its resolution] of a motion to remand, *de novo*." *Capitol Hill Grp. v. Pillsbury, Winthrop, Shaw, Pittman*, *LLC*, 569 F.3d 485, 489 (D.C. Cir. 2009). "[R]emoval statutes are strictly construed . . . and defendants have the burden of showing the federal court's jurisdiction." *Danca v. Priv. Health Care Sys., Inc.*, 185 F.3d 1, 4 (1st Cir. 1999); *cf. Loughlin v. United States*, 393 F.3d 155, 171 (D.C. Cir. 2004) (noting burden on removing party to establish diversity jurisdiction).

## SUMMARY OF ARGUMENT

1. Federal-question jurisdiction is limited to cases arising under the laws of the United States. Here, the District asserts that the Companies violated the District's Consumer Protection Procedures Act by omitting and misrepresenting facts they knew about their products' effect on climate change in advertising within the District. It is this state statute—not any federal law—that supplies the basis for the Companies' liability here.

Under the well-pleaded complaint rule, because these state-law claims do not raise any federal issue on their face, they presumptively belong in state court. There are two limited exceptions to the well-pleaded complaint rule—complete

preemption and *Grable* jurisdiction—that allow state-law claims to be removed to federal court. But the Companies fail to establish that either rare exception applies.

a. The Companies fail to show that any federal law completely preempts the District's state-law claims. To begin, the Companies argue that federal common law "governs" these claims. But there is no federal common law that governs consumer protection and deceptive marketing claims, which is fatal to their argument. Instead, they recast the claims as not about consumer protection, but as a challenge to the Companies' operations—the extraction, production, and sale of fossil fuels—and the harm inflicted globally through climate change. But even if this recast were accurate, their arguments fall short. This is because they rely on a body of federal common law that *once* governed interstate pollution, but that has long been displaced by the Clean Air Act and other federal statutes. Finally, even if there were some basis for finding that federal common law still exists in this area, the Companies cannot establish federal jurisdiction by relying on federal common law because only a federal statute passed by Congress can form a basis for complete preemption. Indeed, complete preemption is necessarily rare and requires a clear showing of Congressional intent. The Companies' complete-preemption argument thus fails for a simple reason—they do not rely on a Congressional act.

b. The Companies' reliance on *Grable* jurisdiction fares no better. The doctrine applies to a "slim category" of claims where a disputed, substantial federal issue is necessarily raised and is capable of resolution without disrupting the federal-state balance. The Companies fail this test for several reasons. To be necessarily raised, the District's claims must depend on the resolution of federal law—but these claims are based on District statutory law and do not depend on the resolution of any federal issue. Even if the claims somehow raised a federal question, the Companies cannot show that the issue is substantial,—meaning its resolution is important to the federal system as a whole. The Companies' reliance on generic federal interests, like energy policy or foreign relations, is insufficient because they fail to connect those interests to any specific question of federal law that must be resolved to establish liability. Moreover, as this Court has explained, federal jurisdiction is disfavored for cases that are fact-intensive and do not involve pure questions of law. Resolution of this case will involve fact-finding on the Companies' decades of deception, and there is no identified pure question of federal law. Finally, even if there were a substantial federal interest that necessarily arises from these state consumer-protection claims, those interests alone do not overcome the concerns about federal-state balance. The consumer-protection claims are within the states' traditional police powers, and the Companies do not point to any authority showing that Congress intended federal

courts to have jurisdiction over such claims.  And state courts are competent to resolve any relevant federal issues.

2.  The Companies cannot establish federal jurisdiction under the federal officer removal statute.  They rely on a trio of commercial relationships with the federal government.  But none of those agreements establish a "special relationship" with the federal government, let alone that the Companies' actions were under the government's "subjection, guidance, or control."  In other words, the Companies' actions under those agreements were not jobs that, in the absence of a contract, the Government itself would have had to perform.

*First*, as to the Outer Continental Shelf ("OCS") leases, the Companies were not acting under the federal government when they won contractual bids to extract fossil fuels in exchange for payments.  Producing oil and gas to sell on the open market is not a job that the government itself would have had to perform without these agreements.  *Second*, the Elk Hills Reserve agreements between the U.S. Navy and Standard Oil (a Chevron predecessor) do not demonstrate that Standard Oil was acting under the federal government.  To be sure, Standard Oil owned one-fifth of Elk Hills, and the agreements limited Standard Oil's production of oil in exchange for compensation.  But such a restriction on production does not amount to control over Standard Oil—the agreement left to Standard Oil's discretion whether to extract any oil at all.  *Third*, the relationship between Shell Oil, Exxon

11

Mobil, and the federal government over the Strategic Petroleum Reserve requires little attention from this Court because the Companies say little about these leases. The Companies certainly do not establish that they were acting under the federal government when they entered commercial agreements related to the Reserve.

Even if the Companies were acting under the federal government per one of those agreements, the Companies' argument still fails because they cannot show the required connection between those agreements and the District's claims for deceptive marketing. Nothing in those agreements required the Companies' alleged false and misleading advertisements, and the Companies do not show otherwise. Instead, they again attempt to recast the complaint as being about the production, sale, and use of oil and gas, not about consumer protection. The Court should reject that attempt. Any fair reading of the complaint shows that the claims are based on deceptive marketing of fossil fuels—not the production or sale of them.

3. Finally, OCSLA cannot provide federal jurisdiction. OCSLA grants jurisdiction for a limited set of cases where the claims arise out of, or in connection with, any operation conducted on the OCS. As the district court found, the Companies fail to show that their fossil fuel operations on the OCS are the "but-for" cause of—or have any meaningful connection to—consumer-protection claims predicated on false advertising and deceptive practices within the District.

12

\* \* \*

The district court correctly remanded this case to the state court, as have several other district courts across the country facing similar claims. Six Courts of Appeals have affirmed; none have disagreed. This Court should join them and affirm.

## ARGUMENT

### I.   There Is No Federal Question Jurisdiction.

"Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." *Gunn*, 568 U.S. at 256 (internal quotation marks omitted)); *see* 28 U.S.C. § 1331. "Only state-court actions that originally could have been filed in federal court may be removed to federal court by the defendant." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987); 28 U.S.C. § 1441(a). A case arises under the laws of the United States "only when a federal question is presented on the face of the *plaintiff's* properly pleaded complaint." *K&D LLC v. Trump Old Post Off. LLC*, 951 F.3d 503, 506 (D.C. Cir. 2020).

To determine whether claims arise under federal law, courts must "examine the 'well pleaded' allegations of the complaint and ignore potential defenses." *Beneficial Nat'l. Bank v. Anderson*, 539 U.S. 1, 6 (2003). "[S]ince 1887 it has been settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption, even if the defense is

13

anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 14 (1983). This means that even "a defense that relies on . . . the pre-emptive effect of a federal statute," "will not provide a basis for removal" because, "absent diversity jurisdiction, a case will not be removable if the complaint does not affirmatively allege a federal claim." *Anderson*, 539 U.S. at 6.

Notwithstanding the well-pleaded complaint rule, a state-law claim may be removed under two limited exceptions. First, a state-law claim may be removed "when a federal statute wholly displaces the state-law cause of action through complete pre-emption." *Anderson*, 539 U.S. at 8. Second, removal may be warranted when a substantial federal issue is embedded within the plaintiff's own statement of the claim and necessarily must be decided—known as the *Grable* doctrine. *Gunn*, 568 U.S. at 258. Neither exception applies here, and the Companies thus fail to satisfy their burden of establishing federal jurisdiction.

### A.     The Companies cannot establish federal jurisdiction by showing complete preemption.

The first exception to the well-pleaded complaint rule—complete preemption—does not apply in this case for three, independently-sufficient reasons. First, the District's state-law claims for false and deceptive marketing do not implicate any area of federal common law. Second, even if they did, the only

14

arguably relevant area of federal common law (concerning interstate pollution) has been entirely displaced by federal statute.  And third, even if it were not, federal common law cannot form a basis for complete preemption—only a statute passed by Congress can.

        1.      The complaint pleads state-law claims that do not implicate any area of federal common law.

The Companies' primary theory of jurisdiction is that the District's state-law claims are "governed by" federal common law.  Br. 13-34.  It is "a well-known principle," however, that "'[t]here is no federal general common law.'"  *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 200 (4th Cir. 2022) ("*Baltimore*") (quoting *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).  This is because "[j]udicial lawmaking in the form of federal common law plays a necessarily modest role under a Constitution that vests the federal government's 'legislative Powers' in Congress and reserves most other regulatory authority to the States."  *Rodriguez v. Fed. Deposit Ins. Corp.*, 140 S. Ct. 713, 717 (2020).  Thus, "before federal judges may claim a new area for common lawmaking, strict conditions must be satisfied."  *Id.*  "[A]bsent some congressional authorization to formulate substantive rules of decision," the Supreme Court has explained that "federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations,

15

and admiralty cases." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981) (footnotes omitted); *Atherton v. Fed. Deposit Ins. Corp.*, 519 U.S. 213, 218 (1997) (areas of federal common law are "few and restricted").

The District's claims have nothing to do with any recognized body of federal common law.   The District's complaint concerns matters of traditional state interests—consumer protection.  *See, e.g.*, *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 150 (1963); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541-42 (2001).  States have a substantial "interest in ensuring the accuracy of commercial information in the marketplace." *Edenfield v. Fane*, 507 U.S. 761, 769 (1993).  Here, the District's Consumer Protection Procedures Act, not federal common law, "supplies the rule of decision."   Br. 27.   The Companies conspicuously point to no federal common law cause of action related to consumer protection.

Instead, the Companies seek to mischaracterize the District's claims as "ultimately premised on transboundary pollution," therefore arising under the federal common law concerning interstate pollution.  Br. 22.  To wit, they proclaim that "the District is functionally seeking to regulate [the Companies'] production and sale of fossil-fuel products everywhere," Br. 24, and that the claims "implicate the foreign affairs of the United States," Br. 25.  Not so.  The District's theory of liability is that the Companies deliberately omitted and misrepresented facts about

16

climate change and their products' relationship to it in advertising within the District, and the relief sought is to remedy local harms caused by that deceptive advertising.    JA 146-57.    The claims do not seek to regulate the Companies' production of fossil fuels as a basis for liability or through the requested relief. The complaint therefore, does not implicate any area of federal common law—let alone arise under it—and that is enough to dismiss the Companies' argument concerning complete preemption.

2.    The federal common law identified by the Companies has been displaced.

Even if this case did somehow implicate an area of federal common law, the only arguably relevant body of federal common law the Companies cite (interstate pollution) was displaced by federal statute, including the Clean Air Act, decades ago.    As the Supreme Court explained in *American Electric Power Co. v. Connecticut* ("*AEP*"), "the Clean Air Act and the [Environmental Protection Agency] actions it authorizes displace any federal common-law right to seek abatement of carbon-dioxide emissions."    564 U.S. 410, 424 (2011).    Thus, as the district court recognized, JA 460 n.3, whatever federal common law may have existed predating the Clean Air Act has been extinguished and cannot provide a basis for removal.    This Court's sister circuits agree.    *See, e.g.*, *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1259-60 (10th Cir. 2022) ("*Suncor*") ("[T]his case could not have been removed to federal

17

court on the basis of federal common law that no longer exists." (internal quotation marks omitted)); *Baltimore*, 31 F.4th at 206 ("[D]ue to statutory displacement, federal common law claims concerning interstate pollution and the regulation of greenhouse-gas emissions are now obsolete.").

The Companies advance no meaningful argument why the Clean Air Act leaves some federal common law within its operative scope, except to say that the district court "impermissibly conflate[d] jurisdiction and merits-related determinations." Br. 29. But as the district court explained, after *AEP*, it is unclear how the District's claims could arise under federal common law in this area if those 'federal law claim[s] [have] been deemed displaced, extinguished, and rendered null by the Supreme Court.'" JA 460 n.3 (quoting *Baltimore*, 31 F.4th at 206). The Fourth Circuit was even clearer: "it is 'no longer open to discussion' that federal common law claims even exist to govern" the claims here. *Baltimore*, 31 F.4th at 206 (quoting *Hagans v. Lavine*, 415 U.S. 528, 536-37 (1974)).

The Supreme Court cases that the Companies say show that federal common law exists actually stand for the very opposite. The Companies describe *AEP* as "reaffirm[ing] that federal common law governs claims involving 'air and water in their ambient or interstate aspects.'" Br. 16 (quoting 564 U.S. at 421). In fact, the Court said that "[i]n light of our holding that the Clean Air Act displaces federal

18

common law, the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal Act," not federal common law. *Id*. at 423, 429.

The Companies also cite *Illinois v. City of Milwaukee* ("*Milwaukee I*") to argue that interstate pollution touches "'basic interests of federalism'" and an "'overriding [f]ederal interest in the need for a uniform rule of decision,'" such that courts must apply "federal common law to claims seeking redress for interstate pollution." Br. 29 (brackets in original) (quoting 406 U.S. 91, 105 n.6 (1972)). But the federal common law recognized in *Milwaukee I* was displaced by amendments to the Federal Water Pollution Control Act, as the Court held nine years later in *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 317 (1981) ("*Milwaukee II*"); *see Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 21-22 (1981) ("The Court has now held that the federal common law of nuisance in the area of water pollution is *entirely pre-empted* by the more comprehensive scope of the [Federal Water Pollution Control Act], which was completely revised soon after the decision in [*Milwaukee I*].").[2]

---

[2]    Contrary to the Companies' truncated quote (at 15), *Milwaukee II* did not hold that "state law cannot be used" in a situation where federal common law has been displaced. The language states, in full: "*if* federal common law exists, it is because state law cannot be used." *Milwaukee II*, 451 U.S. at 313 n.7 (emphasis added). *Milwaukee II* makes clear that the condition "*if* federal common law exists" was not met there because Congress displaced it. *Id*. at 317.

Nor do the cases the Companies cite from the Second and Ninth Circuits support their argument. The Companies first contend that the Second Circuit in *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021), concluded "that claims seeking redress for global climate change . . . are governed by federal common law." Br. 19 (citing 993 F.3d at 91). But as the Fourth Circuit later explained, that case "does not pertain to the issues before" this Court for two reasons. *Baltimore*, 31 F.4th at 203. First, "*City of New York* was in a completely different procedural posture" because New York City filed its complaint in federal court on diversity grounds. *Id.* On appeal from a Rule 12(b)(6) dismissal, the Second Circuit stated that it was resolving a "preemption defense on its own terms," and was not addressing federal common law under the "heightened standard unique to the removability inquiry." *City of New York*, 993 F.3d at 94.

Second, the claims at issue in *City of New York* are materially different from the claims here. The Second Circuit held that New York City's "nuisance suit [sought] to recover damages for the harms caused by global greenhouse gas emissions," such that it would "effectively impose strict liability for the damages caused by fossil fuel emissions" and thus in effect "regulate cross-border emissions." *City of New York*, 993 F.3d at 91, 93. The District's Consumer Protection Procedures Act claims, by contrast, do not sound in strict liability and

20

target the Companies' false and deceptive marketing directed at consumers in the District, not fossil-fuel production or emissions.  JA 146-57.

In any event, although the Companies nowhere acknowledge it, while *City of New York* did conclude that "the City's claims must be brought under federal common law," the Court went on to explain that "those federal claims immediately r[a]n into a problem of their own": "the Clean Air Act displaces federal common law claims concerned with domestic greenhouse gas emissions."  993 F.3d at 95. *City of New York*'s reasoning is thus consistent with the district court's reasoning here.

The Companies' reliance on *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849 (9th Cir. 2012), fares no better.  Br. 21-22.  Like *City of New York*, *Kivalina* did not concern removal at all.  The *Kivalina* plaintiffs filed their complaint in federal court on federal question grounds, pleading claims under federal common law.  *Id*. at 853.  The Ninth Circuit, relying on *Milwaukee II* and *AEP*, found that no such cause of action remained because "the Supreme Court has held that federal common law addressing domestic greenhouse gas emissions has been displaced by Congressional action."  *Id*. at 858.  The court therefore affirmed dismissal for lack of subject-matter jurisdiction because "[j]udicial power can afford no remedy unless a right that is subject to that power is present."  *Id*. at 856-57.  That decision thus *supports* the district court's reasoning here.  As the Fourth

21

Circuit explained, "if anything, [*Kivalina*] suggests that the displacement of federal common law deprives federal courts of jurisdiction." *Baltimore*, 31 F.4th at 207.

Notably, the First Circuit observed that the Companies' argument in these removal cases actually conflicts with their own argument in *Kivalina*, where they "successfully argued . . . that 'the Clean Air Act *displaces* any federal common law claims potentially arising from greenhouse[-]gas emissions.'" *Rhode Island v. Shell Oil Prod. Co.*, 35 F.4th 44, 56 n.9 (1st Cir. 2022) (brackets in original) (quoting Answering Brief of Defendants-Appellees (available at 2010 WL 3299982) filed in *Kivalina*, 696 F.3d 849). The First Circuit continued: "'Displacement of the federal common law does not leave those injured by air pollution without a remedy,' . . . because '[o]nce federal common law is displaced, state nuisance law becomes an available option to the extent it is not preempted by federal law.'" *Id.* (brackets in original) (quoting *Kivalina*, 696 F.3d at 866 (Pro, J., concurring)).[3]

---

[3]    The Companies also rely on a past position taken by the U.S. Solicitor General in a case where the Supreme Court addressed the scope of an appeal challenging a remand to state court. Br. 17; *see* U.S. Solicitor General amicus brief, filed in *BP p.l.c. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532 (2021), available at https://tinyurl.com/427n3wpw, at 26-28. The views of the Solicitor General, of course, have no legal effect. At any rate, more recently, the U.S. Solicitor General re-examined its position and concluded that "state-law claims like those pleaded here should not be recharacterized as claims arising under federal common law." U.S. Solicitor General amicus brief in *Suncor Energy*

In short, because federal statutes have displaced any federal common law regarding fossil-fuel production and emissions regulation, federal common law cannot form a basis for federal jurisdiction in this case. Rather, when a statute "displaces federal common law," state-law claims may proceed, subject to "the preemptive effect of the federal Act." *AEP*, 564 U.S. at 429.[4]

> ### 3. Federal common law cannot be the basis for removal because only Congress may completely preempt state law.

Even assuming federal common law were not displaced in this area, federal common law cannot completely preempt the District's state-law claims—only a

---

*Inc. v. Bd. Of Co. Comm'rs*, No. 21-1550, available at https://tinyurl.com/mwjx7kbt, at 7; *see also id.* at 11 (arguing that no exception to the well-pleaded complaint rule applies and that Congress has displaced any relevant federal common law).

[4]    The district court primarily interpreted the Companies' arguments as seeking to expand or create federal common law. On appeal, the Companies clarify that they are not "seek[ing] to *expand* federal common law." Br. 28. The Court therefore need not reach that issue.

The Companies advance two additional arguments that warrant little attention. First, the Companies argue that states cannot impose regulatory policies on other states or nationwide. Br. 16. Closely related, the Companies introduce an argument, not advanced in the district court, that the District as a municipal corporation granted powers through the Home Rule Act faces greater limitations than States on its power to legislate outside of its borders. Br. 18. But the Companies never identify how the District's complaint—seeking to enjoin them from engaging in misinformation—will have any regulatory effect on the other states or how the legislative limitations in the Home Rule Act are relevant at all.

statute can do that. *Contra* Br. 32-34.[5] And the Companies did not argue below—nor on appeal—that the Clean Air Act or any other statutory provision completely preempted the District's claims. *See* ECF Record Document 51. As the district court explained, "complete preemption requires a 'clear and manifest purpose' from Congress—something unavailable from a judge-made federal common law rule." JA 462 (quoting *Milwaukee II*, 451 U.S. at 316).

Under the doctrine of complete preemption, there are rare occasions where "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar*, 482 U.S. at 393 quoting (*Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987)). "[O]nce an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state-law claim is considered, from its inception, a federal claim, and therefore arises under federal law." *Rivet v. Regions Bank of La.*, 522 U.S. 470, 476 (1998). "Any such

---

[5]     At various times the Companies argue that the District's complaint was artfully pleaded to avoid federal jurisdiction. *See* Br. 31, 34, 35   But the artful pleading doctrine is not a separate exception to the well-pleaded complaint rule; it is simply the complete-preemption exception by another name. As the First Circuit explained, "in the rare situations when [complete preemption] applies, courts sometime derisively describe the complaint as 'artfully pleaded' to sidestep the federal claim." *Rhode Island*, 35 F.4th at 52 (citing *Rivet*, 522 U.S. at 475); *see San Mateo*, 32 F.4th at 748; *Suncor*, 25 F.4th at 1256; *Minnesota*, 2023 WL 2607545, at *2 n.4.

suit" is considered "purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence" of federal law. *Franchise Tax Bd.*, 463 U.S. at 23. "In contrast, ordinary preemption is not a jurisdictional doctrine because it 'simply declares the primacy of federal law, regardless of the forum or the claim.'" *Baltimore*, 31 F.4th at 198. Instances of *complete* preemption are few and far between; the Supreme Court has found complete preemption in only three instances: "§ 301 of the Labor Management Relations Act, § 502 of ERISA, and usury actions under the National Bank Act." *Suncor*, 25 F.4th at 1257.

In finding complete preemption, the Supreme Court has emphasized that whether "'federal power should be exercised to displace state law is primarily a decision for Congress,' not the federal courts." *Atherton*, 519 U.S. at 218 (quoting *Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63, 68 (1966)). When "Congress intends a preemption instruction completely to displace ordinarily applicable state law, and to confer federal jurisdiction thereby, it may be expected to make that atypical intention clear." *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 698 (2006).

Here, the Companies cannot show complete preemption for the simple reason that they do not rely on a federal statute. Instead, they rely on federal common law. Br. 32 (arguing the claims are "necessarily arising under federal

common law"). But "complete preemption requires congressional intent." *Suncor*, 25 F.4th at 1261. Far from intending federal common law to completely preempt state law claims like the District's, Congress's intent here was to *displace* federal common law. *See AEP*, 564 U.S. at 424.

The Companies complain that the "district court misunderstood the relationship between state or local law and federal common law," Br. 30, arguing that the displacement of federal common law by the Clean Air Act limits state action to claims that existed before the enactment of the Clean Air Act. Not so. As noted above, *AEP* explained that while "the Clean Air Act displaces federal common law," "the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect *of the federal Act*." *AEP*, 564 U.S. at 429 (emphasis added); *see* 42 U.S.C. § 7604(e) (nothing in the Act shall "restrict any right which any person . . . may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief."); *cf. Int'l Paper Co. v. Ouellette,* 479 U.S. 481, 497 (1987) ("[N]othing in the [Clean Water] Act bars aggrieved individuals from bringing a nuisance claim pursuant to the law of the *source* State.").

The Companies also cite to two Indian law cases, but those cases do not support their position. First, the Companies' reliance (Br. 33) on *Oneida Indian Nation of N.Y. State v. Oneida Cnty.*, 414 U.S. 661, 677 (1974), is misplaced. The

Companies argue that "[t]he Supreme Court has already recognized that federal common law can function in the same way as a completely preemptive statute in the context of" Indian law.  Br. 33.  However, *Oneida* involved unique questions of Indian tribal lands, and it is a "rudimentary proposition[] that Indian title is a matter of federal law and can be extinguished only with federal consent."  414 U.S. at 670.  As the Supreme Court later explained in *Anderson*, the jurisdictional issue in *Oneida* turned on "the special historical relationship between Indian tribes and the Federal Government."  539 U.S. at 8 n.4.  And *Anderson* reiterated the rule that a state-law claim may be removed "when a federal *statute* wholly displaces the state-law cause of action through complete pre-emption."  *Id.* at 8 (emphasis added).

*National Farmers Union Insurance Companies v. Crow Tribe of Indians*, 471 U.S. 845 (1985), is even further afield.  There, the plaintiff filed the complaint in federal court with claims that arose under federal Indian law.  *Id*. at 848; *see id.* at 851 ("As we have often noted, Indian tribes occupy a unique status under our law.").  Under the well-pleaded complaint rule, there was federal jurisdiction because the federal claims were on the face of the complaint.  Here, the District's claims neither involve Indian law nor are "founded upon federal common law," Br. 26, but rather on state statutory law, JA 146-57.  The Companies ignore this material difference.  And once again, they cite (Br. 26-27) *Milwaukee I*, where the

27

plaintiff invoked federal common law and federal jurisdiction, which therefore does not speak to removal. Moreover, as discussed, *Milwaukee I* was overtaken by *Milwaukee II*'s holding that a statute displaced the federal common law there. *See* Section I.A.2.

The Companies also point to three out-of-circuit cases, but all three are readily distinguishable. Br. 27. Starting with *North Carolina by & through North Carolina Dep't of Admin. v. Alcoa Power Generating, Inc.*, 853 F.3d 140 (4th Cir. 2017), removal in that case was based on a federal constitutional question. *Id.* at 145. Here, the Companies "do not rely on any constitutional provision suggesting federal law applies to or governs" the District's consumer-protection claims. *Baltimore*, 31 F.4th at 207-08.

Next, the Companies cite *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922 (5th Cir. 1997), a case against an airline concerning lost packages. *Id.* at 925. While the Fifth Circuit held that the "claim raise[d] federal question jurisdiction based on the federal common law that controls an action seeking to recover damages against an airline for lost or damaged shipments," *id*. at 923, that decision was based on a statute that "include[d] a provision . . . preserving federal common law actions," *id*. at 928-29. The Companies provide no such statutory clause here preserving federal common law; in fact, federal statutes have displaced the federal common law. *See AEP*, 564 U.S. at 424.

In the third case, *In re Otter Tail Power Co.*, 116 F.3d 1207 (8th Cir. 1997), the complaint "specifically reference[d] the district court's prior decision in th[at] matter" and was "specifically premised on [an] alleged deviation by [defendant] from the terms of the district court's previous order." *Id.* at 1213.  The prior order "explicitly analyzed the effects of a United States treaty, various federal statutes, and the federal common law of inherent tribal sovereignty on the existence and extent of the Tribe's authority."   *Id.* at 1214 (noting "tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States"). In this unique context, the Eighth Circuit held that there was a federal question. No such questions of "tribal sovereignty" are present here, and, notably, the Eighth Circuit recently affirmed remand of a lawsuit similar to this matter.  *See Minnesota v. Am. Petroleum Inst.*, No. 21-1752, 2023 WL 2607545, *3 (8th Cir. Mar. 23, 2023) ("Contrary to the Energy Companies' insistence, federal common law on transboundary pollution does not completely preempt Minnesota's claims.").

### B.    The Companies cannot establish federal jurisdiction under the *Grable* doctrine.

The *Grable* doctrine is an exception to the well-pleaded complaint rule that extends federal jurisdiction to a "slim category" of state-law claims where "a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  *Gunn*, 568 U.S. at 258.  *Grable* jurisdiction lies only if

29

"all four" prongs "are met." *Id.* The district court found that the Companies failed to identify a disputed federal issue necessary to resolve the District's consumer-protection claims. JA 463-64. They continue that failure on appeal. Even if they could show such an issue, it is certainly not substantial. And even if it were substantial, asserting federal jurisdiction over the District's state-law claims would disrupt the federal-state balance.[6]

1.    The state consumer-protection claims do not necessarily raise a federal issue.

The Companies' argument fails at the first prong because no federal issue is necessarily raised on the face of the complaint. A federal issue is "necessarily raised" for subject-matter jurisdiction purposes only when "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd.*, 463 U.S. at 28. The Companies therefore must show that a federal issue "is a necessary element of one of the well-pleaded state claims." *Id.* at 13. A "mere need to apply federal law in a state-law claim" cannot create federal jurisdiction. *Grable*, 545 U.S. at 313. The federal question must be "an essential part of [the plaintiff's] affirmative claim." *D.C. Ass'n of Chartered Pub. Sch. v. District of Columbia*, 930 F.3d 487, 491 (D.C. Cir. 2019).

---

[6]    This Court may affirm on any of the prongs because each raises a question of law which the parties fully briefed below and on appeal. *See Hodge v. Talkin*, 799 F.3d 1145, 1171 (D.C. Cir. 2015).

The *Grable* and *Gunn* decisions illustrate that federal issues are "necessarily raised" only where an element of proof in a state-law cause of action requires the plaintiff to prevail on a concrete, identifiable issue of federal law. In *Grable*, an "essential element of [the state] quiet title claim" required Grable to prove that the IRS had not "give[n] it adequate notice, as defined by federal law." 545 U.S. at 314-15. And in *Gunn*, to prove causation on a legal malpractice claim, the plaintiff needed to show "he would have prevailed in his [underlying] federal patent infringement case" but for the actions of his attorney. 568 U.S. at 259.

In contrast, the District need not prove any issue of federal law to prevail on its consumer-protection claims. The elements are defined by state statute as an "unfair or deceptive trade practice" that includes misrepresentations, misleading statements, deceptive practices, or false statements. D.C. Code § 28-3904. The Companies "pinpoint no specific federal issue that must necessarily be decided for [the District] to win its case; and their speaking about federal law or federal concerns in the most generalized way is not enough for *Grable* purposes." *Rhode Island*, 35 F.4th at 57; *see Baltimore*, 31 F.4th at 210 (The defendants "never identify what federal question is a 'necessary element' for any of [the] state-law claims."). To the extent that there will be any federal issue raised in this case, it will be through a defense raised by the Companies. But "it is black-letter law that an anticipated federal defense does not substantiate federal-question jurisdiction."

*D.C. Ass'n of Chartered Pub. Sch.*, 930 F.3d at 491 (citing *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 153 (1908)).[7]

Instead of identifying an actual issue of federal law that the District must prove, the Companies' arguments once again mischaracterize the District's claims as being about "transboundary pollution and foreign affairs." Br. 35. They argue the case requires a court to make "complex and value-laden policy judgments reserved for federal authorities" to determine the balance between preventing global warming versus energy production and economic growth. Br. 36; *see* Br. 37 (referring to the claims as "collateral attacks on federal legislative and regulatory determinations"). But the Companies identify no policy decision (let alone a complex, value-laden decision) that is an "essential element" of the District's consumer-protection claims. *D.C. Ass'n of Chartered Pub. Sch.*, 930 F.3d at 491. Indeed, the District's claims have nothing to do with policy decisions concerning

---

[7]    Contrary to the Companies' contention, the District's complaint is not "fraud on the federal government" based on "[mis]representations made to federal policy makers." Br. 37. To be sure, as part of their decades-long deception, the complaint explains that the Companies developed a plan to "deceive the public about the dangers of fossil fuels," that included national media contacts, op-eds, and an "outreach program to inform and educate members of Congress . . . and school teachers∕students about uncertainties in climate science." JA 110 (ellipsis in original). At bottom, however, the District's claims are based on the deception to District *consumers*. Tellingly, the Companies do not develop this argument further because liability here is obviously not dependent on whether the Companies committed fraud on members of Congress.

fossil fuel emissions.  And even if they could identify a federal *policy* implicated by the District's state-law claims, that does not mean those claims necessarily raise a disputed issue of federal *law*.  As the district court explained, the complaint brings a consumer-protection claim about whether the Companies "misled consumers about the effects of fossil fuels," and that claim "can be adjudicated without a court resolving any questions of federal law."  JA 464.

The Companies also complain that the "District aims to achieve through its consumer-protection law what has not been achieved in the federal legislative and regulatory process: namely, a determination that defendants' activities are unreasonable."  Br. 37.  But whether that is true is irrelevant.  State law routinely allows for remedies unavailable under federal law, and that fact "is entirely unremarkable."  *Suncor*, 25 F.4th at 1267 (noting that the Companies' argument "is simply a description of our federalist system, not a reason to override state sovereignty").

      2.    Even if there is a federal issue raised in the claims, it is not substantial.

Even if the District's claims necessarily raise a federal question—which they do not—the Companies still fail at the third prong[8]: whether any federal issues are

---

[8]    The second prong is whether the federal issue is "actually disputed," which the Companies briefly combine with the fourth prong in arguing that there is a dispute over whether federal law applies.  Br. 38-39.  But a "federal issue is

substantial.  "The substantiality inquiry under *Grable* looks . . . to the importance of the issue to the federal system as a whole," not to the individual parties.  *Gunn*, 568 U.S. at 260.  Thus, in *Grable*, the Court held "that the national interest in providing a federal forum for federal tax litigation is sufficiently substantial to support the exercise of federal-question jurisdiction."  545 U.S. at 310.  Key factors to consider for determining the importance to the federal system are whether the federal issue "would be controlling in numerous other cases," *Empire*, 547 U.S. at 700, or whether it presents as a "nearly pure issue of law," *Bender v. Jordan*, 623 F.3d 1128, 1130 (D.C. Cir. 2010) (internal quotation marks omitted).  But "federal jurisdiction is disfavored for cases that are 'fact-bound and situation-specific' or which involve substantial questions of state as well as federal law."  *Bender*, 623 F.3d at 1130 (quoting *Empire*, 547 U.S. at 701).

The Companies fail to show that any federal issue is substantial here.  They assert that this case "sits at the intersection of federal energy and environmental regulation and necessarily implicates interstate emissions, foreign policy, and national security."  Br. 38.  How?  The Companies do not say.  Indeed, they identify *no* federal law or regulation at issue in this case—let alone a pure question of federal law that would be in the national interest to have settled by a federal

---

'actually disputed' when the parties disagree about the effect of federal law"—not when a party disputes whether federal law applies or not.  *Baltimore*, 31 F.4th at 209; *accord Gunn*, 568 U.S. at 259.

court.  As the Tenth Circuit explained, "it is difficult to comprehend how the suit's resolution could have controlling effect across the federal system regarding any of these substantial issues when the . . . Companies fail to adequately tether their 'national interest' argument to any specific federal law or laws."  *Suncor*, 25 F.4th at 1268 (citing *Gunn*, 568 U.S. at 260).  In truth, this case will be determined based on intense fact-finding surrounding decades of deceptive actions by the Companies and how that deception affected District consumers.  *See generally* JA 99-144.  That inquiry is not a pure question of law, let alone one that would control numerous other cases.

> 3.    Resolving these quintessential state-law consumer-protection claims in federal court would disrupt the federal-state balance.

Finally, even if there were some substantial federal issue that arises from the District's consumer-protection claims, those interests alone are not enough to establish *Grable*'s fourth prong—that the resolution of those issues in federal court will not disrupt the "federal-state balance."  *Empire*, 547 U.S. at 701.  Generally speaking, a state court "is competent to apply federal law, to the extent it is relevant."  *Id.*; *City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 705 (3d Cir. 2022) ("Our federal system trusts state courts to hear most cases—even big, important ones that raise federal defenses.").  And here, the federal-state balance favors adjudication in state court because the District is seeking to enforce its own laws in its own courts.  Consumer-protection claims are within states' traditional police

powers.  *See Franchise Tax Bd.*, 463 U.S. at 21 n.22 ("[C]onsiderations of comity make [courts] reluctant to snatch cases which a State has brought from the courts of that State, unless some clear rule demands it.").

Moreover, the Companies have pointed to nothing that suggests Congress intended federal courts to be the forum for state consumer-protection violations. Nor could they, because Congress has consistently *declined* to provide a claim for damages in this context and has expressly preserved state law.  For example, the Federal Trade Commission Act preserves state-law actions for unfair or deceptive trade practices, 15 U.S.C. § 57b(e), and the Consumer Product Safety Act preserves state products liability claims, 15 U.S.C. § 2072(c).  And Congress added analogous savings clauses to other federal consumer-protection statutes, such as the Food, Drug, and Cosmetic Act, 21 U.S.C. § 379r(f), and the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. § 5551(a).  These provisions only reiterate that the District's claims should be adjudicated in state court.

## II.    The Federal Officer Removal Statute Does Not Apply.

The Companies alternatively argue that the federal officer removal statute provides for federal jurisdiction.  That argument fares no better.  The statute allows a defendant to remove a civil action against "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States

or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). "Historically, removal under § 1442(a)(1) and its predecessor statutes was meant to ensure a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties." *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981). "The act of removal permit[ed] a trial upon the merits of the state-law question free from local interests or prejudice." *Id*. at 241-42.

Section 1442 applies to *private* parties—like the Companies here—only if they meet two requirements. First, they must have acted under a federal agency or officer. *Watson v. Philip Morris Cos.*, 551 U.S. 142, 151 (2007). Second, the party seeking to invoke Section 1442 jurisdiction also must "show that the suit is one 'for or relating to any act under color of [such] office.'" *K&D LLC v. Trump Old Post Off. LLC*, 951 F.3d 503, 506 (D.C. Cir. 2020) (quoting 28 U.S.C. § 1442(a)(1)).[9] While noting that the Fourth and Tenth Circuits have rejected the Companies' theories that they were "acting under the direction of the federal government," the district court did not reach that prong. JA 470 n.9. It instead concluded that the Companies failed to show a connection between its

---

[9]    The District did not contest below the third requirement under the statute, that the Companies "raise[d] a colorable federal defense." *K&D LLC*, 951 F.3d at 506.

relationships with the federal government and the District's claims.   JA 469-71.

The Companies fail to meet either prong, and this Court can affirm on either

ground.[10]

> ### A.   The commercial leases, contracts, and regulatory compliance the Companies cite do not establish that the Companies were acting under the federal government.

The Companies fail to show that in "carrying out" their deceptive acts "that

are the subject of the [District's] complaint, [they were] 'acting under' any

'agency' or 'officer' of 'the United States.'"   *Watson*, 551 U.S. at 147 (quoting 28

U.S.C. § 1442(a)(1)).   The term "acting under" requires that the private party's acts

"involve an effort to assist, or to help carry out, the duties or tasks of the federal

superior."   *Id*. at 152.   Simply complying with the law, a lease, or a contract are

insufficient because the private party must have a "special relationship" with the

federal government.   *Id.* at 157.   And while some private contractors present the

"archetype case" of "working on behalf of the federal government" and meet this

prong, such contractors must fulfill "'basic governmental tasks'" that "'the

Government itself would [otherwise] have . . . to perform.'"   *W. Virginia State*

*Univ. Bd. of Governors v. Dow Chem. Co.*, 23 F.4th 288, 299 (4th Cir. 2022)

(alterations in original) (quoting *Watson*, 551 U.S. at 154)); *see Box v. PetroTel,*

---

[10]    The district court did not address the "acting under" prong, but this Court may affirm on either prong.  *See supra* n.6.

*Inc.*, 33 F.4th 195, 199-00 (5th Cir. 2022) (rejecting that the private party was "acting under" a federal agency because it "did not show that it helped the [agency] carry out a duty, activity, or task that the [agency] otherwise would have had to do itself"). Commercial contracts and leases are generally insufficient because they do not involve actions under the government's "subjection, guidance, or control." *Watson*, 551 U.S. at 151-52.

Accepting, for purposes of this brief, the Companies' factual assertions, the Companies have the following relationship with the federal government: (1) the Companies produced fuel during the 1940s to support the war efforts, Br. 41-44; (2) post-World War II, the Companies provided specialized fuel to support the military's efforts during the Cold War, Br. 44-45; and (3) the Companies have entered into leases with the federal government to extract and produce oil and gas from the OCS, and other agreements to allow for the production of the Elk Hills Reserve and the Strategic Petroleum Reserve, which relationships require compliance with federal regulations, Br. 45-48.

Even assuming that these leases and agreements bear any relation to the deceptive conduct alleged in the complaint—which they do not, *see infra* Section II.B—the Companies' contracts evidence a commercial relationship that lacks the close control and direction required to show that the Companies are acting under a federal officer or agency. "[T]he federal government's willingness to lease federal

39

property or minimal rights to a private entity for that entity's commercial purposes does not, without more, constitute the kind of assistance required to establish that the private entity is 'acting under' a federal officer." *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 759-60 (9th Cir. 2022) ("*San Mateo*").  And the fact that the Companies must comply with the terms of these agreements as well as the law does not, without more, transfer their functions into governmental functions. *Watson*, 551 U.S. at 151-53.  The particulars of the asserted contractual relationships demonstrate that the Companies were not "acting under" the federal government.

Starting with the OCS leases, the Companies argue that the federal government "directed [the Companies] to explore, develop, and produce oil and gas on the [OCS] pursuant to leases."  Br. 46.  But "directed" is quite an exaggeration.  The OCS leases *allow* the Companies to extract oil and gas; they do not "*require* [the Companies] to tailor fuel production to detailed government specifications aimed at satisfying pressing federal needs."  *Suncor*, 25 F.4th at 1253 (emphasis added).  As the other circuits have held, "many of [the] lease terms are mere iterations of the OCSLA's regulatory requirements," and compliance with federal law cannot create an "acting under" relationship.  *Baltimore*, 31 F.4th at 232; *see also San Mateo*, 32 F.4th at 760 ("the lease requirements largely track statutory requirements"); *Watson*, 551 U.S. at 153 (compliance with the law cannot

show that a private party was acting under a federal officer). At bottom, the OCS leases are commercial leases, and "[b]y winning bids for leases to extract fossil fuels from federal land in exchange for royalty payments, [the Companies are] not assisting the government with essential duties or tasks." *Suncor*, 25 F.4th at 1253. Simply producing oil and gas to sell on the open market is not "a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Watson*, 551 U.S. at 154.

Next, the Companies point to a 1944 Unit Plan Contract between Standard Oil (a Chevron predecessor) and the U.S. Navy at the Elk Hills Naval Reserve.[11] Br. 46. That contract allowed the Navy, which owned approximately four-fifths of the reserve, and Standard Oil, which owned one-fifth, to "coordinate operations in the oil field and production of the oil." *San Mateo*, 32 F.4th at 758; *see generally United States v. Standard Oil Co. of Cal.*, 545 F.2d 624, 626 (9th Cir. 1976) (discussing Elk Hills Reserve contract). Because the Navy sought to limit production to retain the oil reserve for a time of emergency, the agreement curtailed both parties' production and, as one term of the agreement, "gave the Navy 'exclusive control over the exploration, prospecting, development, and

---

[11] In a contradiction, the Companies complain (at 42 n.*) that the complaint "improperly conflates" the activities of their predecessors, subsidiaries, and affiliates, but nonetheless they rely on activities of a predecessor in support their argument that they were "acting under" the federal government.

operation of the Reserve.'"  *San Mateo*, 32 F.4th at 759.  As compensation, Standard Oil obtained, among other things, the right to produce a specified amount of oil per day (an average of 15,000 barrels per day) for its own use.  *Id.* at 759; JA 387, § 4(b).

Those terms, and the Navy's ability to restrict Standard Oil's production, do not amount to "subjection, guidance, or control" over Standard Oil required to establish that it was acting under a federal officer.  *Watson*, 551 U.S. at 151.  For one, Standard Oil was not required to extract any oil at all.  *See* JA 387, § 4(b) (providing that the reserve will be operated to "*permit* production" at a rate sufficient to produce amount to which Standard Oil was entitled, subject to reduction by the Navy (emphasis added)).  And when it did extract oil, Standard Oil "was acting independently, . . . not as the Navy's 'agent.'"  *San Mateo*, 32 F.4th at 759.

At any rate, contrary to the Companies' contention, Br. 48, any supervision of Standard Oil's production did not rise to the level of special relationship required to qualify it as "acting under" a federal officer.  Such a relationship places the private contractor in the government's shoes—completing governmental tasks that the government would have had to fulfill itself.  *Watson*, 551 U.S. at 153-54.  But the purpose behind the 1944 agreement was primarily "to conserve as much of the hydrocarbons in place as was feasible until needed for an emergency," thus

leaving the Navy's share in the ground for future use.  *Standard Oil*, 545 F.2d at 627-28.  Standard Oil's extraction and production—which they were permitted but not required to do—is "a far cry from the type of close supervision" required to be "acting under" the federal government.  *Baltimore*, 31 F.4th at 231.  Moreover, applying the federal officer removal statute here is contrary to the purpose of Section 1442, because nothing in this "arm's-length business arrangement with the Navy" involved "conduct so closely related to the government's implementation of federal law that the . . . Companies would face 'a significant risk of state-court prejudice." *San Mateo*, 32 F.4th at 759-60 (quoting *Watson*, 551 U.S. at 152)).

Additionally, the Companies rely on the Strategic Petroleum Reserve, explaining that Shell Oil and Exxon Mobil and their affiliates have "acted as operators and lessees of the Strategic Petroleum Reserve infrastructure, subject to the federal government's supervision and control in the event of the President's call for a drawdown." Br. 48.  Tellingly, the Companies say nothing else about the Reserve.   But like the Standard Oil arrangement, the Reserve operates with commercial relationships and agreements, which, once again, do not equate with federal "subjection, guidance, or control." *Watson*, 551 U.S. at 151; *see* 42 U.S.C. § 6239 (referring to purchasing petroleum for the reserve, as well as leases or other commercial arrangements for the land and facilities).

Finally, the Companies argue that their oil production supports energy security and national interests.  Br. 45-46, 48.  That may be true, but it does not mean that these operations were "acting under" federal authority.  Indeed, such a theory would dramatically expand federal officer jurisdiction.  The Companies' argument is akin to a large retailer arguing it was "acting under" federal authority when selling defective products because a strong economy is in the national interest.  The Eighth Circuit rejected such a policy argument in *Buljic v. Tyson Foods, Inc.*, where the company argued that it was "acting under" the federal government during the COVID-19 pandemic by "fulfill[ing] a basic governmental task" of "ensuring that the national food supply would not be interrupted."  22 F.4th 730, 739 (8th Cir. 2021).  Even when "an industry is considered critical" that "does not necessarily mean that every entity within it fulfills a basic governmental task or that workers within that industry are acting under the direction of federal officers." *Id.* at 740.  This Court should similarly reject such an expansion of federal jurisdiction here.

### B.    There is no connection between the Companies' commercial agreements with the federal government and the District's claims of deceptive marketing.

Even if the Companies were "acting under" federal authority, there is no connection between the District's claims and any federally directed actions.  Under this Court's precedent, to satisfy the connection requirement, the Companies "must

44

show a nexus, a causal connection between the charged conduct and asserted official authority." *K&D LLC*, 951 F.3d at 507 (quoting *Jefferson Cty. v. Acker*, 527 U.S. 423, 431 (1999)) (internal quotation marks omitted). This means that "'[t]he circumstances that gave rise to the . . . liability' must 'encompass' the defendant's conduct in office." *Id.* (ellipsis in original) (quoting *Acker* 527 U.S. at 433).

As an initial matter, the Companies argue that the 2011 amendment to Section 1442, which added to the statute the words "or relating to," relaxes the causal connection requirement. Br. 49; *see* 28 U.S.C. § 1442(a)(1) (permitting removal "for or relating to any act under color of such [federal] office"). This Court has noted that some circuits read the statute to require only "'a connection or association between the act in question and the federal office,'" *K&D LLC*, 951 F.3d at 507 n.1 (quoting *In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 471 (3d Cir. 2015)), not a *causal* connection. This Court, however, has not decided the effect of the amended language. *Id.* And it need not decide the issue here because, under either standard, the Companies cannot prevail.[12] The Companies fail to demonstrate *any*

---

[12]   If the Court chooses to decide that the standard requires "a causal connection," *K&D LLC*, 951 F.3d at 507, then the Companies' argument fails

connection, let alone a causal connection, between the actual conduct alleged in the complaint and any acts taken under federal authority.

The complaint alleges that the Companies concealed the risks of their fossil fuel products and engaged in deceptive marketing to District consumers.  Nothing in the various agreements with the federal government mandate, recommend, suggest, or even address the alleged deceptive activities that are the subject of the complaint.  The commercial contracts and leases cited by the Companies address production and extraction—not advertising or marketing to consumers.  Said another way, the Companies could have fulfilled all of their responsibilities under these contracts and leases without engaging in the deceptive marketing at issue in this case.  There is simply no "connection or association" between the deception and the federal office.  *K&D LLC*, 951 F.3d at 507 n.1.

The other circuits that have reached this prong of this test have also rejected this argument.  Explaining that the complaint in that case "clearly seeks to challenge the promotion and sale of fossil-fuel products without warning and abetted by a sophisticated disinformation campaign," the Fourth Circuit rejected the defendants' argument that the claims are connected to "fossil-fuel production." *Baltimore*, 31 F.4th at 233.  The court recognized that the complaint there included

---

because they fail to address whether they would meet the causal-connection standard.

"references" to fossil fuel production, but only "to tell a broader story about how the unrestrained production and use of [d]efendants' fossil-fuel products contribute to greenhouse gas pollution." *Id.* Liability was actually based on "the concealment and misrepresentation of the products' known dangers—and the simultaneous promotion of their unrestrained use—that allegedly drove consumption, and thus greenhouse gas pollution, and thus climate change." *Id.* at 233-34; *see Minnesota*, No. 21-1752, 2023 WL 2607545, at *6 (holding that because "none of Minnesota's claims try to hold the Energy Companies liable for production activities—only marketing," the asserted relationship is "too tenuous to support removal"); *Rhode Island*, 35 F.4th at 53 n.6 (rejecting federal-officer removal because "the trio of contracts" relied on by the oil and gas company defendants "'mandat[ed] none of th[e] activities'" alleged in the complaint, e.g., "a misinformation campaign about the harmful effects of the[] [companies'] products" (quoting *Rhode Island v. Shell Oil Prods. Co.*, 979 F.3d 50, 60 (1st Cir. 2020), *cert. granted*, *judgment vacated*, 141 S. Ct. 2666 (2021))).

The Companies contend that they would have prevailed if the district court had correctly focused on the cause of injury or harm alleged, i.e., fossil fuels, rather than the theory of liability, citing *County Board of Arlington County v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 256 (4th Cir. 2021). Br. 50. But that case is easily distinguishable. There, the pharmacies' contracts with the

federal government required them to fulfill prescriptions, *id.* at 251-54, and the complaint sought "monetary damages due to harm arising from 'every opioid prescription' filled by pharmacies," *id.* at 257. Thus the complaint's harms related to the "governmentally-directed conduct." *Id.* This case is fundamentally different: as explained, there are no contractual agreements that required the Companies' deceptive marketing that misled District consumers.

The Companies also cite *Ruppel v. CBS Corp.*, 701 F.3d 1176 (7th Cir. 2012), to support their view that the connection requirement considers "how and when the plaintiff's alleged 'injury occurred.'" Br. 50. That position misunderstands *Ruppel*. In that case, the plaintiff brought a tort claim alleging that his exposure to asbestos in turbines supplied to the Navy caused his mesothelioma. *Id.* at 1178. The court thus understandably analyzed whether the "injury occurred while [plaintiff's employer] 'acted under' a federal officer." *Id.* at 1181. Notably, the Companies' citation to *Ruppel* is not even from the court's analysis of the connection prong. And their claim of federal jurisdiction would plainly fail under *Ruppel*'s reasoning, where the court applied the stricter "causal connection" standard. *Id.* at 1181.

Perhaps recognizing the disconnect between the District's consumer-deception claims and any relationship with the federal government, the Companies again attempt to rewrite the complaint. They argue that the District's alleged

48

injuries are based on "production, sale, and use of oil and gas," and they note that their contracts with the government are to produce oil and gas.  Br. 51.  But the complaint is not based on "production, sale, and use of oil and gas"—it is based on deceptive marketing of those products.  The references in the complaint to product sales are relevant only to show that the sales are higher than they would have been had the Companies been honest with the public.  *See, e.g.*, JA 80.

Finally, *Baker v. Atlantic Richfield Co.*, 962 F.3d 937 (7th Cir. 2020) (Br. 52), does not support the Companies' argument.  The *Baker* court explained that "[t]o show causation, Defendants must only establish that the act that is the subject of Plaintiffs' attack . . . occurred *while* Defendants were performing their official duties."  *Id.* at 945 (quoting *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008)).  As explained, the "act" here is the Companies' deception, and the Companies cannot show that their decades-long deceptive marketing was part of any "official duties" regarding the production of fossil fuels.

## III.    There Is No Jurisdiction Under The Outer Continental Shelf Lands Act.

Lastly, the OCSLA does not provide a basis for federal jurisdiction over the District's consumer-protection claims.  OCSLA was enacted "to authorize the Secretary of the Interior to administer exploration and development of the OCS's mineral resources."  *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 593 (D.C. Cir. 2015).  It grants jurisdiction over a narrow set of "cases and controversies

49

arising out of, or in connection with . . . any operation conducted on the outer Continental Shelf" involving "exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b)(1).

While this Court has not addressed the scope of OCSLA's jurisdiction under Section 1349(b), several circuit courts have. They "consider whether (1) the activities that caused the injury constituted an 'operation' 'conducted on the outer Continental Shelf' that involved the exploration and production of minerals, and (2) the case 'arises out of, or in connection with' the operation." *Baltimore*, 31 F.4th at 220 (quoting *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014)). As those courts have concluded, the "term 'operation' contemplate[s] the doing of some physical act on the [OCS]." *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 567 (5th Cir. 1994). Moreover, several courts have "consistently determined" that the "arising out of, or in connection with" prong "requires a but-for connection between a claimant's cause of action and operations on the [OCS]." *Baltimore*, 31 F.4th at 220; *see Suncor*, 25 F.4th at 1274. Thus, "a 'mere connection' between the cause of action and the OCS operation" is "too remote" to "establish federal jurisdiction." *In re Deepwater Horizon*, 745 F.3d at 163.

As the district court explained and the Companies acknowledge, their "alleged false advertising and misleading information campaigns are not

'operation[s]' under OCSLA."    JA 468 (brackets in original) (quoting *EP*

*Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 567 (5th Cir. 1994)); Br. 56.

Once again, then, their argument falters because the gravamen of the complaint is

that the Companies have misled and deceived consumers about their products.

Moreover, the Companies' activities on the OCS are not the "but-for" cause

of the conduct undergirding the District's claims, JA 468, which the Companies

appear to acknowledge is the appropriate standard, Br. 57.[13]    The District's

asserted injury persists "as a result of . . . distinct marketing conduct" "independent

of [the Companies'] technical operations."    JA 468.   It is not enough, as the

Companies assert, that "[t]he District's complaint targets [the Companies']

advertising of their products, many of which were extracted and produced from

[the Companies'] operations on the Outer Continental Shelf."   Br. 55.   Other

circuits have similarly rejected the Companies' arguments as relying on nothing

---

[13]    The district court applied the but-for test in rejecting the Companies' arguments, but noted a different approach under Ninth Circuit precedent.  JA 468 n.7.   The Ninth Circuit, detailing the history and purpose of OCSLA and its similarities to federal enclave jurisdiction, explained that it reads the statute "as granting federal courts jurisdiction over tort claims only when those claims arise from actions or injuries occurring on the outer Continental Shelf."  *San Mateo*, 32 F.4th at 753; *id.* at 754 (explaining that its approach differs from the "'broad "but-for" test,' adopted by our sister circuits" but that the result in these cases is the same—the defendants' conduct on the OCS and the alleged injuries "is too attenuated to give rise to jurisdiction").   Thus, regardless of the standard applied, the Companies' arguments fail for the same reasons: there is no connection between their deceptive marketing in the District and their operations on the OCS.

more than a "'mere connection' between the claims asserted and an OCS operation"—which is insufficient for federal jurisdiction. *Suncor*, 25 F.4th at 1274; *see, e.g.*, *Rhode Island*, 35 F.4th at 59-60; *San Mateo*, 32 F.4th at 751-55; *City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1112-13 (9th Cir. 2022); *Baltimore*, 31 F.4th at 219-22.

The Companies' additional arguments for OCSLA jurisdiction lack merit. Jurisdiction does not lie because the Companies have leases from the Department of Interior allowing exploration and production of oil and gas on the OCS.  Br. 54. While jurisdiction under OCSLA may exist where a claim is predicated on "a contract or property dispute directly related to an OCS operation," that is certainly not the case here.  *Suncor*, 25 F.4th at 1273.   This situation is unlike any other where a court of appeals has found OCSLA jurisdiction predicated on a contract. *See, e.g.*, *EP Operating Ltd*, 26 F.3d at 570 (finding federal jurisdiction in a partition action to determine ownership of offshore equipment attached to the OCS); *Laredo Offshore Constructors, Inc. v. Hunt Oil Co*. 754 F.2d 1223, 1227 (5th Cir. 1985) (contractual dispute over platform construction on the OCS); *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1206 (5th Cir. 1988) (contractual dispute between buyer and seller of natural gas from OCS).  Indeed, the Companies point to no cases—and the District is aware of none—in which deceptive marketing claims like the District's have supported OCSLA jurisdiction.

The Companies further assert that the District's advertising claims arise "in part" from their OCS operations because the District's claims "are not limited to traditional consumer-protection relief" and seek "relief for the alleged physical effects of global climate change," which they assert "directly implicate [their] production on the [OCS]." Br. 55. Not so. The District's complaint seeks the relief available under the Consumer Protection Procedures Act: restitution, damages for the harm caused by their deceptive actions in the District, as well as statutory penalties and fees. JA 156 (citing D.C. Code § 28-3909). The District does not seek any relief, such as an injunction on extraction and production, that could directly implicate operations on the OCS.

Finally, the Companies urge as a policy matter that allowing this case to remain in state court would frustrate OCSLA's purpose because a substantial damages award "would, at a minimum, substantially discourage production on the Outer Continental Shelf and jeopardize the future viability of the federal leasing program." Br. 55-56. But policy concerns do not create federal jurisdiction. Anyway, these concerns are entirely speculative, as the Tenth Circuit explained: "such a prospective theory of negative economic incentives—flowing from a lawsuit that does not directly attack OCS exploration, resource development, or leases"—is "contingent and speculative." *Suncor*, 25 F.4th at 1275. Federal

jurisdiction is not created "under OCSLA based on [such] speculative impacts."

*Id*.

## CONCLUSION

This Court should affirm.

Respectfully submitted,

HASSAN A. ZAVAREEI
Bar Number 47750
ANNA C. HAAC
Bar Number 62817
**TYCKO & ZAVAREEI, LLP**
2000 Pennsylvania Avenue, NW,
Suite 1010
Washington, D.C. 20006
(202) 973-0900 (phone)
(202) 973-0950 (fax)
hzavareei@tzlegal.com
ahaac@tzlegal.com

BRIAN L. SCHWALB
Attorney General for the District of
Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

THAIS-LYN TRAYER
Deputy Solicitor General

VICTOR M. SHER
Bar Number 38451
**SHER EDLING LLP**
100 Montgomery Street, Suite 1410
San Francisco, CA 94104
(628) 231-2510
vic@sheredling.com

/s/ Lucy E. Pittman
LUCY E. PITTMAN
Senior Assistant Attorney General
Bar Number 483416
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 727-3881 (phone)
(202) 741-5925 (fax)
lucy.pittman@dc.gov

March 2023

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 12,989 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Lucy E. Pittman
LUCY E. PITTMAN