SCHEDULED FOR ORAL ARGUMENT ON MAY 8, 2023

No. 22-7163

# In the United States Court of Appeals for the District of Columbia Circuit

_____

DISTRICT OF COLUMBIA,
PLAINTIFF-APPELLEE

*v.*

EXXON MOBIL CORP.; EXXONMOBIL OIL CORPORATION;
BP P.L.C.; BP AMERICA INC.; CHEVRON CORPORATION;
CHEVRON U.S.A. INC., SHELL PLC, F/K/A ROYAL DUTCH SHELL PLC;
SHELL USA, INC., F/K/A SHELL OIL COMPANY,
DEFENDANTS-APPELLANTS

_____

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA (CIV. NO. 20-1932)
(THE HONORABLE TIMOTHY J. KELLY, J.)*

_____

### REPLY BRIEF OF APPELLANTS

_____

THEODORE J. BOUTROUS, JR.
GIBSON, DUNN & CRUTCHER LLP
  *333 South Grand Avenue*
  *Los Angeles, CA 90071*

THOMAS G. HUNGAR
GIBSON, DUNN & CRUTCHER LLP
  *1050 Connecticut Avenue, N.W.*
  *Washington, DC 20036*

KANNON K. SHANMUGAM
JUSTIN ANDERSON
KYLE SMITH
WILLIAM T. MARKS
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*
  *kshanmugam@paulweiss.com*

THEODORE V. WELLS, JR.
DANIEL J. TOAL
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*

*(additional counsel on signature block)*

# TABLE OF CONTENTS

Page

A.  Removal was proper because the District's claims arise
    under federal common law ................................................................2

B.  Removal was proper because the District's claims
    raise disputed and substantial issues of federal law .................13

C.  Removal was proper under the federal-officer removal
    statute ...............................................................................................18

D.  Removal was proper because the District's claims
    arise out of defendants' operations on the outer
    continental shelf.............................................................................25

# TABLE OF AUTHORITIES

*American Electric Power Co.* v. *Connecticut*, 564 U.S. 410 (2011) ...................8

*Amoco Production Co.* v. *Sea Robin Pipeline Co.*,
    844 F.2d 1202 (5th Cir. 1988)..........................................................28

*Baker* v. *Hercules Offshore, Inc.*, 713 F.3d 208 (5th Cir. 2013) ........................26

*Baker* v. *Atlantic Richfield Co.*, 962 F.3d 937 (7th Cir. 2020) ..............22, 24, 25

*Board of Commissioners* v. *Tennessee Gas Pipeline Co.*,
    850 F.3d 714 (5th Cir. 2017)..............................................................15

*BP p.l.c.* v. *Mayor & City Council of Baltimore*, 141 S. Ct. 1532 (2021) ........10

*City & County of Honolulu* v. *Sunoco LP*, 39 F.4th 1101 (9th Cir. 2022) ......19

*City of Hoboken* v. *Chevron Corp.*, 45 F.4th 699 (3d Cir. 2022),
    *pet. for cert. filed*, No. 22-821 (Feb. 27, 2023) ...........................12, 13

*City of New York* v. *Chevron Corp.*,
    993 F.3d 81 (2d Cir. 2021)..........................................3-9, 16, 24, 28

*City of Milwaukee* v. *Illinois*, 451 U.S. 304 (1981) ...............................................9

*County Board of Arlington County* v. *Express Scripts*
    *Pharmacy, Inc.*, 996 F.3d 243 (4th Cir. 2021) .................................24

Page

Cases—continued:

*D.C. Association of Chartered Public Schools*
    v. *District of Columbia*, 930 F.3d 487 (D.C. Cir. 2019) ...................................15

*Dart Cherokee Basin Operating Co.* v. *Owens*, 574 U.S. 81 (2014)..................20

*District of Columbia* v. *Group Hospital & Medical Services, Inc.*,
    576 F. Supp. 2d 51 (D.D.C. 2008) .......................................................15

*Ford Motor Co.* v. *Montana Eighth Judicial District Court*,
    141 S. Ct. 1017 (2021).......................................................................26

*Franchise Tax Board* v. *Construction Laborers Vacation Trust*,
    463 U.S. 1 (1983)..............................................................................10

*Grable & Sons Metal Products, Inc* v. *Darue Engineering &
    Manufacturing*, 545 U.S. 308 (2005) ..............................................13, 14, 17, 18

*Gunn* v. *Minton*, 568 U.S. 251 (2013) .......................................................17

*International Paper Co.* v. *Ouellette*, 479 U.S. 481 (1987).................................9

*Juliana* v. *United States*, 947 F.3d 1159 (9th Cir. 2020)...................................16

*Laredo Offshore Constructors, Inc.* v. *Hunt Oil Co.*,
    754 F.2d 1223 (5th Cir. 1985)..............................................................26

*Latiolais* v. *Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020) ..............23

*Lopez* v. *McDermott, Inc.*, Civ. No. 17-8977,
    2018 WL 525851 (E.D. La. Jan. 24, 2018) ........................................26

*Minnesota* v. *American Petroleum Institute*,
    63 F.4th 703 (8th Cir. 2023) ..................................................................4

*NASDAQ OMX Group, Inc.* v. *UBS Securities, LLC*,
    770 F.3d 1010 (2d Cir. 2014) .............................................................14, 15, 17

*Native Village of Kivalina* v. *Exxon Mobil Corporation*,
    696 F.3d 849 (9th Cir. 2012)..................................................................9

Page

Cases—continued:

*North Carolina Department of Administration* v. *Alcoa Power Generating, Inc.*, 853 F.3d 140 (4th Cir. 2017) ................................................12

*Oneida Indian Nation* v. *County of Oneida*, 414 U.S. 661 (1974) ...............6, 11

*Otter Tail Power Co.*, *In re*, 116 F.3d 1207 (8th Cir. 1997) ...............................13

*Pet Quarters, Inc.* v. *Depository Trust & Clearing Corp.*, 559 F.3d 772 (8th Cir. 2009) ......................................................................15

*Ruppel* v. *CBS Corporation*, 701 F.3d 1176 (7th Cir. 2012) .............................25

*Sam L. Majors Jewelers* v. *ABX, Inc.*, 117 F.3d 922 (5th Cir. 1997) ...............12

*Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U.S. 630 (1981) ................................................................................3, 7, 13

*Torres* v. *Southern Peru Copper Corp.*, 113 F.3d 540 (5th Cir. 1997) .............13

*United Offshore Co.* v. *Southern Deepwater Pipeline Co.*, 899 F.2d 405 (5th Cir. 1990) ......................................................................26

*United States* v. *Standard Oil Co.*, 332 U.S. 301 (1947) ....................................6

## STATUTES AND REGULATIONS

Clean Air Act, 42 U.S.C. §§ 7401-7671q ....................................... 5-8, 16

Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331-1356c ................................................25, 26, 27, 28

43 U.S.C. § 1349(b) ..............................................................................25

43 U.S.C. § 1349(b)(1) .....................................................................26, 27

Removal Clarification Act, Pub. L. No. 112-51, § 2(b)(1)(A), 125 Stat. 545.................................................................23

15 U.S.C. § 57b(e)..................................................................................18

Page

Statutes and regulations—continued:

28 U.S.C. § 1331 ...................................................................13

28 U.S.C. § 1441 ...................................................................13

28 U.S.C. § 1446(a) ...............................................................20

D.C. Consumer Protection Procedures Act,
   D.C. Code § 28-3901 *et seq.* ...............................................14

40 C.F.R. §§ 60.1-60.5805a ...................................................16

40 C.F.R. §§ 85.501-85.2401 .................................................16

## MISCELLANEOUS

Richard H. Fallon, Jr., et al., *Hart & Wechsler's Federal Courts
   and the Federal System* (7th ed. 2015)...........................................11

iv

The District of Columbia seeks damages and restitution for injuries allegedly resulting from global climate change. The District alleges that defendants are responsible for those injuries because the injuries allegedly result from greenhouse-gas emissions associated with the use of fossil fuels by billions of consumers around the globe. Given the nature of the District's allegations and the relief it seeks, this case is removable to federal court on multiple grounds—including that federal common law necessarily and exclusively governs the District's claims.

The District contends that this case is not about imposing liability for the alleged effects of greenhouse-gas emissions, but instead about "consumer protection and deceptive marketing." Br. 9. But the complaint reveals that this is a far cry from a typical consumer-protection case that belongs in state court. The District never alleges that any of defendants' products failed to perform as advertised, failed to conform to applicable standards, or injured specific consumers in any concrete way—much less injured them *as consumers*. Instead, the District challenges defendants' promotion of fossil-fuel products precisely because of their alleged "role in causing catastrophic climate change." J.A. 141.

Nor can the District mask the true substance of its claims by arguing that it seeks relief for only "local harms." Br. 17. The crux of the District's complaint is that the alleged deception "enabled the unabated and expanded

(1)

extraction, production, promotion, marketing, and sale of [d]efendants' fossil fuel products, to the detriment of DC consumers and the public generally." J.A. 80. Accordingly, when the District says that it is seeking relief for only "local harms," what it means is that consumers purchased too much gasoline, which allegedly increased *global* greenhouse-gas emissions and caused *global* environmental effects felt locally in the District of Columbia.

By requesting such sweeping relief based on the alleged causal connection between defendants' marketing, global greenhouse-gas emissions, and global climate change, the District has necessarily pleaded itself into federal court. The district court erred by concluding otherwise, and its remand order should be vacated.

### A. Removal Was Proper Because The District's Claims Arise Under Federal Common Law

Defendants' argument for removal on the basis of federal common law rests on two basic premises. *First*, as a matter of constitutional structure, federal common law necessarily and exclusively governs claims seeking redress for harms allegedly caused by global climate change, such as those the District asserts here. *See* Br. of Appellants 15-17. *Second*, federal courts have federal-question jurisdiction over claims arising under federal common law, making them removable to federal court. *See* Br. of Appellants 26-27. Applied here,

those premises lead to the inexorable conclusion that defendants properly removed this case to federal court.  The District's attempts to undermine both premises of defendants' argument are unsuccessful.

1.     The District does not dispute that federal common law supplies the rule of decision when "the interstate or international nature of the controversy makes it inappropriate for state law to control." *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981).  And while the District tries to distinguish the Second Circuit's recent decision in *City of New York* v. *Chevron Corporation*, 993 F.3d 81 (2021), based on its procedural posture, *see* p. 7, *infra*, it cannot dispute the Second Circuit's core holding:  namely, that claims seeking redress for injuries allegedly caused by global climate change "must be brought under federal common law."  993 F.3d at 95.

Those principles squarely govern the District's lawsuit.  The crux of the District's complaint is that defendants' allegedly deceptive marketing of fossil fuels "enabled the unabated and expanded extraction, production, promotion, marketing, and sale of [d]efendants' fossil fuel products, to the detriment of DC consumers and the public generally."  J.A. 80.  Based on that premise, the District seeks relief in the form of "restitution" and "damages," alleging injuries from climate change in the form of "more frequent and extreme precipitation events and associated flooding," as well as future "flooding, extreme weather, and heat waves."  J.A. 123, 156.

Those allegations suggest that the District seeks a substantial award "for the harms caused by global greenhouse gas emissions." *City of New York*, 993 F.3d at 91. Critically, the District "has not disavowed," and thus effectively concedes, "an intent to seek damages for physical injuries and property damage linked to the alleged effect of defendants' marketing and sale[s] on the global climate." Br. of Appellants 23. The District's lawsuit thus "takes aim at the production and sale of fossil fuels worldwide," "seeks a global remedy for a global issue," and "presents a clash over regulating worldwide greenhouse gas emissions and slowing global climate change." *Minnesota* v. *American Petroleum Institute*, 63 F.4th 703, 717 (8th Cir. 2023) (Stras, J., concurring) (internal quotation marks and citation omitted).

The District's contrary arguments lack merit.

a.      In an effort to avoid federal jurisdiction, the District principally argues that this Court should ignore the nature of its alleged injuries and requested relief and instead focus solely on its allegations of "deceptive advertising." Br. 17. But the District's complaint "hinges on the link between the release of greenhouse gases and the effect those emissions have on the environment generally (and on the [District] in particular)." *City of New York*, 993 F.3d at 97. If it did not, there would be no need for the District to describe the alleged "catastrophic effects that [defendants'] products would have on sea

4

levels, ocean currents, precipitation patterns, regional temperature, and weather." Br. 2; *see also* J.A. 81-82.

It is of no moment that the initial link in the District's alleged causal chain of injury is allegedly deceptive marketing rather than interstate emissions. In order to obtain damages or restitution for physical injuries caused by climate change, the District will still have to prove harm resulting from interstate (indeed, international) emissions. As the Second Circuit explained, targeting an "earlier moment in the global warming lifecycle" (including the "promotion," marketing, and "sale" of fossil fuels) "is merely artful pleading and does not change the substance of [the] claims." *City of New York*, 993 F.3d at 97 (internal quotation marks and citation omitted). The District cannot simultaneously "disavow[] any intent to address emissions" while "identifying such emissions as the singular source" of the alleged harm. *Id.* at 91.

The District's lawsuit thus goes beyond any ordinary consumer-protection case. It attempts to use consumer-protection law as a vehicle through which to recover damages from injuries allegedly caused by interstate emissions. Like the claims in *City of New York*, therefore, the District's claims arise under federal common law.

b.      The District separately argues (Br. 17) that, even if this case concerns interstate emissions, federal common law cannot govern the District's claims because the Clean Air Act has displaced federal common law in this

5

area. But whether a party can obtain a remedy under federal law is a distinct question from whether federal law supplies the rule of decision in the first instance. The Supreme Court made this very point in *Oneida Indian Nation* v. *County of Oneida*, 414 U.S. 661 (1974), reasoning that a claim governed by federal common law arises under federal law for "jurisdictional purposes" even if that claim "may fail at a later stage for a variety of reasons." *Id.* at 675; *accord United States* v. *Standard Oil Co.*, 332 U.S. 301, 310-314 (1947) (holding that federal common law governed the claim but provided no remedy).

Contrary to the District's assertions, statutory displacement does not somehow empower state law to govern in areas where it has never permissibly applied. As the Second Circuit explained, such a "position is difficult to square with the fact that federal common law governed this issue in the first place" because, "where federal common law exists, it is because state law cannot be used." *City of New York*, 993 F.3d at 98 (internal quotation marks and citation omitted). "[S]tate law does not suddenly become presumptively competent to address issues that demand a unified federal standard simply because Congress saw fit to displace a federal court-made standard with a legislative one." *Id.* Although the Clean Air Act may displace any remedy available under federal common law, it does not displace the entire source of law altogether, much less shift governance of an inherently federal area of law to the individual States or other localities for regulation as they see fit. Indeed, the Second

6

Circuit concluded that such a result is "too strange to seriously contemplate." *Id.* at 99. Statutory displacement thus cannot "give birth to new state-law claims," *id.* at 98, because our constitutional structure "does not permit" controversies such as this one "to be resolved under state law," *Texas Industries*, 451 U.S. at 641.[1]

To avoid that conclusion, the District attempts to distinguish *City of New York* on two grounds: *first*, that it was originally filed in federal court, and *second*, that it involved nuisance claims rather than consumer-protection claims. Br. 20-21. Neither distinction matters here.

*First*, the fact that *City of New York* was filed in federal court does not affect its holding that purportedly state-law claims targeting fossil-fuel production arise under federal common law—a conclusion that holds true regardless of the forum in which the claims were brought. Wherever filed, the claims "must be brought under federal common law" because they are "simply beyond the limits of state law." 993 F.3d at 92, 95.

*Second*, as defendants have already explained, *see* pp. 4-5, the District's claims do not truly sound in consumer protection. In addition, the allegations

---

[1] The Clean Air Act also did not entirely displace federal common law in this area. As the Second Circuit concluded, federal common law is "still require[d]" to govern extraterritorial aspects of claims challenging undifferentiated global emissions, because the Clean Air Act "does not regulate foreign emissions." 993 F.3d at 95 n.7; *see id.* at 101. Federal law thus continues to govern in this area, even after the enactment of the Clean Air Act.

7

made by the plaintiff in *City of New York* closely resemble the District's allegations here.  For example, the City claimed that the defendants had "known for decades that their fossil fuel products pose a severe risk to the planet's climate," yet "downplayed the risks and continued to sell massive quantities of fossil fuels, which has caused and will continue to cause significant changes to the City's climate."  993 F.3d at 86-87.  The District likewise alleges that defendants "have known for decades that their fossil fuel products would disrupt the global climate," yet "downplay[ed] the fossil fuel contribution to climate change."  J.A. 99, 115.  But as the Second Circuit explained, a plaintiff cannot use "[a]rtful pleading" to avoid the application of federal common law where it is "seeking damages" "precisely because fossil fuels emit greenhouse gases." *City of New York*, 993 F.3d at 91.

The District also misreads the Supreme Court's decision in *American Electric Power Co.* v. *Connecticut*, 564 U.S. 410 (2011), suggesting that the Court left open the possibility that state-law claims may be viable in the wake of displacement by the Clean Air Act.  *See* Br. of Appellee 17-19.  The Supreme Court reserved only the narrow question whether state-law claims could proceed under "the law of each State *where the defendants operate power plants*"—*i.e.*, each State where the source of pollution was located.  564 U.S. at 429 (emphasis added).  Here, by contrast, the sources of emissions allegedly

causing the District's alleged injuries include billions of actors consuming fossil fuels (and other products) around the world for decades on end. The District's claims are inherently federal in nature because the basic scheme of the Constitution bars a State affected by transboundary pollution (and thus the District) from using its own law to "regulate the conduct of out-of-state sources." *International Paper Co.* v. *Ouellette*, 479 U.S. 481, 495 (1987); *see* Br. of Appellants 24-25; *cf. City of New York*, 993 F.3d at 92 (noting that "regulation can be effectively exerted through an award of damages" (citation omitted)).

The District's attempt to distinguish *City of Milwaukee* v. *Illinois*, 451 U.S. 304 (1981), and *Native Village of Kivalina* v. *Exxon Mobil Corporation*, 696 F.3d 849 (9th Cir. 2012), fares no better. The District argues only that those cases preserve state and local remedies to the extent that such remedies do not conflict with federal statutory law. *See* Br. 19, 21-22. But neither *Milwaukee* nor *Kivalina* endorsed the proposition that state and local remedies suddenly became viable where they were not before. It remains the case, consistent with our constitutional structure, that the District cannot seek state or local remedies based on emissions where those remedies functionally would regulate conduct in another State. *See* Br. of Appellants 30-31.[2]

---

[2] The District also cites the amicus brief of the United States recently filed in *Suncor Energy (U.S.A.) Inc.* v. *Board of County Commissioners of Boulder County*, No. 21-1550. While the federal government now contends that claims

2.    Addressing the second premise of defendants' argument for re-moval based on federal common law, the District argues (Br. 14) that, under the well-pleaded complaint rule, removal of a claim labeled as arising under state law is permissible only where a federal statute completely preempts the state-law cause of action or where the complaint expressly raises a substantial federal question.  But the Supreme Court has already held that an "independent corollary" of the rule is that a plaintiff "may not defeat removal" through artful pleading:  that is, by "omitting to plead necessary federal questions in a complaint." *Franchise Tax Board* v. *Construction Laborers Vacation Trust*, 463 U.S. 1, 22 (1983).  A federal question is "necessary" for purposes of that rule where, as here, the constitutional structure mandates the application of federal law.  *See* Br. of Appellants 15-17.

The District argues (Br. 24 n.5) that the artful-pleading doctrine is lim-ited to the context of *statutory* complete preemption.  But the Supreme Court has never so held, and a leading treatise has stated that there is "[n]o plausible

---

similar to those alleged here are not removable, the government took the exact opposite position just two years ago as amicus curiae in *BP p.l.c.* v. *Mayor & City Council of Baltimore*, 141 S. Ct. 1532 (2021).  The government candidly cites the "change in Administration" as a primary reason for its about-face. U.S. Br. at 7, *Suncor*, *supra*.  And while the government also points to "inter-vening developments" in the form of court of appeals decisions rejecting its position in *BP*, those decisions rested on reasoning other courts had adopted *before* the government took its position in *BP*.  The government's change in position thus appears to reflect little more than the politicized nature of cli-mate lawsuits such as this one.

reason" why "the appropriateness of and need for a federal forum should turn on whether the claim arose under a federal statute or under federal common law." Richard H. Fallon, Jr., et al., *Hart & Wechsler's Federal Courts and the Federal System* 819 (7th ed. 2015). Indeed, in *Oneida*, *supra*, the Supreme Court treated the federal common law governing the use of tribal lands as having the same effect on state law as a completely preemptive federal statute. *See* Br. of Appellants 33.

The District attempts to distinguish *Oneida* on the ground that it involved "unique questions of Indian tribal lands" necessarily governed by federal law because of the "special historical relationship between Indian tribes and the [f]ederal [g]overnment." Br. 27 (citations omitted). But that is just another way of saying that the case involved questions that implicate a unique area of law that is inherently and exclusively federal in nature. The same is true here: for more than a century, federal courts have treated claims of injury from interstate water and air pollution as requiring the application of federal common law to the exclusion of state law. *See* Br. of Appellants 15-17. The District thus has no meaningful response to *Oneida*.

The District next attempts to distinguish away the decisions of other courts of appeals holding that removal of putative state-law claims is permissible if federal common law supplies the rule of decision. *See* Br. 28-29. The District's efforts fall flat.

11

The District suggests (Br. 28) that the Fourth Circuit's decision in *North Carolina Department of Administration* v. *Alcoa Power Generating, Inc.*, 853 F.3d 140 (2017), is distinguishable because it relied on a constitutional provision with "more than 150 years" of precedent recognizing the federal character of the claims. *Id.* at 148. But defendants' argument is of the same character: defendants contend (Br. 14-17) that federal constitutional principles dictate that federal law alone can govern claims asserting injury from interstate and international emissions.

The District tries to distinguish the Fifth Circuit's decision in *Sam L. Majors Jewelers* v. *ABX, Inc.*, 117 F.3d 922 (1997), on the basis that Congress expressly preserved the relevant federal common law there. *See* Br. 28. But that argument conflates the question of whether federal law governs the District's claims with the question of whether federal common law provides a basis for removal. As to the latter question, the Fifth Circuit clearly held that "removal is proper" where (as here) a cause of action nominally pleaded under state law necessarily "arises under federal common law principles." 117 F.3d at 924. That is so, the Fifth Circuit explained, even when the claims "do not arise under a federal statute" and "jurisdiction is not supported by complete preemption." *Id.* Notably, in a related climate-change case, the Third Circuit acknowledged that *Sam L. Majors* supports removal. *See City of Hoboken* v.

*Chevron Corp.*, 45 F.4th 699, 708 (2022), *pet. for cert. filed*, No. 22-821 (Feb. 27, 2023).

Finally, with respect to the Eighth Circuit's decision in *In re Otter Tail Power Co.*, 116 F.3d 1207 (1997), the District contends (Br. 29) that the decision involved "unique" claims related to "tribal sovereignty" and the effects of a prior decision issued by the district court in related litigation between the parties. But as already explained, *see* p. 11, this case similarly involves "unique" areas of law that are inherently federal in nature.

*    *    *    *    *

In this case, the District attempts to avoid federal court by affixing state-law labels to its claims seeking redress for global climate change. But federal common law applies because our constitutional structure "does not permit the controversy to be resolved under state law." *Texas Industries*, 451 U.S. at 641. Removal was therefore proper under 28 U.S.C. §§ 1331 and 1441.

## B.    Removal Was Proper Because The District's Claims Raise Disputed And Substantial Issues Of Federal Law

Even if viewed as arising under state law, the District's claims would be removable under *Grable & Sons Metal Products, Inc* v. *Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), because claims "implicating . . . federal common law" raise "substantial questions of federal law." *Torres* v. *Southern Peru Copper Corp.*, 113 F.3d 540, 542, 543 (5th Cir. 1997); *see* Br. of Appellants 34-35. The District does not challenge the logic that, if its claims

13

are governed by federal common law, then removal under *Grable* is proper. Nor could it. Numerous courts have upheld removal over nominally state-law claims when "federal common law *alone* governs" those claims. Br. of Appellants 35 (citing cases).

With respect to defendants' additional bases for *Grable* jurisdiction, the District contends that its claims do not necessarily raise any federal issues; that any issues raised would not be substantial; and that adjudication of its claims in federal court would be disruptive. Those arguments all fail.

1.      The District contends that its claims do not necessarily raise a federal issue because those claims contain no "essential element" of federal law. Br. 31. At bottom, the District contends that *Grable* jurisdiction is unavailable because the D.C. Superior Court need not decide any question of federal law in order to determine whether defendants are liable under the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901 *et seq.*, even if an analysis of the District's entitlement to its requested relief necessarily implicates federal questions. That contention is invalid.

For starters, the District incorrectly argues that a federal question must be a necessary "element of proof" of the state-law cause of action in order for *Grable* jurisdiction to lie. Br. 31. An action "necessarily raise[s]" federal issues warranting the exercise of *Grable* jurisdiction where the court must determine compliance with federally prescribed duties, *NASDAQ OMX Group,*

14

*Inc.* v. *UBS Securities, LLC*, 770 F.3d 1010, 1029 (2d Cir. 2014), or where the "interpretation of federal law [is] required," *District of Columbia* v. *Group Hospital & Medical Services, Inc.*, 576 F. Supp. 2d 51, 55 (D.D.C. 2008); *see also Board of Commissioners* v. *Tennessee Gas Pipeline Co.*, 850 F.3d 714, 724-25 (5th Cir. 2017); *Pet Quarters, Inc.* v. *Depository Trust & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009).

This Court's decision in *D.C. Association of Chartered Public Schools* v. *District of Columbia*, 930 F.3d 487 (2019), is not to the contrary. There, when the Court stated that federal law must be an "essential part" of the plaintiff's "affirmative claim," it did so in the context of contrasting it with the plaintiff's attempt to raise a federal question "in response to an anticipated *defense*." *Id.* at 491. But defendants are not invoking a federal defense; they are arguing that the *substance* of the allegations in the complaint require the application of federal law and thus give rise to federal jurisdiction. *See* Br. of Appellants 31-32.

In order to assess liability on the allegations as pleaded, the D.C. Superior Court would have to consider compliance with federal energy policy and environmental standards. The District seeks relief intended to suppress fossil-fuel production and sales and thereby reduce emissions and any ensuing environmental harm. *See, e.g.*, J.A. 146-156. By functionally seeking to suppress the production and sale of fossil fuels, the complaint seeks to establish

liability in contravention of federal law that "affirmatively promotes fossil fuel use in a host of ways, including beneficial tax provisions, permits for imports and exports, subsidies for domestic and overseas projects, and leases for fuel extraction on federal land." *Juliana* v. *United States*, 947 F.3d 1159, 1167 (9th Cir. 2020).

The District attempts to fault defendants for failing to identify any federal law or policy that a court must necessarily decide in adjudicating their claims. Br. 31-32. But by seeking "effectively [to] regulate" greenhouse-gas emissions, the District attempts to countermand several federal energy and environmental policies. *City of New York*, 993 F.3d at 92. Congress has already struck a careful balance between energy production and environmental protection by passing federal statutes such as the Clean Air Act. *See* 42 U.S.C. §§ 7401-7671q. And the Environmental Protection Agency already regulates both stationary and mobile sources of greenhouse gases across the country. *See* 40 C.F.R. §§ 60.1-60.5805a, 85.501-85.2401. By alleging that defendants' advertisements and marketing increase greenhouse-gas emissions, the District seeks to have the D.C. Superior Court adjudicate the same competing interests that Congress and the Environmental Protection Agency have already carefully balanced. The District's complaint thus necessarily raises issues of compliance with federal energy policy and environmental regulation that will require interpretation of federal law.

16

The District even seeks to impose liability for allegedly misleading statements about defendants' compliance with federal fuel-economy and environmental standards. *See* J.A. 141-144. To assess whether those statements are misleading, the D.C. Superior Court would need to assess what the federal standards are, whether the products in question comply with existing standards set forth by the EPA, as well as whether compliance with those federal standards, as evidence of fuel efficiency, can even constitute misleading conduct. The District's complaint thus necessarily raises a disputed question of compliance with federally prescribed standards. *See NASDAQ*, 77 F.3d at 1029.

2. The District next argues (Br. 33-35) that the federal issues just discussed are not substantial. But it strains credulity to argue that issues of federal energy policy and environmental standards are not important "to the federal system as a whole." *Gunn* v. *Minton*, 568 U.S. 251, 260 (2013). Those issues undoubtedly have major implications for the economy, national security, and foreign affairs, and thus meet *Grable*'s standard of substantiality. *See* Br. of Appellants 38. Sidestepping this point, the District posits that "this case will be determined based on intense fact-finding surrounding decades of deceptive actions by [d]efendants and how that deception affected District consumers." Br. 35. But the District fails to mention that such factfinding will

17

necessarily cover defendants' compliance with federal environmental standards.

3.    The District also contends (Br. 35-36) that adjudicating its claims in federal court would disrupt the federal-state balance.  To support that argument, the District cites the saving clause in the Federal Trade Commission Act, arguing that Congress intended States to retain jurisdiction over certain consumer-protection claims.  Br. 36 (citing 15 U.S.C. § 57b(e)).  But that clause does not show that Congress intended for state law to apply to actions seeking redress for harms allegedly caused by interstate emissions.  If anything, the sweeping nature of the District's claims takes them far beyond the realm of ordinary consumer-protection law, attempting to allow the District to extend its law beyond its borders to hold energy companies liable for harms allegedly caused by global climate change.  *See* Br. of Appellants 38-39.  Because this case satisfies the requirements for removal under *Grable*, the district court erred by remanding it to state court.

## C.    Removal Was Proper Under The Federal-Officer Removal Statute

The federal-officer removal statute provides another source of jurisdiction over the District's claims.  *See* Br. of Appellants 39-53.  The notice of removal and the extensive factual record in this case demonstrate that the fed-

eral government has historically exercised a significant degree of control, direction, and supervision over defendants' production and operations. *See* J.A. 44-59. The District's contrary arguments lack merit.

1. The District contends (Br. 38-44) that the federal government's control over defendants when they supported wartime efforts or supplied the military with specialty, non-commercial-grade fuels does not rise to the level of oversight or special agency relationship necessary to satisfy the "acting under" requirement in the federal-officer removal statute. That position is at odds with the historical record and the law.

Defendants have set forth extensive evidence of the federal government's close control of its fuel production beginning during World War II and continuing through the present day. *See* J.A. 163-453. Defendants acted under the direction of the federal government in their performance of critical functions for the military. As two former Chairmen of the Joint Chiefs of Staff have explained, "[f]or more than a century, and to this day, the [f]ederal [g]overnment has incentivized, directed and controlled aspects of United States oil production and has reserved rights to take additional control of such operations for the benefit of the Nation's defense, security and economy." Amicus Br. of General Myers & Admiral Mullen at 7, *City & County of Honolulu* v. *Sunoco LP*, 39 F.4th 1101 (9th Cir. 2022) (No. 21-15313). Indeed, the District does not dispute that defendants acted under close federal supervision

19

by developing and producing special fuels for the federal government during wartime.  Br. of Appellee 36-44.  That activity alone is sufficient to satisfy the first requirement for federal-officer removal.

The District focuses on defendants' operations on the Outer Continental Shelf, at the Elk Hills Naval Reserve, and at the Strategic Petroleum Reserve. But its arguments concerning those operations only confirm that additional bases for satisfying the "acting under" requirement are present.

As a threshold matter, this case is at the pleading stage, where a removing defendant need only file a notice "containing a short and plain statement of the grounds for removal."  28 U.S.C. § 1446(a).  The Supreme Court has recognized that Congress intended to "simplify the pleading requirements for removal" and that lower courts should "apply the same liberal rules to removal allegations that are applied to other matters of pleading."  *Dart Cherokee Basin Operating Co.* v. *Owens*, 574 U.S. 81, 87 (2014) (internal quotation marks, citation, and brackets omitted).  Defendants have easily met their pleading burden here.

*The Outer Continental Shelf.* — The District argues (Br. 40-41) that the leases at issue merely allow defendants to extract fossil fuels and do not provide the government with significant oversight authority.  That is incorrect. Congress developed specific policies for managing the reserves on the Outer

Continental Shelf; those policies were "intended to result in expedited exploration and development of the Outer Continental Shelf in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments." J.A. 51. The lease program obligates lessees to "develop[] . . . the leased area" diligently, including carrying out exploration, development, and production activities for the express purpose of "maximiz[ing] the ultimate recovery of hydrocarbons from the leased area." *Id.* (citation omitted). The District nonetheless argues that these leases are merely "commercial leases" (Br. 41) and thus did not place defendants under the federal government's control. But the government maintains control over lessees by extensively supervising their oil and gas production, retaining the right to control the rate of production, and maintaining control over the disposition of extracted materials. J.A. 51-52. Those requirements render the leases a far cry from garden-variety "commercial leases." Br. 41.

*The Elk Hills Naval Reserve.* — The District alleges that the leases with the Navy do not provide the requisite "subjection, guidance, or control" over Standard Oil to satisfy the "acting under" prong of the federal-officer removal statute. Br. 42. That too is incorrect. Under its agreement with Standard Oil, the Navy was "afforded" a "means of acquiring *complete control* over the development of the entire Reserve *and the production of oil therefrom*." J.A. 49

21

(citation omitted; emphases added). Standard Oil was placed under the supervision of an "Operating Committee" that was to "*supervise* and *direct*" "all exploration, prospecting, development and producing operations on the Reserve." *Id.* (citation omitted; emphasis added). Finally, the Navy maintained "absolute" discretion to control Standard Oil's rate of production and the amount of oil produced. J.A. 50 (citation omitted). Defendants thus acted under close federal direction to produce critical wartime supplies.

*The Strategic Petroleum Reserve.* — The District argues that defendants' operations and leases at the Strategic Petroleum Reserve were merely "commercial relationships and agreements" that did not amount to "subjection, guidance, or control." Br. 42-43. But that argument ignores the actual facts. Among other obligations, defendants were directly subject to federal control insofar as they were obligated to pay royalties specifically in the form of oil to the federal government. *See* J.A. 56-58. Those royalties have contributed to the government's strategic stockpile—a crucial element of American energy security and treaty obligations. *Id.* By fulfilling that requirement, defendants functioned as private contractors helping "the [g]overnment to produce an item that it needs." *Baker* v. *Atlantic Richfield Co.*, 962 F.3d 937, 942 (7th Cir. 2020) (citation omitted). In addition, the leases between certain defendants and the federal government allowed defendants to use pipelines at the Strategic Petroleum Reserve under the condition that defendants would

22

draw down the reserve when the government required resources.  *See* J.A. 58-59.  The federal government has exercised that option on multiple occasions, including during Hurricane Katrina.  *See* J.A. 59.

The District nonetheless likens defendants' production of critical resources for the federal government to "a large retailer arguing it was 'acting under' federal authority when selling defective products because a strong economy is in the national interest." Br. 44.  That analogy is inapt.  Defendants produced critical resources for, and at the direction of, the federal government, which worked as intended and were critical to achieving the government's national-security needs.

2.    The District also contends (Br. 44-49) that defendants have not established the requisite connection between the challenged conduct and defendants' actions taken under federal direction.  But in 2011, Congress amended the text of the federal-officer removal statute to permit removal of lawsuits "for *or relating to*" a federally directed action.  Removal Clarification Act, Pub. L. No. 112-51, § 2(b)(1)(A), 125 Stat. 545 (emphasis added).  Several courts of appeals have held that the amended statutory language materially "broadened federal officer removal to actions, not just causally connected, but alternatively connected or associated, with acts under color of federal office." *Latiolais* v. *Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc); *see* Br. of Appellants 49 (collecting cases).  Defendants satisfy that relaxed standard

because the complaint alleges that defendants' promotion of fossil fuels increased the consumption that caused the alleged injuries here.  Contrary to the District's suggestions (Br. 46), the federal government need not dictate alleged misrepresentations for defendants' production to relate to the District's claims.  *See Baker*, 962 F.3d at 944-945.  Because greenhouse-gas emissions become "well mixed" and undifferentiated once emitted, *City of New York*, 993 F.3d at 92; *see* J.A. 99, the claims necessarily encompass the fossil fuels defendants produced under federal direction and control for decades.

The District seeks to distinguish (Br. 47) the Fourth Circuit's decision in *County Board of Arlington County* v. *Express Scripts Pharmacy, Inc.*, 996 F.3d 243 (2021), on the ground that the harms alleged in that case stemmed directly from prescriptions filled under the direction of the government.  But as here, the harm alleged there "necessarily include[d] activity that [was] directly connected to" a government contract.  *Id.* at 257.  The District seeks redress for the harms allegedly caused by defendants' production of fossil fuels, a significant portion of which were produced pursuant to closely regulated government contracts.  *See* J.A. 121-123.  As in *Express Scripts*, therefore, the harms alleged here "necessarily include[] activity that is directly connected" to defendants' productions for the federal government.  996 F.3d at 257.

The District also attempts to distinguish (Br. 48-49) the Seventh Circuit's decisions in *Baker*, *supra*, and *Ruppel* v. *CBS Corporation*, 701 F.3d 1176 (2012), but those attempts are similarly unavailing.  In *Baker*, the court unequivocally held that removal was proper when "at least some" of the harms alleged "arose from  .  .  .  federal acts," even when those acts were a "small, yet *significant*, portion of [the defendants'] relevant conduct."  962 F.3d at 945.  And in *Ruppel*, the Court held that removal was proper where a company "worked hand-in-hand with the government," like defendants and their predecessors did here.  701 F.3d at 1181.  Removal was therefore proper under the federal-officer removal statute.

### D. Removal Was Proper Because The District's Claims Arise Out Of Defendants' Operations On The Outer Continental Shelf

This case is also removable under the Outer Continental Shelf Lands Act (OCSLA).  *See* 43 U.S.C. § 1349(b).  The District does not dispute that defendants have explored for and recovered oil and gas on the Outer Continental Shelf for decades.  Nor can the District dispute that it seeks recovery for alleged climate-related harms.  Because the District's claimed climate-change injuries allegedly arise from fossil-fuel extraction and production—which occurs in part through defendants' substantial operations on the Outer Continental Shelf—jurisdiction lies under OCSLA.

The District contends (Br. 51) that defendants have failed to establish a sufficient causal connection between the District's claims and defendants' operations on the Outer Continental Shelf. But the required connection is not as stringent as the District suggests. OCSLA grants federal courts jurisdiction over all actions "arising out of, or in connection with," operations on the Shelf. 43 U.S.C. § 1349(b)(1). That language creates "broad" jurisdiction, *Baker* v. *Hercules Offshore, Inc.*, 713 F.3d 208, 213 (5th Cir. 2013)—a point the District does not dispute—and Congress "intended" for it to "extend[] to the entire range of legal disputes that it knew would arise relating to resource development" on the Shelf, *Laredo Offshore Constructors, Inc.* v. *Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985). Courts have exercised jurisdiction under OCSLA even where an operation on the Outer Continental Shelf is only indirectly related to a plaintiff's alleged harms occurring downstream from the operation. *See United Offshore Co.* v. *Southern Deepwater Pipeline Co.*, 899 F.2d 405, 407 (5th Cir. 1990); *Lopez* v. *McDermott, Inc.*, Civ. No. 17-8977, 2018 WL 525851, at *3 (E.D. La. Jan. 24, 2018).

The District also overlooks the Supreme Court's holding in an analogous context that the "requirement of a 'connection' between a plaintiff's suit and a defendant's activities" does not require a "causal showing," let alone but-for causation. *Ford Motor Co.* v. *Montana Eighth Judicial District Court*, 141 S. Ct. 1017, 1026 (2021). Here, where the statutory language is "arising out of,

*or in connection with*," 43 U.S.C. § 1349(b)(1) (emphasis added), the District's contrary view would render the "connection" prong superfluous.

In any event, the District's own allegations satisfy even a "but-for" standard. *See* Br. of Appellants 56-57. In substance, the District alleges that defendants' challenged statements and omissions are problematic precisely because they led to increased production—production that occurs in part on the Outer Continental Shelf, J.A. 62-63—which in turn is a "but for" cause of the District's climate-related injuries. While defendants dispute that contention, federal jurisdiction is present under that theory as alleged.

The District further contends (Br. 50-51) that jurisdiction does not lie under OCSLA because its claims are based on defendants' alleged misinformation campaign rather than its fossil-fuel production, and thus did not involve "operations" under OCSLA. But the sweeping relief requested by the District belies that characterization. Despite the District's attempt to artfully plead around federal jurisdiction, the District's injuries, as alleged, necessarily arise from the total, undifferentiated accumulation of all greenhouse-gas emissions, including those created from the combustion of fossil fuels produced from the Outer Continental Shelf. *See* Br. of Appellants 13-14. There is no avoiding that fact.

Finally, the District argues (Br. 53-54) that it is "speculative" whether the remedies it seeks would "alter[] the progress of production activities" on

the Outer Continental Shelf and thus "threaten[] to impair the total recovery of the federally[] owned minerals from the reservoir or reservoirs underlying" the Shelf. *Amoco Production Co.* v. *Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988). But common sense and basic economics dictate that imposing such penalties—whether labeled as damages or restitution—would affect the recovery of fossil fuels from the Shelf. *See City of New York*, 993 F.3d at 92-93. The District does not deny that it is seeking to impose massive penalties on defendants for their promotion and sale of fossil-fuel products. In fact, the whole point of this lawsuit and similar ones is to discourage the development of fossil fuels. *See* Br. of Appellants 24. Removal was therefore proper under OCSLA.

# CONCLUSION

The remand order of the district court should be vacated and the case remanded for further proceedings.

Respectfully submitted,

/s/ Theodore J. Boutrous, Jr.

THEODORE J. BOUTROUS, JR.
GIBSON, DUNN & CRUTCHER LLP
  333 South Grand Avenue
  Los Angeles, CA 90071

THOMAS G. HUNGAR
GIBSON, DUNN & CRUTCHER LLP
  1050 Connecticut Avenue, N.W.
  Washington, DC 20036

Counsel for Defendants-Appellants
Chevron Corporation
and Chevron U.S.A., Inc.

/s/ David C. Frederick

DAVID C. FREDERICK
GRACE W. KNOFCZYNSKI
DANIEL S. SEVERSON
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
  1615 M Street, N.W., Suite 400
  Washington, DC 20036

Counsel for Defendants-Appellants
Shell plc and Shell USA, Inc.

APRIL 17, 2023

/s/ Kannon K. Shanmugam

KANNON K. SHANMUGAM
JUSTIN ANDERSON
KYLE SMITH
WILLIAM T. MARKS
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  2001 K Street, N.W.
  Washington, DC 20006
  (202) 223-7300
  kshanmugam@paulweiss.com

THEODORE V. WELLS, JR.
DANIEL J. TOAL
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  1285 Avenue of the Americas
  New York, NY 10019

Counsel for Defendants-Appellants
Exxon Mobil Corporation
and ExxonMobil Oil Corporation

29

/s/ James W. Cooper
JAMES W. COOPER
ETHAN SHENKMAN
ARNOLD & PORTER
  KAYE SCHOLER LLP
  *601 Massachusetts Avenue, N.W.*
  *Washington, DC 20001*

NANCY G. MILBURN
DIANA E. REITER
ARNOLD & PORTER
  KAYE SCHOLER LLP
  *250 West 55th Street*
  *New York, NY 10019*

JOHN D. LOMBARDO
ARNOLD & PORTER
  KAYE SCHOLER LLP
  *777 South Figueroa Street,*
  *44th Floor*
  *Los Angeles, CA 90017*

JONATHAN W. HUGHES
ARNOLD & PORTER
  KAYE SCHOLER LLP
  *3 Embarcadero Center,*
  *10th Floor*
  *San Francisco, CA 94111*

*Counsel for Defendants-Appellants*
*BP p.l.c. and BP America Inc.*

## CERTIFICATE OF COMPLIANCE

I, Kannon K. Shanmugam, counsel for appellants Exxon Mobil Corporation and ExxonMobil Oil Corporation and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g), that the foregoing Reply Brief of Appellants is proportionately spaced, has a typeface of 14 points or more, and contains 6,418 words. I further certify that the other signatories to this brief consented to my use of their electronic signature.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

APRIL 17, 2023